UNITED STATES, Appellee

v.

Hasan K. AKBAR, Sergeant
U.S. Army, Appellant

No. 13-7001

Crim. App. No. 20050514

United States Court of Appeals for the Armed Forces

Argued November 18, 2014

Decided August 19, 2015

OHLSON, J., delivered the opinion of the Court, in which STUCKY
and RYAN, JJ., joined. BAKER, J., filed a separate dissenting
opinion, in which ERDMANN, C.J., joined.

Counsel

For Appellant: Lieutenant Colonel Jonathan F. Potter and Major
Aaron R. Inkenbrandt (argued); Colonel Kevin Boyle and Major
Jacob D. Bashore (on brief).

For Appellee: Major Kenneth W. Borgnino and Captain Janae M.
Lepir (argued); Colonel John P. Carrell, Lieutenant Colonel
James L. Varley, and Captain Carrie L. Ward (on brief); Captain
Chad M. Fisher.

Amicus Curiae for Appellant: Andrea D. Lyon, Esq. -- for
National Association of Criminal Defense Lawyers (on brief).

Military Judges: Dan Trimble, Patrick J. Parrish, and Stephen
R. Henley


**This opinion is subject to editorial revision before final publication.**

United States v. Akbar, No. 13-7001/AR

Judge OHLSON delivered the opinion of the Court.

Contrary to his pleas, a panel of officer and enlisted court-martial members convicted Appellant of attempted murder (three specifications) and premeditated murder (two specifications), in violation of Articles 80 and 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 918 (2000). The fifteen-member panel sentenced Appellant to death. The convening authority approved the adjudged sentence, and the United States Army Court of Criminal Appeals (CCA) affirmed the findings and sentence. United States v. Akbar, No. ARMY 20050514, 2012 CCA LEXIS 247, at *102, 2012 WL 2887230, at *32 (A. Ct. Crim. App. July 13, 2012) (unpublished). Appellant's case is now before us for mandatory review under Article 67(a)(1), UCMJ, 10 U.S.C. § 867(a)(1) (2012).

## Overview of the Case

The evidence adduced at trial showed that on the night of March 22, 2003, as American armed forces were preparing to launch Operation Iraqi Freedom from their staging area in Kuwait, Appellant threw grenades into three of the tents of his fellow servicemembers and opened fire with his M-4 rifle, killing two military officers and wounding fourteen others. The ensuing investigation revealed that Appellant previously had written in his diary of his intent to "kill as many of [his

2

fellow servicemembers] as possible" as soon as he arrived in Iraq.

Although Appellant raises a number of issues for review, the gravamen of his appeal focuses on whether his attorneys provided ineffective assistance of counsel. The Supreme Court has set a high bar for an appellant to prevail on such a claim. Specifically, the seminal case of Strickland v. Washington, 466 U.S. 668 (1984), requires an appellant to show that: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) the counsel's deficient performance gives rise to a "reasonable probability" that the result of the proceeding would have been different without counsel's unprofessional errors. Id. at 688, 694. Upon analyzing both the law and the facts in this case, we conclude that Appellant has failed to meet either of these requirements established by the Supreme Court.

In regard to the first prong of Strickland, we first note that Appellant was represented by two experienced military attorneys who devoted more than two years to preparing and presenting the defense in this case. With the benefit of appellate hindsight, we could dissect every move of these trial defense counsel and then impose our own views on how they could have handled certain matters differently and, perhaps, better. However, that is not the standard of review we are obligated to

apply. Rather, based on long-standing precedent from the Supreme Court, we are required to be "highly deferential" in our review of counsel's performance, and we must presume that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689, 690. We also are constrained by the principle that strategic choices made by trial defense counsel are "virtually unchallengeable" after thorough investigation of the law and the facts relevant to the plausible options. Id. at 690-91.

Concerning this last point, we are particularly mindful that many of the steps that were taken -- or not taken -- by trial defense counsel in the instant case, and that are now under scrutiny in this appeal, were the result of trial defense counsels' strategic decision to conduct the case in a manner that avoided introduction of additional damaging information about Appellant. Specifically, trial defense counsel successfully sought to shield from the court-martial panel details about Appellant's alleged stabbing of a military police officer (MP), just days before Appellant's court-martial began. We conclude that trial defense counsel reasonably believed that the admission of such evidence would have seriously undermined their ability to convince the panel members during sentencing that Appellant had rehabilitative potential, and thus should not be sentenced to death. For this and other reasons discussed in

4

greater detail below, we conclude that the performance of trial defense counsel was not "measurably below the performance standards ordinarily expected of fallible lawyers." United States v. Davis, 60 M.J. 469, 474 (C.A.A.F. 2005).

In regard to the second prong of the ineffective assistance of counsel test, several reasons convince us that there was no reasonable probability that the panel members would have acquitted Appellant or sentenced Appellant to something less than the death penalty had trial defense counsel presented their case in the manner now urged on appeal. First, Appellant's murder of Army Captain (CPT) Christopher Seifert and Air Force Major (MAJ) Gregory L. Stone, and his attempted murder of other officers of the United States armed forces, was premeditated. Second, prior to committing this offense, Appellant had written incriminating passages in his diary, such as: "I may have to make a choice very soon about who to kill. . . . I will have to decide if I should kill my Muslim brothers fighting for Saddam Hussein or my battle buddies"; and, "I am not going to do anything about it as long as I stay here. But as soon as I am in Iraq I am going to kill as many of [my fellow servicemembers] as possible." Third, Appellant committed this attack in Kuwait at the start of Operation Iraqi Freedom in an effort to hobble the American military's ability to prevail in battle. Fourth, Appellant was thirty-one years old at the time he committed the

5

offenses, had served in the United States Army for just under five years, and had attained the rank of sergeant. Fifth, both the sanity board and many of Appellant's own experts concluded that Appellant was not suffering from a severe mental disease or defect at the time he committed the offense or at the time of testing. Sixth, Appellant was not intellectually deficient, as demonstrated by his engineering degree from a well-known university and his "extremely high, superior IQ." And finally, even assuming that all of the information now provided by appellate defense counsel is true, we conclude that Appellant's additional mitigation evidence is not sufficiently compelling to establish a substantial likelihood that the court-martial panel would have imposed a different sentence. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410 (2011); see also United States v. Kreutzer, 61 M.J. 293, 300 (C.A.A.F. 2005) (noting that "overwhelming evidence of guilt may present an insurmountable obstacle to an appellant claiming prejudice from ineffective assistance of counsel"). Based on these factors and others discussed below, we conclude that if there ever was a case where a military court-martial panel would impose the death penalty, this was it.

Since Appellant can establish neither deficient performance nor prejudice, we conclude that Appellant cannot prevail on his claims of ineffective assistance of counsel. We further

conclude that Appellant's other assignments of error are similarly without merit.  Accordingly, we affirm the lower court's decision.

## I.  Facts

### A.  The Offenses

In March 2003, soldiers from the 1st Brigade, 101st Airborne Division, were stationed at Camp Pennsylvania, Kuwait, preparing to begin Operation Iraqi Freedom.  On the night of March 22, Appellant was guarding grenades with another soldier. When Appellant was left alone, he stole seven grenades:  four M-67 fragmentation grenades and three M-14 incendiary grenades. The brigade was scheduled to cross the border from Kuwait into Iraq in the next few days.

Before movement and while most of the brigade slept, Appellant took a fellow soldier's body armor and then walked to the tents of the brigade officers.  He shut off the generator for the outdoor lighting to the tent area, plunging it into darkness.  Appellant then threw one incendiary and one fragmentation grenade into Tent 1, where the brigade commander (Colonel (COL) Frederick Hodges), brigade executive officer (MAJ Ken Romaine), and brigade sergeant major (Command Sergeant Major (CSM) Bart Womack) were sleeping.  When MAJ Romaine emerged from the tent, Appellant shot him, severely injuring, but not killing, him.

Appellant then moved to Tent 2 where several officers and two interpreters were sleeping and threw two fragmentation grenades into the tent. Many of the officers were injured from the shrapnel, and MAJ Gregory Stone was killed from eighty-three shrapnel wounds.

Appellant finally moved to Tent 3, which housed sixteen officers, and threw a fragmentation grenade into the tent, which injured multiple officers. When CPT Christopher Seifert exited the tent, Appellant shot him in the back at close range, causing CPT Seifert to bleed to death.

In the midst of the military's response to the attacks, the brigade S-2, MAJ Kyle Warren, learned from COL Hodges that Appellant may have attacked Camp Pennsylvania. MAJ Warren found Appellant and tackled him to the ground. When MAJ Warren asked Appellant if he had attacked the tents, Appellant responded, "Yes."

At the time of apprehension, Appellant was in possession of one fragmentation grenade and two incendiary grenades along with three empty incendiary grenade canisters. His weapon, an M-4 rifle, had been recently fired. Ballistics testing matched the bullets from Appellant's firearm with those that had wounded MAJ Romaine and killed CPT Seifert. Appellant also had M-14 and M-67 grenade residue on his uniform and hands. His fingerprints were on the switch to shut off the generator.

                    B.   The Trial Defense Team

Following the March 2003 Camp Pennsylvania attack, Appellant was initially represented by MAJ Daniel Brookhart, CPT David Coombs, CPT Jackie Thompson, and Lieutenant Colonel (LTC) Victor Hansen.  Of these counsel, LTC Hansen was the most experienced because he had served as a trial counsel, senior trial counsel, and chief of military justice, as well as a professor of criminal law at what is now known as the Army Judge Advocate General's Legal Center and School (LCS).  He also had served as the lead trial counsel for a fact-finding hearing in a capital case, United States v. Murphy.  Given this experience, LTC Hansen served as lead counsel.

Although LTC Hansen had the most capital experience among the group, the other counsel were also well-qualified judge advocates.  Because Appellant's claims of ineffective assistance of counsel mostly concern MAJ Brookhart and CPT Coombs, we describe their qualifications in some detail.

MAJ Brookhart had served as a judge advocate for approximately eleven years before the pretrial hearings began for Appellant's court-martial.  He had earned a master of laws in military law from the LCS with a specialty in criminal law. MAJ Brookhart had tried seventy-five cases as trial counsel or senior defense counsel, including fifteen contested trials involving serious offenses.  He had dealt with expert witnesses,

including mental health experts.  He had been a government appellate counsel for a year, during which time he attended the capital litigation course held by the Naval Justice School.  He took this course so that he could handle the capital case of United States v. Kreutzer.  He also had participated in the trial counsel assistance program which provided him with litigation training.  Additionally, MAJ Brookhart had served as branch chief at the government appellate division where he participated in strategy sessions for the Murphy capital case, and reviewed and edited the brief in the Kreutzer capital case.  MAJ Brookhart had argued seven cases before this Court and seven cases at the CCA.

CPT Coombs had served as a judge advocate for approximately seven years before his appearance as counsel at Appellant's pretrial hearing.  During this time, CPT Coombs had served for more than two years as a trial counsel and for nearly four years as a defense counsel.  CPT Coombs had tried seventy-eight cases, fifteen of which were contested.  He had worked with expert witnesses, including forensic psychiatrists.  CPT Coombs also had attended a week-long death penalty course in September 2003.  In preparation for Appellant's case, both counsel consulted capital resources to include motions in other capital cases, law review articles, and materials from a capital litigation course.

In addition to these two attorneys, the trial defense team also included a forensic psychiatrist, Dr. Walker, and a neuropsychologist, Dr. Clement, who both started working on the case in May 2003. Dr. Walker was used to assist the defense in understanding Appellant's mental status at the time of the crime and the trial, to help prepare a sentencing case, and to observe the Rule for Courts-Martial (R.C.M.) 706 board. Dr. Clement conducted neuropsychological tests on Appellant for the benefit of other defense experts. A forensic DNA expert joined the defense team in June 2003 to observe Government testing of key evidence.

Initially the attorney workload was divided as follows. MAJ Brookhart focused on findings issues, CPT Coombs took the lead on motions, CPT Thompson contacted potential witnesses while deployed in Iraq, and LTC Hansen worked mitigation issues. The strategy was to use the services of a mitigation specialist, Ms. Deborah Grey, early in the process in order to uncover and develop information that could be used to avoid a capital referral and to submit an offer to plead guilty. LTC Hansen advised Appellant that an offer to plead guilty would be the best way to avoid a capital referral. On two occasions, Appellant agreed to this strategy, but he ultimately changed his mind.

In furtherance of the mitigation strategy, Ms. Grey began her work in August 2003 and was authorized to perform 400 hours of mitigation work. LTC Hansen and Ms. Grey traveled to Appellant's childhood neighborhoods where they interviewed friends, family members, and associates, including Appellant's childhood imam, Appellant's brother, high school teachers and administrators, and college professors and administrators. Ms. Grey provided the defense team with detailed written summaries of these interviews and also collected school, medical, employment, military, and other official records.

Appellant's mother, whom counsel described as having an emotional and mental influence over Appellant, did not agree with LTC Hansen's strategies or the mitigation efforts. In December 2003, Appellant's mother sent a letter to MAJ Brookhart, informing him that she had asked her son to fire LTC Hansen and CPT Thompson because she did not trust them, in large part because they were encouraging Appellant to plead guilty. As a result, at his mother's behest, Appellant released LTC Hansen, the defense's most experienced capital litigator, as well as CPT Thompson, in January 2004.

To replace the dismissed military counsel, Appellant, with his mother's encouragement, retained as lead counsel two civilian attorneys, Mr. Musa Dan-Fodio and Mr. Wazir Ali-Muhammad Al-Haqq, at different times in the pretrial

proceedings.  Neither attorney had capital litigation experience nor military justice experience.  As the first civilian lead counsel, Mr. Dan-Fodio changed trial strategy to try to get Appellant's case transferred to the United Nations Human Rights Commission or another international forum or, alternatively, to focus on self-defense, defense-of-others, duress, and Appellant's innocence.

Mr. Dan-Fodio subsequently withdrew from the case and was replaced by Mr. Al-Haqq in the spring of 2004.  This left Appellant with three counsel -- Mr. Al-Haqq, MAJ Brookhart, and CPT Coombs.  Mr. Al-Haqq became lead counsel and focused on an insanity defense.  For this purpose, in June 2004, the defense team retained Dr. George Woods Jr., a neuropsychiatrist and forensic psychiatry expert.  By this point, the defense team also had obtained the assistance of a ballistics and gunshot powder residue expert, a certified latent print examiner, and a pathologist to review physical and scientific evidence.

Around the time Appellant retained Mr. Al-Haqq as lead counsel, Ms. Grey was informed in early May 2004 that her services as a mitigation specialist were no longer needed because Appellant's mother refused to permit Ms. Grey to interview her or anyone else in her family.  At the time of her withdrawal, Ms. Grey estimated that approximately 200 hours would be needed to complete the mitigation case.

In August 2004, Mrs. Scharlette Holdman replaced Ms. Grey as the defense team's mitigation specialist, and she was authorized to conduct seventy-five hours of interviews of Appellant's family members. When Mrs. Holdman withdrew for medical reasons, Ms. Scarlet Nerad replaced her in September 2004. The Government authorized Ms. Nerad to conduct 368 hours of mitigation investigation and 198 hours of base-level investigation. Ms. Nerad interviewed Appellant, his father, mother, sisters, brother, half-brother, grandfather, aunts, uncles, and cousins. She also collected thousands of pages of documents, including court records, medical records of Appellant and his relatives, and education records of Appellant's siblings.

When Mr. Al-Haqq stopped receiving payments from Appellant, he ceased working on the case in August 2004. He informed counsel he was withdrawing in late February 2005, but military counsel had anticipated this announcement and had worked to prepare Appellant's case for trial accordingly. MAJ Brookhart and CPT Coombs were now left as Appellant's trial defense counsel. By the start of the court-martial, the defense team already had managed to file nearly sixty motions on multiple topics, including many of the issues raised in this appeal.

## C.  Trial Proceedings

Following numerous continuances, Appellant's trial was scheduled to begin on April 6, 2005, 744 days after Appellant's attack on Camp Pennsylvania.  However, on March 30, 2005, Appellant allegedly found a pair of scissors in the office of the staff judge advocate and used them to stab an MP in the neck.  Appellant also allegedly tried to seize the MP's firearm before being subdued by another MP.[1]  Following the incident, the military judge, upon trial defense counsels' motions, reopened the R.C.M. 706 sanity board and preliminarily prevented the Government from referencing the stabbing incident.  The sanity board deemed Appellant competent to stand trial.

Following the alleged scissors attack, trial defense counsel did not seek a delay in the start of the trial in a successful effort to preclude the Government from having the opportunity to refer additional charges against Appellant.  Thus, trial proceedings began, as scheduled, on April 6, 2005.  Twenty members were detailed to the venire pool.  Following two days of voir dire, a fifteen-member panel consisting of nine officers and six enlisted soldiers was selected after the defense successfully challenged one member for cause and the

---

[1] Appellant was not charged in the stabbing incident.  Also, as discussed below, Appellant's counsel successfully prevented the panel from considering this incident during the sentencing phase of Appellant's trial.

15

Government successfully challenged three members for cause and used one peremptory challenge.

The Government's case on the merits lasted four days and involved forty witnesses who mostly testified about the Camp Pennsylvania attack on March 22, 2003. When witnesses had information about Appellant, trial defense counsel cross-examined them, eliciting information about Appellant's unfocused state in the period leading up to the attack, his daydreaming, his sleep problems and tendency to fall asleep at inappropriate times, his long periods of silence, his laughing and smiling without reason, and his tendencies to pace and talk to himself. Trial defense counsel also elicited through cross-examination that Appellant had heard servicemembers joking about and using derogatory terms for Muslims.

Besides witness testimony, the Government's case involved admission of these entries from Appellant's diary:

> I may have not killed any Muslims, but being in the Army is the same thing. I may have to make a choice very soon about who to kill.

> I will have to decide if I should kill my Muslim brothers, fighting for Saddam Hussein, or my battle buddies.

> I'm hoping to get into a position so I don't have to take any crap from anyone anymore.

For the defense case on the merits, counsels' strategy was two-fold: (1) to present evidence establishing diminished mental capacity so as to raise doubt about Appellant's ability

16

to premeditate; and (2) to "frontload" mitigation evidence during the merits stage of the trial. As part of this strategy, trial defense counsel elicited testimony from nine defense witnesses.

Dr. Fred Tuton was a clinical psychologist who had examined Appellant at the age of fourteen after allegations surfaced about Appellant's sister being sexually abused by Appellant's stepfather. Dr. Tuton testified that Appellant displayed no normal emotions during the meeting and reported having sleep problems and not being able to trust people. Dr. Tuton diagnosed Appellant with an adjustment disorder with depressed mood associated with a mixed specific developmental disorder.

Mr. Paul Tupaz, Appellant's college roommate, testified about his friendship with Appellant which lasted until 1994. According to Mr. Tupaz, Appellant had difficulty sticking to his plans, was not very social and spent time by himself, "paced a lot," talked to himself, and had difficulty sleeping.

Members of Appellant's unit and unit leadership testified about Appellant's poor work performance, his isolation from others, his pacing and talking to himself, his sleeping difficulties, and his laughing and smiling at inappropriate times. One servicemember testified about military personnel using derogatory names regarding Muslims in Appellant's presence.

The testimony of Dr. Woods, Appellant's expert in forensic psychiatry, revealed a family history of mental illness, particularly a maternal uncle with psychiatric problems, a father with depression, and a half-brother with paranoia.  Dr. Woods explained that Appellant had come from an "extremely poverty-stricken home" and had an "extraordinarily abusive" stepfather.  Additionally, he noted that Appellant's mother had been homeless.  Dr. Woods reported that test scores revealed Appellant to be suffering from depression, paranoia, impulsivity, sleep problems, and bizarre thinking, which Dr. Woods believed was corroborated by Appellant's diary entries and academic history.  Dr. Woods further testified that Appellant had difficulty picking up social cues, perceiving situations, and differentiating reality.

Although Dr. Woods could not provide a definitive diagnosis, he provided three "differential"[2] diagnoses: (1) schizotypal disorder; (2) schizophrenia paranoid type; and (3) schizoaffective disorder.  Dr. Woods believed that Appellant's symptoms affected him on March 22, 2003, by causing him to be overwhelmed emotionally and preventing him from thinking clearly.

---

[2] According to Dr. Woods, a differential diagnosis is based upon an individual's symptoms and provides the possible disorders that would be consistent with the symptoms.

In closing argument, trial defense counsel argued that the evidence showed that Appellant had a mental illness at the time the attack occurred, and that the Government had therefore failed to meet its burden of proving premeditation.  Counsel explained that Appellant's mental illness caused him to become emotionally charged, which in turn led Appellant to react out of confusion and fear.  Throughout the closing, counsel argued that Appellant's actions did not represent "good planning," "just confusion."

Despite the defense case and counsel's closing argument, the panel members returned a guilty verdict on the premeditated murder and attempted murder charges.  The case then moved to the sentencing phase.

The Government's presentencing case lasted one-and-a-half days and included the testimony of twenty-one witnesses.  COL Hodges, the brigade commander, testified about the impact of the attack on the brigade's battle readiness.  In response to a question about the psychological impact of Appellant's attack, COL Hodges stated that he "hated" that a "fragging had occurred" in his unit, noting that in reflecting on the "worst days for the United States Army, at the end of Vietnam, the two things that [came] to mind [were] heavy drug use and fraggings."[3]

---

[3] A fragging is an incident in which an individual "deliberately injure[s] or kill[s] (one's military leader) by means of a fragmentation grenade."  Merriam-Webster Unabridged Online

Other servicemember victims testified about the impact of their injuries, the psychological impact of the attack, the impact on their military careers, their memories of the deceased victims, and their reactions upon learning that the attacks were by a fellow servicemember.  As to this last point, the servicemember victims testified about feeling "disbelief," "distrust," "shock[]," "betrayed," "[e]xtremely frustrated, angry," "pissed," and "confused."

Colleagues of the victims also testified about feeling "anger," "disbelief," and "betrayal" upon learning another servicemember was responsible.  Finally, the deceased victims' family members and friends testified about the impact of losing CPT Seifert and MAJ Stone.

Prior to the start of Appellant's presentencing case, the defense admitted a binder containing fifteen exhibits: (1) Appellant's entire diary (313 pages); (2) the FBI's written synopsis of the diary (nine pages); (3) Ms. Grey's mitigation report showing Appellant's family tree, Appellant's personal history, and a summary of Appellant's diary (thirty-three pages); (4) government records reflecting Appellant's family's use of food stamps from 1986-1994 (nineteen pages); (5) the search and seizure authorization for Appellant's military e-mail

---

Dictionary, http://unabridged.merriam-webster.com/unabridged/fragging (last visited Aug. 14, 2015).

account (one page); (6) definitions of relevant Islamic terms (eight pages); (7) Appellant's paperwork for his name change (four pages);[4] (8) Ms. Grey's interview notes from a high school guidance counselor (one page); (9) Ms. Grey's interview notes from a high school teacher (two pages); (10) Ms. Grey's interview notes from the high school college advisor and photographs of the high school (six pages); (11) another mitigation specialist's interview notes with the ex-wife of Appellant's college roommate (two pages); (12) a memorandum from a servicemember in Appellant's platoon (three pages); (13) a memorandum of the equal opportunity advisor for the brigade (four pages); (14) Ms. Grey's interview notes with Appellant's childhood imam and three photographs of Appellant's childhood mosque (six pages); and (15) the criminal records for Appellant's stepfather (four pages).

Before providing each member with a binder, the military judge instructed the members that once the trial recessed for the day, they would be provided defense exhibits to read at home or work. The military judge added that the members were not to conduct independent research, discuss the exhibits with anyone, or copy the exhibits.

---

[4] Appellant's birth name was Mark Fidel Kools. His parents became members of the Nation of Islam, and Appellant's name was changed to Hasan Karim Akbar when Appellant was eight years old. Appellant enlisted in the Army under his birth name. However,

The following morning, the defense presented its case in mitigation. The defense presented testimony from CPT David Storch (one of Appellant's former platoon leaders), SFC Daniel Kumm (the platoon sergeant for 2nd Platoon), and Mr. Dan Duncan (Appellant's high school physics teacher). CPT Storch testified about Appellant's termination from his platoon and Appellant's problems as a noncommissioned officer (NCO), including difficulties relating well with soldiers, needing detailed guidance to perform tasks, and performing in an increasingly unsatisfactory manner over time. SFC Kumm testified about Appellant being a "below average" NCO, being a soldier he did not want to take to Iraq, and being assigned the task of guarding grenades on March 22, 2003, at Camp Pennsylvania in Kuwait. Mr. Duncan testified about the "very poor, low socioeconomic, high crime," and gang-ridden area where Appellant's high school was located. He described Appellant as an "excellent student" who was memorable for trying to learn material and being in "the top 5 to 10" students whom Mr. Duncan had ever taught at the high school. Mr. Duncan described Appellant as living in "a drab apartment building in a rather depressed area." After Mr. Duncan's testimony, the military judge recessed for the day "because of some witness travel

---

he petitioned to change his name to Hasan Akbar in June 2001, and the Army finalized the name change in September 2001.

schedules," and for a second day he permitted the members to take the defense-created binders home with them.

On the final morning of the defense's presentencing case, the defense offered into evidence and distributed to the members copies of two statements:  one from Ms. Regina Weatherford, Appellant's former high school classmate, and one from Appellant's brother.  Ms. Weatherford's statement described Appellant's academic success in high school and his tendency to sit by himself during high school.  The brother's statement described how Appellant helped raise him, how Appellant financially helped the family, and how Appellant had trouble falling in love too quickly with women.  Defense counsel agreed with the military judge that they had decided for "sound tactical reasons" not to call Ms. Weatherford or Appellant's parents to testify.

The final piece of Appellant's sentencing case was his unsworn statement before the members of the court-martial panel. Appellant took the stand and explained that he had decided not to read the six-page statement that he previously had prepared because he felt that it sounded "like an excuse."  Instead, he said, "I want to apologize for the attack that occurred.  I felt that my life was in jeopardy, and I had no other options.  I also want to ask you to forgive me."

During trial defense counsel's sentencing argument, counsel emphasized that the Government's argument was "based upon emotion," and that emotion should not be used when deciding whether to impose the death penalty.  He argued for life without parole "based upon logic and reason."  Counsel cited Appellant's mental illness, noting that the diary provided "a unique look into [Appellant's] mind."  Counsel also cited Appellant's sleep problems as negatively affecting his ability to think.  Counsel further noted the command's responsibility, as part of a "band of brothers," to ensure poor performers or those with mental illness did not deploy and did not remain as members of the Army.  Counsel then cited Appellant's difficult upbringing and school environment.  Counsel ultimately returned to and emphasized Appellant's mental illness as the cause of the lethal events at Camp Pennsylvania.

The military judge provided the panel members with instructions on the procedures that must be used during deliberations in capital cases.  Specifically, the military judge instructed the members that in order for them to impose the death penalty:  (1) they had to unanimously find beyond a reasonable doubt that an aggravating factor existed; (2) they had to unanimously find that the extenuating and mitigating factors were "substantially outweighed" by the aggravating circumstances; and (3) they had to reach the decision to impose

death unanimously based on each member's individual decision. The military judge listed thirty-one mitigating factors but explained that they were not the exclusive factors that the members could consider. Trial defense counsel explicitly stated that he did not object to these instructions.

The members then began their deliberations. Approximately six hours later, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839 (2012), hearing to discuss this note from the members: "Sir, reconsideration has been proposed." The military judge proposed to the parties that he use reconsideration instruction 2-7-19 from the Military Judges' Benchbook (Benchbook), and the parties agreed.[5] Appellant never raised an objection to the instruction. Following additional

_____

[5] The reconsideration instruction explained the process for the members to revote after reaching a sentence if a member proposed reconsideration, noting that the process was different depending on whether the proposal to reconsider related to increasing or decreasing the sentence. The instruction outlined the following process for determining whether the panel could reconsider and revote the sentence: (1) if the proposal was to increase the sentence, a majority of members had to vote by secret ballot in favor of reconsideration; (2) if the proposal was to decrease the sentence, one-fourth of the members had to vote in favor of reconsideration with a view to decrease the sentence; and (3) if the sentence reached was death, only one member vote was required to reconsider the sentence. If the required votes were not obtained for reconsideration, the instruction informed the members that they were to announce the original sentence without indicating whether it was the original or reconsidered sentence. But, if a sufficient number of votes were obtained for reconsideration, the instruction required the members to adhere to the military judge's original instructions for proposing and determining an appropriate sentence.

deliberations, the president of the panel announced that the members had unanimously determined that an aggravating factor had been proven beyond a reasonable doubt, and that the matters in mitigation and extenuation were "substantially outweighed" by the aggravating circumstances. The president then announced that the members had voted unanimously that Appellant should be "put to death."

## II. Analysis

Appellant's counsel has assigned a total of fifty-nine issues for this Court to consider. Appellant also has personally presented a number of additional matters for us to consider pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A. 1982).[6] After careful review, we conclude that a majority of the assigned issues and all of the personally asserted issues do not have merit and therefore warrant no additional discussion. However, we deem it appropriate to address below twenty-one assigned matters, starting with Appellant's ineffective assistance of counsel claims.

### A. Ineffective Assistance of Counsel

Appellant challenges the effectiveness of trial defense counsels' performance at all stages of the pretrial and trial

---

[6] The assigned issues and personally asserted Grostefon issues, which we permitted Appellant to submit out of time, United States v. Akbar, 73 M.J. 242 (C.A.A.F. 2014) (order), are listed in the Appendix to this decision.

proceedings.[7]  We review these ineffective assistance of counsel claims de novo.  See United States v. Datavs, 71 M.J. 420, 424 (C.A.A.F. 2012).  To prevail, Appellant "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  An attorney is deficient when his representation falls "below an objective standard of reasonableness."  Id.

We do not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine "whether counsel made an objectively reasonable choice in strategy" from the available alternatives.  United States v. Dewrell, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting United States v. Hughes, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)).  Similarly, we must remain mindful that counsel have "wide latitude . . . in making tactical decisions."  Pinholster, 131 S. Ct. at 1406 (quoting Strickland, 466 U.S. at 689).  Thus, our scrutiny of a trial defense counsel's performance is "highly deferential," and we make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

---

[7] Such challenges have become the norm in death penalty appeals in both the civilian and military criminal justice systems.  See David D. Velloney, Balancing the Scales of Justice:  Expanding Access to Mitigation Specialists in Military Death Penalty Cases, 170 Mil. L. Rev. 1, 18 & n.81 (2001).  The vast majority of ineffective assistance of counsel claims are unsuccessful. See Anne M. Voigts, Note, Narrowing the Eye of the Needle: Procedural Default, Habeas Reform, and Claims of Ineffective Assistance of Counsel, 99 Colum. L. Rev. 1103, 1118 (1999).

challenged conduct, and to evaluate conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.

An appellant is prejudiced by counsel's deficient performance where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  In the capital sentencing context, we "reweigh the evidence in aggravation against the totality of available mitigating evidence" to determine if there is a reasonable probability that the panel would have returned a different sentence.  Wiggins, 539 U.S. at 534.

For ease of analysis, our discussion of Appellant's ineffective assistance of counsel claims in the instant case is divided into four categories:  (1) pretrial preparation; (2) merits phase performance; (3) penalty phase performance; and (4) cumulative error.  As we explain in detail below, we conclude that none of these claims merits relief.

1. Pretrial Preparation

a.  Investigation

Trial defense counsel have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

691. "[S]trategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690. In considering whether an investigation was thorough, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 (1984)). The Supreme Court has "rejected the notion that the same [type and breadth of] investigation will be required in every case." Pinholster, 131 S. Ct. at 1406-07 (citing Strickland, 466 U.S. at 691).

i. Pretrial Interviews

A. Testifying Witnesses

Appellant claims that trial defense counsel failed to adequately interview and prepare two witnesses who testified at trial -- Mr. Tupaz, Appellant's college roommate, who testified during the merits phase, and Mr. Duncan, Appellant's high school physics teacher, who testified during presentencing. Neither argument is persuasive.

The record reflects that trial defense counsel contacted Mr. Tupaz in the month prior to trial. In a post-trial affidavit, trial defense counsel reported interviewing Mr. Tupaz over the telephone and reviewing draft questions for trial preparation. In his post-trial declaration, Mr. Tupaz did not "remember talking to any defense attorneys prior to showing up"

29

for the trial at which time Mr. Tupaz recalled speaking to trial defense counsel.  We conclude that Mr. Tupaz's inability to remember talking to trial defense counsel is "too equivocal and ambiguous to overcome the presumption that [Appellant's] counsel were competent."  United States v. Key, 57 M.J. 246, 249 (C.A.A.F. 2002).  Even assuming trial defense counsel did not interview Mr. Tupaz, counsel's questioning of Mr. Tupaz during trial demonstrated that counsel was adequately prepared for his testimony.  Therefore, it cannot be said that counsels' performance was deficient in this regard.

Appellant now claims that Mr. Tupaz should have been asked to testify about the likelihood that Appellant took inappropriate comments made by members of the military about Muslims both very literally and personally.  However, this proffered testimony was cumulative of Dr. Woods's testimony on the same topic, and thus it would not have made Mr. Tupaz's testimony more compelling in scope or degree.

As for Mr. Duncan, we accept Appellant's claim that he was not interviewed by defense counsel prior to trial.  However, we note that trial defense counsel possessed the mitigation specialist's report about her own interview of Mr. Duncan, which included facts and observations proffered by Mr. Duncan in regard to Appellant's high school experiences.  Further, trial defense counsel were able to elicit testimony from Mr. Duncan

30

that Appellant's high school was in a poor and dangerous neighborhood, Appellant was "an excellent student," and Appellant lived in a "depressed area."  Mr. Duncan's post-trial declaration contains no additional substantive information that he would have provided had counsel interviewed him prior to his testimony.  Therefore, Appellant has not established a reasonable probability of a different sentence based on counsels' failure to interview Mr. Duncan.  We therefore reject Appellant's ineffective assistance of counsel claims with respect to Mr. Tupaz's and Mr. Duncan's testimony.

## B.  Nontestifying Lay Witnesses

In the course of his ineffective assistance of counsel claims, Appellant complains that counsel failed to personally contact or to adequately interview his father, his brother, his sisters, his cousins, a high school friend, and a former landlady.  In analyzing this issue, we first note that counsel must "investigate adequately the possibility of evidence that would be of value to the accused in presenting a case." United States v. Boone, 49 M.J. 187, 196 (C.A.A.F. 1998).  Further, generally speaking, "[e]ffective counsel will contact potential witnesses to determine the facts" of the case.  United States v. Fluellen, 40 M.J. 96, 98 (C.A.A.F. 1994).  However, the duty to investigate does not require trial defense counsel to personally interview every potential witness in a case.  See LaGrand v.

31

Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998).  For example, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative" and "distract [counsel] from more important duties."  Bobby v. Van Hook, 558 U.S. 4, 11 (2009).  As a result, the key point in deciding this issue is whether counsel made a good faith and substantive effort to identify those individuals who might be most helpful at trial, and to implement a means for obtaining information about and from these potential witnesses, thereby allowing counsel an opportunity to make an informed decision about their value for Appellant's court-martial.  Cf. Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986) (noting that trial counsel need not interview a witness if the account is fairly known to counsel).

Trial defense counsel met this standard here. Specifically, counsel developed a strategy whereby a mitigation expert first interviewed potential witnesses and then provided counsel with a summary of their statements.  For those family members with relevant information, one defense counsel would then conduct a phone interview to determine whether to select the person as a witness.  There is nothing inherently deficient about this strategy.

The parties dispute whether trial defense counsel actually interviewed certain witnesses.  For the sake of our analysis, we

will assume that trial defense counsel did not personally

conduct interviews of any of Appellant's family members and

friends.  The record nonetheless indisputably reflects that LTC

Hansen (when he was part of the defense team) and/or the

mitigation specialists did interview those witnesses and then

provided the defense team with summaries of those interviews.

Those witnesses included Appellant's father, brother, sisters,

two cousins,[8] a high school friend, and former landlady.  We

conclude that these summaries allowed trial defense counsel to

make informed decisions about whether to call these potential

witnesses to testify at trial.  Therefore, we do not find a

sufficient basis to conclude that they engaged in ineffective

assistance of counsel.

C. Nontestifying Professional/Expert Witnesses

Appellant claims that trial defense counsel were

ineffective in failing to interview or call to testify Dr. Donna

Sachs, Appellant's treating college psychologist, and Dr.

Wilbert Miles, a clinical psychologist.  At the outset, we note

that "[i]t can be assumed that in some cases counsel would be

deemed ineffective for failing to consult or rely on experts."

---

[8] Appellant complains about counsels' failure to interview a
third cousin, Kimberly Vines, but we agree with the Government
that her claim about having no recollection of an interview is
simply "too equivocal and ambiguous to overcome the presumption"
of counsel's competence.  United States v. Key, 57 M.J. 246, 249
(C.A.A.F. 2002).

Harrington v. Richter, 562 U.S. 86, 106 (2011).  However, that is not the case here.

The record demonstrates that trial defense counsel believed that a mitigation expert had coached or influenced Dr. Sachs' memory of Appellant.  Regardless of whether counsels' belief was correct, trial defense counsels' concern was reasonable.  Therefore, we will not second guess counsels' tactical decision in declining to rely on Dr. Sachs.

We also conclude that there was no deficiency in trial defense counsels' decision not to rely on Dr. Miles despite his expertise in the special challenges faced by African American soldiers.  See Richter, 562 U.S. at 107 (noting that counsel can formulate reasonable strategy even if it means ignoring experts "whose insight might possibly have been useful").  We note that trial defense counsel already had the assistance of other mental health professionals, including a neuropsychiatrist, a neuropsychologist, and a forensic psychiatrist.  See United States v. Loving, 41 M.J. 213, 250 (C.A.A.F. 1994).  "The mere fact that [trial] defense counsel did not 'shop around' for another more favorable expert [did] not render them ineffective."  Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir. 1992).

Moreover, even if counsel were deficient in not having Dr. Miles testify at trial, Appellant has not established any

34

prejudice resulting from this assumed deficient performance. First, much of the information that would have been elicited from Dr. Miles was already obtained from Dr. Woods. Second, we recognize that Dr. Miles, unlike Dr. Woods, could have provided an opinion about "how someone from [Appellant's] background and culture, presented with distress[ing] life experiences and [a] history of racial oppression, may have [developed] a state of mind that his own life was under imminent risk." However, Appellant has not demonstrated that this information would have led to a different outcome on the merits or at sentencing. We therefore find no merit to Appellant's ineffective assistance claims based on counsels' failure to rely on Dr. Miles or Dr. Sachs.

ii. Site Visits

Appellant asserts that trial defense counsel were deficient because they failed to travel to the locations where Appellant grew up, which he believes hindered them from properly interviewing witnesses and fully understanding Appellant. The premise of Appellant's argument is flawed because the defense team did conduct site visits. Both LTC Hansen, the first lead counsel in this case, and the mitigation specialists made site visits to Appellant's high school and his childhood neighborhoods, conducted interviews with Appellant's acquaintances and family members, and summarized the interviews

from these visits in memoranda used by the trial defense counsel. We conclude that trial defense counsel acted reasonably in opting not to repeat site visits performed by others on the defense team.

### iii. Use of Mitigation Experts

Appellant next criticizes trial defense counsels' use of the mitigation specialists in his case, pointing to counsels' failure to follow all of their advice as well as the purported dysfunction in counsels' relationship with them. In examining this issue, we first acknowledge the special importance of mitigation specialists in military justice capital cases. See Kreutzer, 61 M.J. at 298 n.7, 302-03, 305. Without a "professional death penalty bar in the military services," these specialists are likely "the most experienced member[s] of the defense team in capital litigation." Id. at 298 n.7. The mitigation specialists' role is "to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." Id. at 302 (citation and footnote omitted). The specialists are considered "an indispensable member of the defense team throughout all capital proceedings." Id. at 305 (citation omitted). As a result, "mitigation specialists may play a particularly

36

important role in ensuring the fair and full adjudication of military death penalty cases where . . . counsel have little training or experience in capital litigation." Id. at 303.

In the instant case, however, we first conclude there is no basis to find counsel ineffective for failing to always follow the mitigation specialists' advice. It is counsel, not mitigation specialists, who are entrusted with making strategic litigation decisions in each case. See Strickland, 466 U.S. at 689 (noting "the constitutionally protected independence of counsel" and "the wide latitude counsel must have in making tactical decisions").

Second, for purposes of this appeal we will accept the premise that there was some dysfunction with and antipathy toward the mitigation specialists on the part of the trial defense counsel. But despite these problems, the various mitigation specialists employed in Appellant's case performed extensive work and gathered significant information about Appellant's background, upbringing, and related issues which the trial defense counsel effectively used in the preparation and presentation of Appellant's case. We particularly note the efforts of Ms. Grey, whose nearly 400 hours of mitigation work resulted in interviews, interview summaries, and thousands of pages of records which were provided to trial defense counsel. When Ms. Grey was fired by Appellant at his mother's behest, Ms.

Grey estimated that an additional 150 to 210 hours of work was needed to complete the mitigation investigation. One of her successor mitigation specialists, Ms. Nerad, performed nearly three times this estimate by billing approximately 565 hours of work, which resulted in additional interviews, summaries, and records reviewed by trial defense counsel. Therefore, regardless of whatever dysfunction or antipathy might have existed, the mitigation specialists were able to adequately perform their important role by providing trial defense counsel relevant and useful information in defending Appellant. See Kreutzer, 61 M.J. at 302. Trial defense counsel then used this information to defend Appellant both during the merits and penalty phases of the trial in questioning witnesses and presenting evidence.

Finally, trial defense counsel made a reasonable strategic decision not to have a mitigation specialist testify or be physically present at Appellant's trial. Although it may be advantageous to have a mitigation specialist actively participate at a capital trial, it is not required. See Kreutzer, 61 M.J. at 305. Moreover, the circumstances of this case demonstrate that counsel acted reasonably in deciding not to employ a mitigation specialist at trial. See Pinholster, 131 S. Ct. at 1406 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety

of circumstances faced by defense counsel . . . .") (quoting Strickland, 466 U.S. at 688-89). The record demonstrates that the appointed mitigation specialist at the time of trial, Ms. Nerad, disagreed with a number of approaches taken by trial defense counsel. Under these circumstances, trial defense counsel could reasonably conclude that the presence and participation of the mitigation specialist at trial would not have been beneficial. See id. at 1407 (noting that reviewing court must entertain the range of possible reasons for counsel's decisions). Therefore, we find no basis to conclude that trial defense counsel were ineffective in the manner in which they used the mitigation specialists.

iv. Information to Dr. Woods

Appellant claims that trial defense counsel were ineffective for failing to provide Dr. Woods with certain information, including sufficient mitigation evidence and additional psychological testing data. Appellant asserts that this information would have allowed Dr. Woods to make a forensic diagnosis that Appellant suffered from schizophrenia and post-traumatic stress disorder.

However, even if we assume Dr. Woods received none of this material, we still find no demonstrated prejudice. First, even in the absence of additional information, Dr. Woods was able to provide the panel with "differential diagnoses" of schizotypal

personality disorder, high functioning paranoid schizophrenia, and schizoaffective disorder. Dr. Woods opined that on March 22, 2003, Appellant's symptoms, "played a great role in his mental state at the time of the offense" by "overwhelm[ing Appellant] emotionally and to really not think as clearly, to not really understand." The post-trial affidavits do not demonstrate that Dr. Woods would have changed this opinion or strengthened it with additional information or testing.

Second, Dr. Woods testified that "it would really require appropriate treatment to really determine which of the three [differential diagnoses] would be accurate." (Emphasis added.) This testimony indicates that Dr. Woods himself recognized that he could not have given a more definitive diagnosis of Appellant, even with more testing and mitigation information.

Third, Dr. Woods downplayed the importance of a precise diagnosis, stating: (1) "The fact that it may not be called schizophrenia or what have you is, in the long run, less important . . . ."; and (2) "The fact that it's not -- it may not be called schizophrenia is not clinically relevant." As can be seen then, Dr. Woods's testimony emphasized Appellant's symptoms and minimized the importance of a precise diagnosis. Under these circumstances, we conclude that Appellant has not demonstrated any likelihood of a different outcome in this case

even if trial defense counsel had provided additional information or testing data to Dr. Woods.

b.  Additional Funding and Continuances

Appellant claims that trial defense counsel were ineffective for failing to request additional funding and for failing to seek a continuance at two separate points before trial -- following the mitigation specialist's request in early March 2005, and following Appellant's alleged stabbing of the MP in late March 2005.  We first reject this argument because Appellant has not carried "his burden to show that his counsel would have been successful if he had filed . . . timely motion[s]" for a continuance and additional funding.  United States v. Jameson, 65 M.J. 160, 164 (C.A.A.F. 2007).  Simply stated, there is no "reasonable probability that [the] motion[s for a continuance and additional funding] would have been [deemed] meritorious" by the military judge.  Id. at 163-64 (quoting United States v. McConnell, 55 M.J. 479, 482 (C.A.A.F. 2001)).  These motions would have come a few days before and one month before the start of trial, respectively, and after the military judges in this case already had granted three prior continuances in a case that was originally scheduled for trial in July 2004.  Given the late requests and this record of delay, which totaled more than 700 days after the Camp Pennsylvania attack, there is an insufficient basis for us to conclude that

the military judge likely would have granted additional continuances, see United States v. Wiest, 59 M.J. 276, 279 (C.A.A.F. 2004) (listing factors relevant for continuance), or additional funding, see United States v. Garries, 22 M.J. 288, 291 (C.M.A. 1986) (requiring showing of why request for funds was needed).

We next observe that Appellant has not adequately demonstrated that additional time or funding in early March 2005 would have resulted in a more favorable outcome in the proceedings. Specifically, Appellant has not demonstrated that additional investigation would have resulted in a substantively different or enhanced mitigation posture at trial, particularly where approximately 1,000 hours of investigation already had been devoted to this case. Accordingly, Appellant has not established that counsel were ineffective for failing to request additional funds or a continuance in early March 2005.

In regard to late March 2005, we also conclude that counsel were not ineffective for deciding not to seek a continuance after the March 30, 2005, stabbing of the MP. The record is clear that trial defense counsel made the strategic calculation that a delay in the court-martial would provide the Government with an opportunity to charge Appellant with the assault on the MP. Evidence admitted at trial in support of this additional specification likely would have greatly undermined the defense

42

position that Appellant's prior violent conduct was aberrational and that Appellant had rehabilitative potential. Therefore, we do not conclude that trial defense counsel were ineffective for deciding not to seek a continuance at that point in the proceedings.

    c. Special Instruction Regarding Guilty Pleas

Appellant contends that his trial defense counsel were ineffective for failing to seek a mitigation instruction concerning Appellant's inability to plead guilty.[9] Indeed, we note that before trial began, trial defense counsel withdrew a requested instruction informing the members that because this matter had been referred as a capital case, Article 45, UCMJ, 10 U.S.C. § 845 (2012), required Appellant to plead not guilty and be tried before members. However, the record shows that trial defense counsel acted entirely reasonably in obtaining the withdrawal of this instruction for the simple reason that Appellant had decided not to submit an offer to plead guilty and instead had decided to argue at trial that he had not premeditated the attacks. Therefore, we conclude that trial defense counsel were not ineffective for withdrawing the instruction.

---

[9] Article 45, UCMJ, states, "A plea of guilty by the accused may not be received to any charge or specification alleging an offense for which the death penalty may be adjudged." Article 45(b), UCMJ, 10 U.S.C. § 845(b) (2000).

     d. Voir Dire

Appellant challenges trial defense counsels' use of an "ace of hearts" strategy during the voir dire process.[10]  An ace of hearts strategy is predicated on the fact that in order for a panel to impose a death sentence, the members must vote unanimously to impose that sentence.  See R.C.M. 1006(d)(4). Therefore, the strategy posits that the accused will benefit from having the largest possible number of panel members because that will increase the chances that at least one member of the panel (the so-called "ace of hearts") will vote for a sentence other than the death penalty.  In furtherance of this strategy, trial defense counsel in the instant case made the strategic decision to minimize their use of peremptory challenges and challenges for cause.

It may be argued that the ace of hearts strategy ignores panel dynamics whereby vocal and opinionated members hostile to the defense position may disproportionately impact deliberations.[11]  However, in light of the fact that trial

---

[10] Appellant also claims that counsel were ineffective for failing to seek a change in venue.  The record reflects that counsel sought to change venue but failed to convince the military judge of the need to do so.  As a result, counsels' attempt to change venue means that they were not ineffective for failing to do so.

[11] See Eric R. Carpenter, An Overview of the Capital Jury Project for Military Justice Practitioners:  Jury Dynamics, Juror Confusion, and Juror Responsibility, 2011 Army Law. 6, 8-10, 13-16 & nn. 28, 46-47 (May 2011).

defense counsel consulted with other experienced attorneys and relied on an appellate military judge's concurring opinion in United States v. Simoy, 46 M.J. 592, 625 (A.F. Ct. Crim. App. 1996) (Morgan, J., concurring), rev'd in part on other grounds by 50 M.J. 1 (C.A.A.F. 1998), before deciding to employ this strategy, we conclude that their decision is "virtually unchallengeable." United States v. Curtis, 44 M.J. 106, 119 (C.A.A.F. 1996) (quoting Strickland, 466 U.S. at 690).[12] Therefore, we conclude that there was no ineffective assistance of counsel.

2. Merits Phase

Appellant claims that trial defense counsel were ineffective for conceding guilt in opening statement, during the defense case on the merits, and in closing argument. However, Appellant's assertions are misplaced because trial defense counsel never conceded that Appellant was guilty of premeditated murder, only that he had committed certain acts.

To be blunt, there was absolutely overwhelming evidence adduced at trial that Appellant committed the acts that resulted in the deaths of MAJ Stone and CPT Seifert, and the wounding of fourteen other military officers. Therefore, it was not

---

[12] As discussed infra, we do not find a sufficient basis to conclude that any of the panel members should have been disqualified for cause, so counsel were not ineffective for failing to challenge members for bias.

unreasonable for trial defense counsel to forego trying to convince the court-martial panel to the contrary, and to instead focus squarely on trying to persuade the panel members that Appellant's acts were not premeditated.  Accordingly, concessions such as the ones made by trial defense counsel that Appellant "threw those grenades" and "shot and killed Captain Seifert" were not unreasonable because they did not concede Appellant's guilt to capital murder.  Indeed, this type of approach is a well-recognized defense strategy in capital cases. See Florida v. Nixon, 543 U.S. 175, 190-91 (2004); Lingar v. Bowersox, 176 F.3d 453, 458–59 (8th Cir. 1999) (holding that concession of elements of second-degree murder to challenge defendant's mens rea for a capital-murder conviction was not constitutionally deficient where overwhelming evidence pointed to defendant as perpetrator).  Accordingly, we conclude that trial defense counsel were not ineffective in this regard.

3.  Penalty Phase

Appellant describes trial defense counsels' presentencing presentation as consisting of "[t]hirty-eight minutes [of testimony and Appellant's unsworn statement] and a document dump."  Specifically, he criticizes the performance of trial defense counsel for failing to develop a coherent mitigation theme, submitting his entire diary for the panel's review, and

presenting a mitigation case primarily through documents instead of live witness testimony.

In closely analyzing this issue, we acknowledge at the outset that trial defense counsel may well have presented a stronger case in mitigation if they had adopted a different approach and taken different steps during the presentencing phase of this court-martial. However, in determining whether there was ineffective assistance of counsel, we do not assess trial defense counsels' performance through the prism of appellate hindsight and then apply our subjective view of how we think defense counsel should have conducted the trial. Rather, pursuant to Supreme Court precedent, we are obligated to determine whether trial defense counsels' performance fell below an "objective standard of reasonableness" and, if so, whether there was a "reasonable probability" that the result of the proceeding would have been different absent counsels' deficient performance. Strickland, 466 U.S. at 688, 694. In the instant case, not only do we conclude that trial defense counsels' performance was not "measurably below the performance standards ordinarily expected of fallible lawyers," Davis, 60 M.J. at 474, we also conclude that even if trial defense counsel had handled the mitigation case precisely as appellate defense counsel now avers they should have, there is no reasonable probability that the court-martial panel would have imposed a lesser sentence.

See Loving v. United States, 68 M.J. 1, 7 (C.A.A.F. 2009).
Accordingly, for the reasons cited in greater detail below, we
disagree with Appellant's assessment of this issue.

### a. Mitigation Theme

Appellant argues that trial defense counsel failed to
develop a comprehensive and compelling mitigation argument
encompassing Appellant's upbringing in accordance with the
tenets of the Nation of Islam, his need to overcome great
disadvantages as a youth, and his continued willingness to
provide love and support to his family.  We recognize that
counsel are well advised to adopt a coherent defense theme and
strategy throughout a trial.  Curtis, 44 M.J. at 120.  However,
there are a number of acceptable ways to establish, develop, and
present such a theme in any given case.  See Pinholster, 131 S.
Ct. at 1407.

In the instant case, the record reflects that trial defense
counsels' mitigation strategy was to emphasize Appellant's
mental illness while also pointing out Appellant's difficult
upbringing, his lack of ties to radical Islamic groups, and the
Army leadership's questionable decision to bring Appellant to
Kuwait despite signs of mental illness and poor NCO skills.  The
evidence that supported these arguments was developed during

both the merits[13] and penalty phases of the trial. Because trial defense counsels' decision about how best to handle the sentencing argument followed an extensive mitigation investigation and exploration of other possible approaches, Appellant's criticism amounts to a dispute over counsels' strategy. See United States v. Gray, 51 M.J. 1, 19 (C.A.A.F. 1999) (characterizing argument about counsels' failure to present an "adequate sentencing case" as an attack on "strategy and tactics"). Under such circumstances, Appellant has not established that trial defense counsels' selection and presentation of a mitigation theme constituted ineffective assistance of counsel.

---

[13] The "frontloading" of mitigation evidence during the merits phase is reasonable where the same fact-finder (1) considers guilt and penalty evidence and (2) is instructed about the ability to consider all evidence for mitigation. See Pinholster, 131 S. Ct. at 1408 (citing Woodford v. Visciotti, 537 U.S. 19, 25 (2002)); Bell v. Cone, 535 U.S. 685, 699 (2002) (rejecting ineffective sentence claim for failure to present testimony of medical experts at penalty phase where "compelling mitigating evidence" admitted during guilt phase); Curtis, 44 M.J. at 119 ("Mitigating evidence may . . . be introduced at both the findings and the sentencing stages of a capital trial."); Eaton v. Wilson, No. 09-CV-261-J, 2014 U.S. Dist. LEXIS 163567, at *398-*99, 2014 WL 6622512, *149-*50 (D. Wyo. Nov. 20, 2014) (explaining that "if the jury knows nothing about the defendant other than the facts of the crime when it renders its verdict finding him guilty, the defense bears a very heavy burden to win them over to life in the second stage of trial"). Here, the military judge instructed the panel that it could "consider any matter in extenuation and mitigation, . . . whether it was presented before or after findings." Counsel therefore reasonably adopted a strategy of presenting mitigation evidence during the guilt phase.

b.  Submission of the Diary

Appellant argues that trial defense counsel were ineffective for submitting the entirety of Appellant's "damning" diary into evidence at sentencing because it led to the introduction of aggravating evidence, not mitigating evidence. However, upon closely analyzing this issue, we find there is an insufficient basis to conclude that trial defense counsel provided ineffective assistance of counsel.

To be clear, we fully recognize that some of the entries contained in the diary introduced by the defense were, indeed, damning.  However, we are also mindful of the fact that when counsel made the decision to introduce the entire diary, the Government already had presented to the panel some of its most damaging portions.  For example, the Government introduced the following two passages:  "[A]s soon as I am in Iraq I am going to try to kill as many [fellow soldiers] as possible"; and "I may have to make a choice very soon about who to kill. . . . I will have to decide if I should kill my Muslim brothers fighting for Saddam Hussein or my battle buddies."  These portions, along with others introduced to the panel upon admission of the entire diary, underscored Appellant's premeditation.  However, it is important to note that at the time of the diary's admission, the members had already found premeditation during the merits phase, and the existence or degree of premeditation was not at issue

50

during sentencing. Therefore, the record indicates not only that trial defense counsel reasonably concluded that additional passages in the diary would not inflict any more damage on the defense than those already selected by the Government, but that they also reasonably concluded that the diary in its entirety would paint a persuasive portrait of a mentally ill man who could not control his thought processes or his actions in the period leading up to the Camp Pennsylvania attack.[14] Therefore, we conclude that trial defense counsel were well aware of the inflammatory nature of portions of the diary, yet made a strategic decision to submit the diary in its entirety. In doing so, we note that generally speaking, we "'will not second-guess the strategic or tactical decisions made at trial by defense counsel.'" United States v. Mazza, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting United States v. Anderson, 55 M.J. 198, 202 (C.A.A.F. 2001)). Indeed, we decline to do so here.

---

[14] For instance, in the diary entries from the two months before Appellant's attack, Appellant wrote (1) "I am in no condition to take care of a family and when I leave the Army, I may be homeless. I pace, daydream, and talk to myself everyday. And I am alone with very little chance of finding a mate."; and (2) "I am a loser. That is just the truth. Everything I have tried to work for I don't have. A wife, good job, Self-respect." Throughout the thirteen years that Appellant kept the diary, his entries reflected his struggles as demonstrated by his thoughts about suicide, his low self-esteem, his problems staying awake, his isolation or loneliness, his problems having relationships with women, his sexual frustrations, his problematic relationships with his parents, and his problems maintaining employment.

Appellant further claims that even if it was a reasonable strategic decision to admit the diary as a whole, witness testimony was needed to place the diary entries into proper perspective.  The record shows, however, that counsel did contextualize the diary through Dr. Woods's testimony, as well as through the FBI analysis of the diary and Ms. Grey's analysis of the diary, which were submitted to the panel members as evidence.  Also, counsels' sentencing argument emphasized that the diary provided an important glimpse into Appellant's mental state and that it showed the facts and effects of Appellant's difficult upbringing.  Moreover, with the diary's admission, counsel was able to argue at sentencing that despite the conflict between the mental health experts as to a specific diagnosis, the diary showed that Appellant suffered from a profound mental illness when he committed the offenses, which warranted a sentence of life imprisonment rather than the death penalty.  Given these circumstances, we conclude that counsels' performance was not deficient.

c.  Mitigation Primarily Through Documents

Appellant claims that trial defense counsel were ineffective because they presented Appellant's mitigation case primarily through documents instead of through live testimony by family and friends.  However, we disagree with Appellant's initial premise that the mitigation case consisted only of

thirty-eight minutes of testimony and a "document dump." The record shows that trial defense counsel actually began developing the mitigation case during the merits phase of the trial. They did so through the testimony of the expert witnesses, members of Appellant's unit, and Appellant's college roommate. This evidence covered Appellant's troubled upbringing, his strange behavior, his tendency to spend time alone, his poor skills as an NCO, his symptoms of mental illness, and his mental illness diagnoses. Once the merits phase ended, counsel did not ignore this evidence but instead built upon it during the presentencing phase and relied upon it during the sentencing arguments. Therefore, we conclude that trial defense counsel presented a more substantial and thoughtful mitigation case at trial than Appellant now claims on appeal.

We also disagree with Appellant's criticism of trial defense counsels' decision to present mitigation evidence primarily through documents rather than through live testimony. In examining this issue, we view it as an essential fact that trial defense counsels' presentation was greatly affected by Appellant's alleged stabbing of an MP just days before the court-martial began. In light of this incident, trial defense counsel made a strategic decision to be very cautious about taking any steps that could be used by the Government to

introduce evidence of this uncharged misconduct in the course of the trial.  Trial defense counsel were successful in this effort, and we deem their approach to be a reasonable and appropriate one.  See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines) 10.11.G, reprinted in 31 Hofstra L. Rev. 913, 1056-57 (2003) (noting that "[i]n determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence").  Any one of the witnesses who might have been called to testify by the defense could have unintentionally opened the door to evidence about the MP stabbing by, for example, testifying about their belief that Appellant's actions at Camp Pennsylvania were out of character.  Therefore, trial defense counsel reasonably concluded that they should limit the number of defense witnesses both because they posed a danger to Appellant's case and because, if they did testify, their testimony would be so circumscribed that whatever value they otherwise would have had for the defense would be substantially diminished.  See Cone, 535 U.S. at 700-01 (finding state court's application of Strickland was not unreasonable with respect to failing to call other witnesses where "counsel feared that the prosecution might elicit information about [the defendant's]

criminal history"); Burger, 483 U.S. at 792 (concluding decision not to present character witnesses not unreasonable where prior convictions might have been introduced on cross); Tinsley v. Million, 399 F.3d 796, 809-10 (6th Cir. 2005) (noting no testimony may be better than some testimony "given the risk that every positive argument by a defendant potentially opens the door to a more-harmful response").

We also conclude that trial defense counsel did not merely "dump" a bunch of documents on the panel. Counsel reviewed and selected relevant documents for the members to consider, which were presented to each member in a binder. Among the documents submitted to the members were those that provided important context for, and useful summaries of, Appellant's diary.

The military judge implicitly instructed the members that they were required to review the documents in the binders. For instance, the military judge instructed the members prior to disseminating the binders as follows:

> The defense has requested, the government does not oppose, and I'm going to allow you to take several defense exhibits with you when we recess for the day in a few moments. They are in the black binders in front of you. The exhibits contain a lot of material, and it will help if you have read through the documents before the defense calls its witnesses starting tomorrow. Since counsel estimate it may take some time to do so, rather than require you to read it in open court, which is what would normally happen, I'm going to let you read it at home or work.

> A couple cautionary instructions however. You are only to read the exhibits. Please do not conduct

> any independent research based on anything you may read. Also, please, do not discuss the exhibit with anyone, to include friends and family members, or yourselves. You can only discuss the exhibits with each other once you begin your formal deliberations, which probably won't happen until Thursday. Also do not copy the exhibits or let anyone else read them. And please bring them back with you when you return to court tomorrow morning . . . .

This instruction informed the members of their duty to review the exhibits in two ways. First, the military judge told the members, "rather than <u>require</u> you to read [the evidence] <u>in open court</u>, which is what would normally happen," they were being permitted to "read it at home or work." (Emphasis added.) Second, the military judge told the members they were "only to <u>read</u> the exhibits" instead of discussing them or performing research. (Emphasis added.) These facets of the instruction had the effect of notifying the members that they had to review Appellant's documentary evidence.

The military judge reiterated the members' duty to review the defense exhibits when he allowed the members to take the binders home for a second day, stating: "[Y]ou should be able to take them with you for the rest of the day <u>if you need more time to review the documents</u>." (Emphasis added.) By informing the members that they had more time to review the documents, the military judge again signaled to the members that they were

expected to review all the evidence.[15]  The record does not reveal that the members disobeyed the military judge's instructions, so we presume that the members followed them.  See United States v. Stewart, 71 M.J. 38, 42 (C.A.A.F. 2012).  We therefore conclude that the members were aware of their duty to review, and did in fact review, the evidence submitted to them in the binders.

Counsels' sentencing argument then explained the purpose of the diary by asserting that it provided a "unique" look into Appellant's troubled mind.  This is hardly a case in which counsel obtained records and "then dump[ed] the whole file in front of the jury without organizing the files, reading them,

---

[15] Besides these specific instructions, the military judge's general sentencing instructions apprised the members of their duty to consider all evidence in the case, including that submitted in the binders.  For instance, the military judge instructed the members that their deliberations on the aggravating factors "should properly include a full and free discussion on all of the evidence that has been presented." (Emphasis added.)  The military judge also instructed the members that they could consider "any matter in extenuation and mitigation, whether pre-offense or post-offense; whether it was presented before or after findings; and whether it was presented by the prosecution or the defense."  These general sentencing instructions informed the members that their sentencing deliberations were to be based on all the evidence, which included the defense sentencing exhibits the military judge permitted the members to take home.  Finally, the military judge instructed the members of the importance of considering the evidence submitted in the binders when he listed the possible mitigating factors in the case, some of which explicitly referenced the evidence submitted in the binders, including Appellant's diary, Ms. Grey's interviews of individuals, the diary analyses by Ms. Grey and the FBI, and the social service records.

eliminating irrelevant files or explaining to the jury how or why they are relevant." Johnson v. Bagley, 544 F.3d 592, 602 (6th Cir. 2008). Accordingly, we do not see a sufficient basis to conclude that trial defense counsels' method of introducing the documents was deficient.

Appellant insists that the live testimony of family members and friends, not submission of documents, was needed to present all the available mitigation evidence to counter the Government's aggravation evidence. He further argues that trial defense counsels' failure to present this evidence constituted an incomplete and incompetent defense.

To be sure, "evidence about [an accused's] background and character is relevant because of the belief, long held by this society, that [those accused] who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than [those] who have no such excuse." Loving, 68 M.J. at 15 (quoting Boyde v. California, 494 U.S. 370, 382 (1990)). Here, however, trial defense counsel did not ignore Appellant's social history. They introduced evidence about Appellant's abusive stepfather through the testimony of Drs. Tuton and Woods. Further, through testimony, a declaration from Appellant's brother, and the mitigation specialist's interview notes, they introduced evidence about Appellant growing up in impoverished

58

circumstances and living and going to school in dangerous
neighborhoods. And through Appellant's diary, trial defense
counsel also introduced evidence of Appellant's adverse
upbringing. Finally, the exhibits submitted by trial defense
counsel at sentencing contained information that humanized
Appellant such as the diary entries that detailed assistance to
his family and listed his goals of assisting his family and his
community, the interview summaries of Appellant's teachers that
described his work ethic and politeness, the statement from
Appellant's brother that recounted Appellant's financial
support, and the interview summary from Appellant's childhood
imam that described Appellant's lack of aggression. Therefore,
there is an insufficient basis to conclude that trial defense
counsel needed additional live testimony in order to present key
points of their mitigation case.

The record also reveals that counsel did not act
unreasonably in choosing not to present live testimony from
Appellant's father, brother, sisters, cousins, high school
friend, and former landlady. A trial defense counsel's decision
on whether to call a witness is a tactical decision. See United
States v. Anderson, 55 M.J. 198, 202 (C.A.A.F. 2001); Fluellen,
40 M.J. at 98 (noting part of the tactical decision in the case
was deciding what witnesses not to call). In this case, trial
defense counsel made an informed tactical decision, after a

reasonable investigation, when selecting trial witnesses.  See Wiggins, 539 U.S. at 533-34.  Therefore, for this reason and for the additional reasons cited below, we conclude that Appellant has not provided us with a sufficient basis to question trial defense counsels' tactical decisions regarding these witnesses.

First, trial defense counsel had interactions with Appellant's father prior to trial and obtained additional information about his background through the mitigation expert's report.  They therefore assessed his likely manner of presentation as a witness, and learned of his significant criminal background, history of drug use, and impaired cognitive abilities.  See Pinholster, 131 S. Ct. at 1407 (noting that in applying strong presumption of competence, court is required to affirmatively entertain range of possible reasons for counsel's performance).  Upon doing so, counsel explicitly informed the military judge that they had made an informed, conscious, and strategic decision not to have Appellant's father testify during sentencing.  See Lord v. Wood, 184 F.3d 1083, 1095 n.8 (9th Cir. 1999).  We see no basis to question this decision.

Appellant claims that his father would have served as a valuable witness to document "the prejudices the Nation of Islam instilled in" Appellant.  Indeed, trial defense counsel could have employed this strategy of eliciting testimony on this point.  However, they chose a different strategy, one that

described Appellant as not being "hate-filled" but "a person with mental illness, who is very sensitive to anything said to him." In fact, trial defense counsels' affidavit explains that they wanted to downplay Appellant's link to the Nation of Islam because it would "likely . . . carry strong negative connotations with the panel members," which ultimately would harm Appellant's defense. Additionally, counsel chose not to portray Appellant as a hate-filled person since childhood because this approach would have conflicted with their strategy of portraying Appellant's actions on March 22, 2003, as aberrational and not premeditated, and because it would have undermined their position that Appellant had rehabilitative potential. We therefore do not find a basis to question counsels' tactical decision not to call Appellant's father to testify.

Second, we conclude that counsel was not deficient in presenting the declaration of Appellant's brother at trial rather than having the brother testify. Although the brother now claims that he was willing and able to testify at Appellant's trial, the brother's April 26, 2005, trial declaration stated that he could not leave his wife's side due to the birth of a child. Additionally, we conclude there is no additional information in the brother's post-trial one-page declaration that reasonably could be considered powerful

mitigation evidence.  We do not consider counsels' failure to call Appellant's brother as a witness to be deficient performance under these circumstances.

Third, the record reflects that trial defense counsel had the mitigation specialists' interview summaries for Appellant's sisters, his cousins, a high school friend, and his former landlady.  With this information, trial defense counsel made an informed decision not to call these witnesses, and we do not find a sufficient basis to second-guess that decision.  Cf. Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (noting that "decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony").

We finally conclude that even if trial defense counsels' mitigation presentation was deficient, Appellant has not established prejudice.  This inquiry asks "whether if the members had been able to place the additional evidence 'on the mitigating side of the scale, there is a reasonable probability that at least one [member] would have struck a different balance.'"  Loving, 68 M.J. at 7 (quoting Wiggins, 539 U.S. at 537).  The new mitigating evidence "must differ in a substantial way -- in strength and subject matter -- from the evidence actually presented at sentencing."  Id. at 16 (quoting Hill v.

Mitchell, 400 F.3d 308, 319 (6th Cir. 2005)).  Appellant has not met this standard.

The additional post-trial evidence in this case can generally be placed into one of seven categories:  Appellant's parents' backgrounds, the history of family mental illness, Appellant's challenging upbringing and his positive qualities as a child, the influence on Appellant of the Nation of Islam, Appellant's high school experience, Appellant's attempt to repay a debt, and the impact of Appellant's execution on his family. Many of these areas were presented at trial, including information about Appellant's upbringing and positive qualities, his high school experience, and the existence of mental health issues in the family.  While some of the post-trial information may be viewed as elaborating on these points, there is not a sufficient basis to conclude that this information was different in quality or substance from what the members actually considered.  Therefore, we consider it to be "largely cumulative."  See Loving, 68 M.J. at 16.

We recognize that the material submitted by Appellant post-trial includes information in four areas that were not addressed at the court-martial.  However, we conclude that Appellant was not prejudiced by counsels' failure to present this evidence. First, trial defense counsel concluded that the role of the Nation of Islam in Appellant's life represented a "double-edged

sword" in that any mitigation effect of this information may have been outweighed by the extent to which it alienated the panel and undermined trial defense counsels' theory that Appellant's attack was due to mental illness and was not the product of hatred and premeditation. Cf. Wiggins, 539 U.S. at 535 (noting that limited investigation justified where defendant's history was "double-edged"). Second, Appellant's attempt to repay his landlady long after she expected him to, although a positive story, certainly is not "sufficiently compelling" to establish prejudice given Appellant's crimes and their impact on the victims. See Loving, 68 M.J. at 17. Third, although the post-trial evidence demonstrates that Appellant's parents' had challenging upbringings, Appellant does not explain why this information would prove compelling to the panel members as they decided the appropriate sentence to impose on Appellant.

Finally, we recognize the potential mitigating value of Appellant's family members expressing opinions about the impact Appellant's death sentence would have on his family. We do not seek to minimize the importance of such testimony in capital cases. However, in the instant case, there is an insufficient basis to conclude that the panel's knowledge of this information would have changed the result of the proceeding given the aggravating circumstances. Moreover, trial defense counsel had to weigh whether such testimony would have alienated the panel

members in light of the fact that Appellant's murderous actions had so tragically and irrevocably affected the families of the victims of Appellant's attack.  Accordingly, we conclude that Appellant has not met his burden of establishing that he was prejudiced by counsels' submission of documents instead of live witness testimony.

    4.  Cumulative Error

We next consider whether trial defense counsels' conduct, examined in its totality, constituted ineffective assistance of counsel even if individual oversights or missteps did not independently rise to that level.  Loving, 41 M.J. at 252; see also United States v. Dado, 759 F.3d 550, 563 (6th Cir. 2014).  As shown above, for the vast majority of Appellant's individual ineffective assistance of counsel claims, there is an insufficient basis to conclude that trial defense counsel acted unreasonably.  These claims do not provide a basis for establishing ineffective assistance of counsel based on cumulative error.  See United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006) (stating that "ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions"); Campbell v. United States, 364 F.3d 727, 736 (6th Cir. 2004); Hough v. Anderson, 272 F.3d 878, 907 n.14 (7th Cir. 2001).  In those few instances where we assumed otherwise, we found no prejudice.  Even considering these instances of assumed

deficient performance in the aggregate, we conclude that they do not establish prejudice at the findings phase or penalty phase of the trial. Therefore, we conclude that Appellant has not provided us with a sufficient basis to apply the cumulative error doctrine to the circumstances of his case, and we decline to find ineffective assistance of counsel on the basis of this doctrine. See Becker v. Luebbers, 578 F.3d 907, 914 n.5 (8th Cir. 2009) (noting that even if some aspect of counsel's performance was deficient, prejudice must be limited to constitutionally defective aspects of representation).

## B. DuBay Hearing

Appellant asserts that, at a minimum, we should order a post-trial fact-finding hearing in this case under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967). Our decision in United States v. Ginn, 47 M.J. 236 (C.A.A.F. 1997) sets forth the proper standard to determine whether a DuBay hearing is necessary to resolve ineffective assistance of counsel claims. We have considered the five Ginn factors[16] and conclude that the issues in this case can be resolved on the record before us and without a DuBay hearing.

---

[16] These factors are whether: (1) the facts alleged would result in relief; (2) the alleged facts are conclusory or speculative; (3) the parties agree on the facts; (4) the record "compellingly demonstrate[s] the improbability of" the allegations; and (5) Appellant adequately explains why an allegation contradicts a matter within the guilty plea record. Ginn, 47 M.J. at 248.

## C. Victim-Impact Presentation

Appellant challenges two aspects of the Government's victim-impact presentation. First, he contends that presentencing testimony from Government witnesses violated the Eighth Amendment. Second, he challenges the propriety of trial counsels' sentencing argument. In making these claims, Appellant correctly concedes that his trial defense counsel did not raise objections to the witness testimony or to the trial counsels' argument during the court-martial. Therefore, we note that he has "forfeit[ed] appellate review of [these issues] absent plain error." United States v. Eslinger, 70 M.J. 193, 197-98 (C.A.A.F. 2011); see also United States v. Frey, 73 M.J. 245, 247 n.1 (C.A.A.F. 2014) (sentencing argument); United States v. Holt, 33 M.J. 400, 408-09 (C.M.A. 1991) (victim-impact testimony). To prevail under the plain error standard, Appellant has the burden of "establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." United States v. Knapp, 73 M.J. 33, 36, reconsideration denied, 73 M.J. 237 (C.A.A.F. 2014).

We conclude that Appellant fails to meet the first prong of the plain error standard. Victim impact testimony is admissible in capital cases to inform the panel about "the specific harm caused by the [accused]." Payne v. Tennessee, 501 U.S. 808, 825 (1991); United States v. Wilson, 35 M.J. 473, 476 n.6 (C.M.A.

67

1992).  Trial counsel may elicit evidence about (1) the victim's personal characteristics or (2) the emotional impact of the murder on the victim's family.  See Payne, 501 U.S. at 827.  What is not permitted is evidence or argument about the family members' "opinions and characterizations of the crimes," the defendant, or the appropriate sentence.  See Booth v. Maryland, 482 U.S. 496, 508-09 (1987), overruled on other grounds by Payne, 501 U.S. at 830 n.2.  Examples of this type of impermissible victim-impact evidence include:  an opinion from the victim's family members that the victims were "butchered like animals"; a statement that the witness "doesn't think anyone should be able to do something like that and get away with it"; and descriptions of the defendant as "vicious," worse than an animal, and unlikely to be rehabilitated.  Booth, 482 U.S. at 508.

We conclude that the Government did not violate these proscriptions in the course of eliciting witness testimony in the instant case.  Initially, we note that Appellant mischaracterizes the victim testimony as equating Appellant to a terrorist or traitor, or describing Appellant's conduct as treasonous, mutinous, or assisting the enemy.

During the Government's sentencing case, trial counsel posed questions concerning witnesses' reaction upon learning that a fellow servicemember was the alleged perpetrator of the

68

Camp Pennsylvania attack. Such questions were appropriate because they were designed to elicit testimony about the effect this unique bit of information had on the victims. Moreover, it was not improper for the Government witnesses, many of whom were also victims of the attack, to express human responses, including feeling "betrayed," "disbelief," "livid," "angry," "shocked," and "pissed."[17] This testimony placed Appellant's crime in context by describing how his actions affected the victims of the attacks.

Also, COL Hodges's testimony about "fraggings" during the Vietnam War was made in the context of describing why he, as commander of the battalion, was particularly psychologically shaken by Appellant's particular attack, and we do not deem such testimony to be improper. Similarly, we conclude that COL Hodges's observations about the "very worst days for

---

[17] Appellant supports his challenge to sentencing testimony by citing the testimony of the victims' family members in United States v. Mitchell, 502 F.3d 931, 990 (9th Cir. 2007), and DeRosa v. Workman, 679 F.3d 1196, 1240 (10th Cir. 2012). We observe that much of the contested testimony in this case was made by the victims who were reporting their own reactions to the crime, so they did not constitute family member testimony about the crime or Appellant. We recognize that trial counsel elicited testimony by civilians about their reactions upon learning that a servicemember was responsible for the attacks. To the extent that this testimony by the civilians was improper, we find no prejudice because it was brief and unlikely had any impact on the panel where the victims properly testified about their reactions upon learning that the perpetrator was a servicemember. See United States v. Davis, 609 F.3d 663, 685 (5th Cir. 2010).

the United States Army" were not inflammatory in intent or effect. Instead, they reflected COL Hodges's embarrassment and dismay that Appellant's attack occurred in the battalion he was commanding, and COL Hodges's comments were directly responsive to trial counsels' question about how Appellant's attack had affected him.

We also do not consider improper trial counsel's sentencing argument in which he characterized Appellant as "the enemy within the wire" and asked for the imposition of the death penalty in order to send a message about the value of innocent life and the value of loyalty. Trial counsel "may strike hard blows," but "he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935); see also United States v. Halpin, 71 M.J. 477, 479 (C.A.A.F. 2013). He "may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" Halpin, 71 M.J. at 479 (quoting United States v. Baer, 53 M.J. 235, 237 (C.A.A.F. 2000)). This includes arguments in capital cases concerning "the human cost" of an accused's capital crime. Payne, 501 U.S. at 827. Under the circumstances of this case, it was not a foul blow to characterize Appellant as the enemy within the wire given his act of tossing grenades and shooting officers within the confines of Camp Pennsylvania at the start of Operation Iraqi Freedom.

Trial counsels' request to send a message about the value of life, loyalty, and the bond among the band of brothers was essentially a general deterrence argument. Trial counsel may make such general deterrence arguments when they are not the Government's only argument and when the military judge properly instructs the members about conducting an individualized consideration of the sentence. See United States v. Lania, 9 M.J. 100, 104 (C.M.A. 1980) (stating that "general deterrence is suitable for consideration in sentencing and for instructions"). Trial counsels' argument was more than one of general deterrence because it focused on Appellant's motivation, his acts, and their aftermath. Also, the military judge properly instructed the panel as to general deterrence. Therefore, there was nothing improper in asking the members to send a general deterrence message.

Finally, Appellant challenges trial counsel's two references to "weighing life":

- "What you must decide is what a life is worth; what two lives are worth; what a military career is worth; what the use of your legs are worth; what a little boy's life without his father is worth."

- "Weigh his life -- that is what you're doing. You're weighing his life against what he did, what he caused, and what he set in motion forever."

These comments were made in the specific context of trial counsel's argument that the aggravating circumstances outweighed the mitigating circumstances. This is "entirely consistent with

71

Payne's recognition that victim-impact evidence is properly considered to 'counteract' the mitigating evidence in helping the [fact-finder] evaluate moral culpability." United States v. Lawrence, 735 F.3d 385, 435 (6th Cir. 2013). Also, we note that other federal courts have held that "to the extent that [Payne] expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not victim-to-defendant comparisons." United States v. Fields, 483 F.3d 313, 340-41 (5th Cir. 2007) (citing Humphries v. Ozmint, 397 F.3d 206, 224 n.8 (4th Cir. 2005)). Trial counsel in the instant case did not make victim-to-victim characterizations. We therefore find no error in his argument.[18]

Even if we were to assume that trial counsels' arguments were improper, we conclude that Appellant has demonstrated no prejudice. In the plain error context, we determine whether the cumulative effect of an improper sentencing argument impacted "the accused's substantial rights and the fairness and integrity of his trial." Halpin, 71 M.J. at 480 (quoting United States v. Erickson, 65 M.J. 221, 224 (C.A.A.F. 2007)). This inquiry examines "whether trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the appellant

---

[18] Since neither the victim testimony nor trial counsels' sentencing argument was improper, we reject Appellant's related ineffective assistance of counsel claims.

72

was sentenced on the basis of the evidence alone." Id. (quoting Erickson, 65 M.J. at 224) (original alterations and internal punctuation omitted). This case involved many aggravating circumstances, including Appellant's murder of two military officers, his use of grenades, the extensive injuries to some officers, and the impact of the attack on the unit as it prepared for battle. Also, the fact that trial defense counsel did not see fit to object to the argument is "some measure" that the argument had "minimal impact." United States v. Gilley, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting United States v. Carpenter, 51 M.J. 393, 397 (C.A.A.F. 1999)). Accordingly, we do not conclude that trial counsel's argument warrants reversal.

### D. Sua Sponte Disqualification of Members

Appellant challenges the military judge's failure to sua sponte dismiss fourteen of the fifteen panel members on implied and/or actual bias grounds. We note that "[i]t is clear that a military judge may excuse a member sua sponte" under R.C.M. 912(f)(4). United States v. Strand, 59 M.J. 455, 458 (C.A.A.F. 2004). That rule permits a military judge to, "in the interest of justice, excuse a member against whom a challenge for cause would lie" even if neither party has raised such a challenge. See R.C.M. 912(f)(4) (2005 ed.). However, in United States v. McFadden the majority held that although "[a] military judge has the discretionary authority to sua sponte excuse [a] member,

[he] has no duty to do so." 74 M.J. 87, 90 (C.A.A.F. 2015). Moreover, even if the military judge had such a duty, he did not abuse his discretion in failing to sua sponte remove any of the members for the reasons that follow.

First, we are mindful of the essential fact that, as noted above, trial defense counsel were using the ace of hearts strategy during this voir dire process, and we note that the military judge had been placed on notice that Appellant was "seeking to maximize the panel size." Second, the military judge had afforded trial defense counsel great leeway in determining how they would conduct voir dire, thereby obviating the need for the military judge to take a more active role in the process. Third, the military judge could observe that trial defense counsel were not impassive in the voir dire process, as evidenced not only by their questioning of potential panel members but also by the fact that they sought and obtained the removal of a member on implied bias grounds, did not object to the Government's challenge to three other members, and explained their opposition to the Government's challenges to three additional panel members.

In regard to Appellant's challenges to the service on the panel of specific members, we make the following observations. Appellant first states that the military judge should have sua sponte disqualified COL GQ and COL PM because of their friendly

74

relationship with COL Hodges, a victim and witness in Appellant's case.  However, it is not an infrequent occurrence in the military for a panel member to know a witness in a court-martial, and without more, we have not found implied bias in such circumstances.  Cf. United States v. Ai, 49 M.J. 1, 5 (C.A.A.F. 1998) (rejecting member challenge on implied bias grounds where member held professional relationship with witness, candidly disclosed the relationship, and unequivocally denied influence).[19]  We similarly decline to do so here.

Second, Appellant states that the military judge should have sua sponte dismissed LTC CF and LTC DL because another panel member, COL PM, had a supervisory relationship over them.  Once again, it is not an infrequent occurrence in the military to have panel members who have a supervisory relationship with another panel member.  And where, as here, all of the panel members state openly that they will not feel constrained in performing their court-martial duties, there is an insufficient

---

[19] Appellant cites United States v. Harris, but the member in that case not only knew two victims but also rated the victims, was aware of the crimes, and chaired a committee to reduce the crime in question on base.  13 M.J. 288, 289 (C.M.A. 1982).  Neither COL GQ's nor COL PM's relationship with COL Hodges is nearly as close as the member's relationship with the victims in Harris.  In United States v. Leonard, 63 M.J. 398, 403 (C.A.A.F. 2006), we found implied bias where a member had a relationship "of trust" with a victim in a case in which the victim's credibility was an issue.  The record does not reflect a similar relationship of trust in this case or that COL Hodges's credibility was at issue.

basis for the military judge to sua sponte remove them from the panel. United States v. Castillo, 74 M.J. 39, 43 (C.A.A.F. 2015) ("[A] senior-subordinate/rating relationship does not per se require disqualification of a panel member.") (quoting United States v. Wiesen, 56 M.J. 172, 175 (C.A.A.F. 2001)).

Third, Appellant argues that the military judge should have sua sponte dismissed LTC WT from the panel because of his relationships with his two older brothers. One brother was the commanding general of the 101st Airborne Division, the unit to which Appellant and some of the victims were assigned. The other brother worked with a victim in this case and served as the executive officer for the senior commanding general of the convening authority in this case. However, LTC WT stated he did not discuss the case with his brothers or feel any pressure to vote in any particular manner in this case. We therefore conclude that LTC WT's fraternal relationships did not provide a basis for the military judge to sua sponte dismiss LTC WT. See Strand, 59 M.J. at 459 (finding military judge did not have a sua sponte duty to dismiss for implied bias a member who was the son of the commander). This is particularly true here because both Appellant and his trial defense counsel specifically stated that they did not want to excuse LTC WT for cause.

Fourth, Appellant generally challenges a number of members -- SFC KD, MAJ DS, LTC TG, SFC JC, CSM MH, CSM RC, and MSG PC --

on the basis that they had an inelastic predisposition to adjudge a particular sentence. We note, of course, that Appellant is "entitled to have his case heard by members who are not predisposed or committed to a particular punishment, or who do not possess an inelastic attitude toward the punitive outcome." United States v. Martinez, 67 M.J. 59, 61 (C.A.A.F. 2008) (citing United States v. James, 61 M.J. 132, 138 (C.A.A.F. 2004)); see also R.C.M. 912(f)(1)(N) Discussion. However, the record reveals that each of these panel members agreed to follow the military judge's instructions and to appropriately consider a full range of punishments in this case. Therefore, the voir dire of these individual members disclosed no basis for the military judge to sua sponte disqualify them.

Fifth, we have reviewed LTC TG's views on Islam[20] and share some of Appellant's concerns about his comments during voir dire. However, we ultimately conclude that the military judge should not have invoked his authority under R.C.M. 912(f) to dismiss LTC TG sua sponte because LTC TG also expressed positive views of Muslims, describing them as "very nice" and "very friendly people," and more importantly, because LTC TG stated

---

[20] When specifically asked by trial defense counsel about his views on Islam, LTC TG stated that Islam was a "male oriented religion" and a "passionate religion," by which he meant that "sometimes you can't think clearly and you take certain views that are selfish -- for your own selfish pleasures, self-desire instead of the good of the man."

openly that he would not be influenced in the course of the trial by any of his preconceptions about Muslims generally. See Elfayoumi, 66 M.J. at 357 (noting that question of bias is not whether a member has particular views but whether they can put these views aside to evaluate the case on its merits).

Sixth, Appellant avers that the military judge should have sua sponte dismissed SFC JC from the panel because he stated that Appellant sounded guilty. We note that a member "must be excused when he or she '[h]as []formed or expressed a definite opinion as to the guilt or innocence of the accused as to any offense charged." Nash, 71 M.J. at 88 (quoting R.C.M. 912(f)(1)(M)). However, in the instant case SFC JC's voir dire responses "dispel[led] the possibility" of bias because he stated that his initial opinion was not definite and that he understood Appellant was presumed innocent. See id. at 89; see also Irvin v. Dowd, 366 U.S. 717, 723 (1961). Therefore, we conclude that the military judge did not abuse his discretion in failing to sua sponte dismiss SFC JC.

Seventh, Appellant contends that the military judge should have sua sponte excused CSM MH for ignoring the military judge's order to avoid exposure to any pretrial publicity about Appellant's case. We find this challenge meritless because trial defense counsel specifically opposed MH's removal. We also find that although CSM MH admitted to reading about the MP

stabbing incident in the newspaper, he stated he could put the event out of his mind. Therefore, the military judge did not err in failing to sua sponte disqualify MH.

Eighth, Appellant challenges ten other panel members because of their knowledge of the March 30 stabbing incident. We note, however, that panel members are not automatically disqualified simply because they have learned facts about an accused from outside sources. Cf. Murphy v. Florida, 421 U.S. 794, 799 (1975) (noting that defendant is not presumptively deprived of his due process rights if juror is exposed "to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged"). These ten challenged panel members, along with SGM MH, generally reported learning something along the lines of Appellant overpowering an MP, scuffling with an MP, or stabbing an MP. However, to the extent that the members were asked, they uniformly expressed their ability to lay aside their knowledge of these events in rendering a verdict in this case, which vitiates Appellant's claim of actual bias. Cf. Murphy, 421 U.S. at 800-01 (noting in finding no due process violation that no jurors "betrayed any belief in the relevance of [the defendant's] past to the present case"); United States v. McVeigh, 153 F.3d 1166, 1184 (10th Cir. 1998) (finding no actual bias despite some members learning of appellant's confession

from news reports where jurors indicated they could keep an open mind).

In terms of implied bias, we find none in this instance because trial defense counsel made no attempt to have the members excused based on their knowledge of the stabbing incident, trial defense counsel adequately explored their concerns during the voir dire process, and the members stated that they would judge the case on the merits rather than decide the case based on this incident. Therefore, the military judge did not abuse his discretion by declining to sua sponte dismiss these panel members.

Ninth, and finally, Appellant challenges seven members because of their initial negative reactions to Appellant's attack. Specifically, these members expressed "shock" (or a similar emotion) upon first learning about the events at Camp Pennsylvania. However, we note the long-standing principle that a member "is not disqualified just because he has been exposed to pretrial publicity or even has formulated an opinion as to the guilt or innocence of an accused on the basis of his exposure." United States v. Calley, 22 C.M.A. 534, 537, 48 C.M.R. 19, 22 (1973); see also United States v. Barraza, 576 F.3d 798, 803 (8th Cir. 2009) ("An initial impression about a case does not disqualify a [member] if the [judge] accepts the [member's] assurances that he or she will set aside any

preconceived beliefs and follow the court's instructions.");

United States v. Iribe-Perez, 129 F.3d 1167, 1171 n.4 (10th Cir.

1997) (noting that although "noteworthy trials" will "pique the

interest of the public" and will lead "many potential jurors

[to] have formed initial impressions about the case," a juror

will not be disqualified unless he cannot set aside the initial

impressions).

We find the members' initial reactions to Appellant's

crimes to be neither unreasonable nor unexpected. Cf. Irvin,

366 U.S. at 722 (noting that an "important case can be expected

to arouse the interest of the public" so most jurors will have

"formed some impression or opinion as to the merits of the

case"). And importantly, the members' voir dire responses

indicated that their initial reactions would not impact their

view of the case or affect their decisions in the course of the

court-martial. Therefore, the members' initial reactions did

not provide the military judge with a sua sponte basis to

dismiss the challenged members. See Calley, 22 C.M.A. at 538,

48 C.M.R. at 23 (holding after careful consideration of voir

dire that "none . . . had formed unalterable opinions about

[appellant's] guilt from the publicity").

### E. Venue

Appellant asserts that his trial venue should have been

moved because of pervasive pretrial publicity at Fort Bragg. We

review this challenge for an abuse of discretion.  Loving,

41 M.J. at 282.  Servicemembers are entitled to have their cases

"adjudged by fair and impartial court-martial panels whose

evaluation is based solely upon the evidence," not pretrial

publicity.  United States v. Simpson, 58 M.J. 368, 372 (C.A.A.F.

2003).  Pretrial publicity by itself is not enough, however, for

a change of venue.  Curtis, 44 M.J. at 124.  Instead, an accused

is entitled to a change of venue if the "pretrial publicity

creates 'so great a prejudice against the accused that the

accused cannot obtain a fair and impartial trial.'"  Loving,

41 M.J. at 254 (quoting R.C.M. 906(b)(11) Discussion).

Appellant's change of venue argument is meritless.  The

convening authority had already moved Appellant's case to Fort

Bragg from Fort Campbell, the headquarters for Appellant's unit.

Further, the military judge determined that the pretrial

publicity was not inflammatory and had not saturated the

community.  In addition, as the above panel bias discussion

demonstrates, the voir dire process uncovered no fixed opinions

of Appellant's case that rose to the level of actual prejudice.

See Simpson, 58 M.J. at 372 (defining actual prejudice).

Finally, Appellant's position that the military community's

knowledge of his notorious crimes, standing alone, served as a

basis for a change of venue would, if adopted, essentially have

precluded the military from conducting Appellant's court-martial

at any military installation.  The military judge therefore did
not abuse his discretion in denying Appellant's request to
change venue.

### F.  Conflict of Interest

Appellant raises a number of alleged conflicts of interest
in this case, but we find only one merits discussion -- trial
defense counsels' working relationship with one of the victims,
CPT Andras Marton, who served with the Army Judge Advocate
General's Corps.  At an Article 39(a), UCMJ, hearing, MAJ
Brookhart and CPT Coombs informed the military judge about their
"strictly professional" relationship with CPT Marton.  Counsel
explained that they had tried cases against CPT Marton, but did
not have further contact with him.  Appellant acknowledged that
he was aware of the possible conflict and had the right to be
represented by conflict-free counsel, but he expressly wanted
MAJ Brookhart and CPT Coombs to continue representing him due to
his familiarity with counsel and their familiarity with his
case.

An accused has the right to conflict-free legal
representation.  See United States v. Lee, 66 M.J. 387, 388
(C.A.A.F. 2008); United States v. Murphy, 50 M.J. 4, 10
(C.A.A.F. 1998).  However, he may waive this right so long as it
is knowing and voluntary.  United States v. Davis, 3 M.J. 430,
433 n.16 (C.M.A. 1977).

Although trial defense counsels' relationship with a victim raises some obvious concerns, it does not establish reversible error because Appellant knowingly and voluntarily waived the issue. The military judge engaged in an open discussion with Appellant about the potential conflict. Following this discussion, Appellant informed the military judge that he wanted to waive any conflict or potential conflict. The post-trial affidavits alleging a conflict do not outweigh these considerations because the affidavits are conclusory in nature and are contradicted by trial defense counsel's own statements and by the record.

### G. Trial Defense Counsel Assignments

Appellant complains about unlawful command influence and prosecutorial misconduct stemming from the Government's control of trial defense counsels' assignments. Indeed, the record shows that the lead Government trial counsel arranged for MAJ Brookhart and CPT Coombs to be placed in positions that would not conflict with their roles as Appellant's trial defense counsel. However, because Appellant never objected at trial to trial counsels' role in these assignments, we review the arguments for plain error. See Halpin, 71 M.J. at 479-80.

Appellant cites no case law, and we are aware of none, finding prosecutorial misconduct under similar facts. Although this point is not dispositive because this could be an issue of

84

first impression, it does tend to show that trial counsels'
input into the trial defense counsels' assignments does not
plainly or obviously constitute prosecutorial misconduct.  See
United States v. Tarleton, 47 M.J. 170, 172 (C.A.A.F. 1997)
(noting that "the absence of controlling precedent favorable to
appellant demonstrates that the error, if any, was not plain
error").  But importantly, in reaching our decision on
Appellant's prosecutorial misconduct argument and also his
unlawful command influence argument, we rely heavily on the fact
that Appellant has not demonstrated any unfairness in the
proceedings based on defense counsels' assignments.  See
Simpson, 58 M.J. at 373 (noting there is no unlawful command
influence claim where there is no evidence of unfairness in the
proceedings); United States v. Meek, 44 M.J. 1, 6 (C.A.A.F.
1996) (holding that prosecutorial misconduct claim reviewed for
prejudice); see also Smith v. Phillips, 455 U.S. 209, 219 (1982)
(noting that "touchstone of due process analysis in cases of
alleged prosecutorial misconduct is the fairness of the trial").
Indeed, the record of trial indicates that trial counsels'
actions were intended to assist Appellant by ensuring that his
counsel remained available to him.  We therefore see no basis
for concluding there was prosecutorial misconduct and/or
unlawful command influence in this case.

H.  Trial Defense Counsels' Qualifications

Appellant and amicus raise three distinct arguments about trial defense counsels' qualifications, but as demonstrated below, none of them provides a basis for relief.  First, Appellant contends that trial defense counsel did not have the training or experience necessary to effectively defend him in this case, and challenges the CCA's conclusions that counsel were "well-qualified."  However, after reviewing trial defense counsels' extensive legal experience as summarized at the beginning of this opinion, we reject Appellant's argument outright and agree with the CCA's conclusion that counsel were "well-qualified."

Second, in its brief, amicus curiae advocates that we adopt and apply to the instant case the provisions of Guideline 5.1 of the American Bar Association (ABA) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. This guideline seeks to establish minimum qualifications for counsel in capital cases.  In addressing this issue, we take particular note of the Supreme Court's memorable observation in Ring v. Arizona:  "[D]eath is different."  536 U.S. 584, 606 (2002).  Congress has recognized as much in civilian federal cases by requiring the services of at least one counsel "learned in the law applicable to capital cases."  18 U.S.C. § 3005 (2012).  Congress has even extended this requirement of "learned

86

counsel" to alleged terrorists being prosecuted in military commissions. See 10 U.S.C. § 949a(b)(2)(C)(ii) (2012). We further note that even in the absence of congressional action, the judge advocates general could take unilateral steps to improve the process by which trial litigators are selected in capital cases, and to enhance their training and qualifications. Indeed, LTC Hansen, who we pointedly note was summarily dismissed by Appellant, serves as an example of someone who was particularly well qualified to litigate a capital case. However, as an Article I court, we also note that -- absent constitutional implications in a particular case or congressional authorization -- it is beyond our authority to impose the learned counsel qualification advocated by amicus. Indeed, in the past we have similarly considered and rejected claims that learned counsel must participate in military capital cases. See, e.g., Gray, 51 M.J. at 54; Curtis, 44 M.J. at 127; Loving, 41 M.J. at 300. Nonetheless, "we remain vigilant as to the quality of representation provided servicemembers in capital cases in the military justice system." Gray, 51 M.J. at 54.

Finally, Appellant and amicus argue that we should adopt the ABA Guidelines in analyzing capital defense counsels' performance. However, we instead adhere to the Supreme Court's guidance that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety

of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. We therefore do not adopt the ABA Guidelines as the ultimate standard for capital defense representation in the military. See Pinholster, 131 S. Ct. at 1407 ("It is '[r]are' that constitutionally competent representation will require 'any one technique or approach.'") (quoting Richter, 562 U.S. at 89). Instead, we examine whether "counsel [made] objectively reasonable choices" based on all the circumstances of a case. Van Hook, 558 U.S. at 9 (quoting Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000)).

## I. Mitigation Evidence

Appellant contends that the panel's consideration of mitigation evidence was unconstitutionally limited by the prohibition against guilty pleas in capital cases, which is contained in Article 45(b), UCMJ. This challenge is meritless based on our prior case law. Gray, 51 M.J. at 49; Loving, 41 M.J. at 292; United States v. Matthews, 16 M.J. 354, 362-63 (C.M.A. 1983). It is also meritless under the facts of this case. Appellant refused to allow his counsel to submit any offers to plead guilty, so this potential mitigation evidence would never have been available for him to present at trial.

J.  Exclusion of Occupational Branches

Appellant is correct that the exclusion of nine occupational branches from court-martial service in this case pursuant to Army Regulation (AR) 27-10 would have conflicted with the statutorily defined criteria in Article 25, UCMJ, 10 U.S.C. § 825 (2012).  See United States v. Bartlett, 66 M.J. 426, 429 (C.A.A.F. 2008).  We conclude, however, that here there was no impermissible selection of panel members.

It is true that the initial convening authority was advised that he had to select the panel in accordance with AR 27-10. However, when the succeeding convening authority made his selections he was informed by the acting staff judge advocate: (1) "[Y]ou must detail those members who, in your opinion, are best qualified for the duty by virtue of their age, education, . . . and judicial temperament"; and (2) "You may . . . choose anyone in your general court-martial jurisdiction for service as a court member provided you believe they meet the Article 25 criteria listed above."  We recognize that the succeeding convening authority adopted his predecessor's panel pool, but the succeeding convening authority did not act pursuant to the improper AR 27-10 instruction, but instead acted based on proper legal advisement in accordance with Article 25, UCMJ, criteria.

Also, even if the panel was impermissibly selected pursuant to AR 27-10, we conclude that the Government has met its burden

of showing any error was harmless.  As the Government demonstrates, the six circumstances which this Court identified and relied upon in deciding Bartlett, 66 M.J. at 431, as showing harmless error are also present here:  (1) there is no evidence that the Secretary of the Army acted with an improper motivation in promulgating AR 27-10; (2) the convening authority followed a facially valid regulation without an improper motive; (3) the convening authority had authority to convene a general-court martial; (4) Appellant was sentenced by members who were selected by the convening authority; (5) Appellant was sentenced by members who met the Article 25, UCMJ, criteria; and (6) the military judge noted that the panel had female and African American representation.  We therefore find no reversible error in the convening authority's selection of the panel's venire.

## K.  CCA Ruling on Appellate Experts

Appellant claims that the CCA erred in denying his request for appellate assistance by mental health experts.  The CCA concluded that Appellant had failed to sufficiently show that the expert assistance was necessary.  We review this decision for an abuse of discretion.  Gray, 51 M.J. at 20.  An abuse of discretion arises if the CCA's factual findings are clearly erroneous or if its decision is based on a misapplication of the law.  See United States v. Taylor, 47 M.J. 322, 325 (C.A.A.F.

1997).  Neither factor applies in this instance, and we find no abuse of discretion in the CCA's denial of expert assistance.

## L.  Military Judge's Instructions

Appellant challenges two instructions by the military judge:  (1) the sentencing instruction relating to weighing mitigating and aggravating factors; and (2) the instruction on reconsidering the sentence.  Ordinarily, we review the adequacy of a military judge's instructions de novo.  United States v. MacDonald, 73 M.J. 426, 434 (C.A.A.F. 2014).  However, if an appellant fails to object to the instruction at trial, we review for plain error.  United States v. Thomas, 46 M.J. 311, 314 (C.A.A.F. 1997); R.C.M. 1005(f).

### 1.  Sentencing

The military judge instructed the panel that to impose a death sentence, it had to unanimously determine, in relevant part, (1) "beyond a reasonable doubt, that the aggravating factor existed," and (2) that "the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances."  Appellant now argues that the military judge should have instructed the members that they had to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  Appellant bases this argument on his reading of the Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v.

Arizona, 536 U.S. 584 (2002), which stand for the proposition that a jury must find beyond a reasonable doubt aggravating factors that are necessary to impose the death penalty. See Ring, 536 U.S. at 609; Apprendi, 530 U.S. at 490. However, contrary to Appellant's assertion, these cases do not require any particular standard of proof with regard to weighing the aggravating and mitigating circumstances. United States v. Gabrion, 719 F.3d 511, 533 (6th Cir. 2013) (en banc) (joining six other federal circuits in concluding that decision weighing aggravating and mitigating did not have to be proven beyond a reasonable doubt); Lockett v. Trammel, 711 F.3d 1218, 1253 (10th Cir. 2013). Indeed, the Supreme Court itself has indicated that the beyond a reasonable doubt standard is unnecessary in weighing aggravating and mitigating factors. See Kansas v. Marsh, 548 U.S. 163, 173 (2006) (noting that state could place burden on defendant to prove mitigating circumstances outweighed aggravating circumstances); id. at 174 (noting that states have "a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed"). We therefore find no error in the military judge's sentencing instruction.

    2.  Reconsideration

    After the members requested reconsideration of their sentence, the military judge, without objection and with

Appellant's consent, provided the members with the standard

Benchbook reconsideration instruction 2-7-19.  Dep't of the

Army, Pam. 27-9, Legal Service, Military Judges Benchbook ch. 2

§ VII, para. 2-7-19 (2010).  Appellant now claims the military

judge should have instructed the members either (1) not to

impose death if they had initially voted for life or,

alternatively, (2) to follow the R.C.M. 1004 deliberative

process during reconsideration.[21]  The parties agree that

Appellant forfeited this issue by failing to raise it at trial,

so we review this claim for plain error.  See Thomas, 46 M.J. at

314.

We find no plain or obvious error in the military judge's

reconsideration instruction.  First, Appellant has cited no case

law to support his position that "R.C.M. 1009 does not authorize

a panel to reconsider its sentencing determination with a view

toward increasing a sentence to death."  There also is no

factual support for Appellant's position because the record does

not indicate whether the panel requested reconsideration in

---

[21] Panel members are required to make four unanimous findings
before imposing the death penalty:  (1) the accused was guilty
of an offense that authorized the imposition of the death
penalty, R.C.M. 1004(a)(1)-(2); (2) one aggravating factor
existed beyond a reasonable doubt, R.C.M. 1004(b)(7); (3) "the
extenuating or mitigating circumstances [were] substantially
outweighed by any aggravating circumstances," R.C.M.
1004(b)(4)(C); and (4) the accused should be sentenced to death,
R.C.M. 1006(d)(4)(A).  See also United States v. Simoy, 50 M.J.
1, 2 (C.A.A.F. 1998).

order to increase Appellant's sentence to death or to decrease his sentence. Second, we are not persuaded that a plain reading of the text of this rule mandates this conclusion. For instance, R.C.M. 1009(e)(3)(A), which identifies the number of votes needed to increase a sentence on reconsideration, does not provide an exception in death penalty cases. The reconsideration provision for decreasing a sentence, on the other hand, does contain a specific provision for death cases. See R.C.M. 1009(e)(3)(B)(i). Because R.C.M. 1009 does not explicitly prohibit the panel from reconsidering a sentence in a capital case with a view to increasing the sentence to death, we conclude that the military judge's reconsideration instruction was not plainly erroneous. Without case law or the text of R.C.M. 1009 clearly supporting Appellant's claim, we find no plain or obvious error. See United States v. Nieto, 66 M.J. 146, 150 (C.A.A.F. 2008) (finding no clear or obvious error where "at the time of trial, the case law from this Court did not preclude trial counsel's questions, generally applicable federal criminal law did not provide guidance on point, and only a handful of state cases addressed this matter").

Third, Appellant has not demonstrated that it was plain error for the military judge to authorize a revote without repeating the required instructions under R.C.M. 1004(b)(6). In regard to this argument, it is sufficient to note that the

military judge read, with Appellant's express agreement, Benchbook instruction 2-7-19, which specifically instructed the members to "adhere to all my original instructions for proposing and determining an appropriate sentence." We therefore find no reversible error stemming from the military judge's reconsideration instruction.

### M. Motion to Suppress

Appellant argues that the military judge's decision to admit Appellant's confession under the public safety exception was error because the confession was obtained in violation of his Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), and Miranda[22] rights.[23] The following facts serve as the basis for this challenge.

---

[22] Miranda v. Arizona, 384 U.S. 436 (1966).

[23] Because Appellant frames the issue in the context of the public safety exception, we discuss this exception infra. We note, however, that other grounds also support the conclusion that MAJ Warren's brief questioning under the attendant circumstances did not violate Appellant's Article 31(b), UCMJ, rights. Our case law provides that these warnings are not required when an accused's questioner is "fulfill[ing] his operational responsibilities" and not attempting "to evade constitutional or codal rights." United States v. Loukas, 29 M.J. 385, 389 (C.M.A. 1990). Here, MAJ Warren, who served as an intelligence officer, tasked himself with security following Appellant's attack. MAJ Warren's purpose was operational as demonstrated by the obvious safety concerns and his limited questioning of Appellant. MAJ Warren also was not seeking to avoid Appellant's statutory or constitutional rights. Given the urgency of the threat to Camp Pennsylvania after Appellant's attack and MAJ Warren's ad hoc security position, we find that MAJ Warren was acting in an operational capacity and conclude there was no need to provide Appellant with an Article 31(b), UCMJ, warning. Loukas, 29 M.J. at 389.

Shortly after Appellant's attack on the brigade officers at Camp Pennsylvania, COL Hodges informed MAJ Warren, who was coordinating security: "This may be one of our own. 2d Battalion is missing an engineer soldier. His name is Sergeant Akbar. . . . There's some ammo missing." Soon after this briefing, MAJ Warren found Appellant, grabbed him, and forced him to lie face down on the ground. Once Appellant was on the ground, MAJ Warren pointed his firearm at Appellant while holding him down with his left hand. He then told Appellant not to move. After reholstering his firearm as another soldier stood guard, MAJ Warren kneeled down, looked directly at Appellant's face, and asked Appellant, "Did you do this? Did you bomb the tent?" Appellant responded, "Yes." Prior to questioning Appellant, MAJ Warren did not give Appellant any Article 31(b), UCMJ, warnings.

We conclude that the military judge did not abuse his discretion in admitting Appellant's confession. The Supreme Court has recognized a public safety exception to Miranda warnings. New York v. Quarles, 467 U.S. 649, 655-56 (1984). We have extended this exception to Article 31, UCMJ, rights advisements "when life is endangered." United States v. Jones, 26 M.J. 353, 357 (C.M.A. 1988); see also United States v. Morris, 28 M.J. 8, 14 (C.M.A. 1989). In an instance such as this one, an unwarned statement is inadmissible under Article

31(b), UCMJ, unless (1) the statement falls within the public safety exception and (2) the statement was voluntary.  Jones, 26 M.J. at 357; cf. Quarles, 467 U.S. at 654 (noting that in absence of evidence of compelled confession, Court was only examining whether public safety justified failure to give Miranda warning).  Appellant challenges only the public safety exception aspect of this test.

We conclude that the public safety exception did apply to Appellant's statement.  MAJ Warren conducted his questioning of Appellant in a combat staging area shortly after Appellant's deadly attack on the brigade's officer corps on the eve of battle.  At the time MAJ Warren questioned Appellant, the perpetrator of the attack remained at large and his identity was unclear.  MAJ Warren's questioning ensured that no further life would be endangered by seeking to definitively ascertain the identity of the attacker.  Once MAJ Warren obtained the admission, he ceased all questioning, further indicating that the questions were elicited solely to secure the safety of the Camp.  See Quarles, 467 U.S. at 659 (observing applicability of public safety exception where law enforcement "asked only the question necessary to locate the missing gun before advising respondent of his rights").  Under these circumstances, the

military judge did not err in concluding the public safety exception applied.[24]

Even assuming that the admission of Appellant's confession was error, it was harmless beyond a reasonable doubt.  The admission of a confession is prejudicial if, after reviewing the entire record of an individual case, "'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'"  United States v. Mott, 72 M.J.

---

[24] We note that whether Appellant's admission was voluntary is a closer question.  When evaluating the voluntariness of a statement, we "review the totality of the circumstances to determine whether Appellant's 'will was overborne and his capacity for self-determination was critically impaired.'" United States v. Chatfield, 67 M.J. 432, 439 (C.A.A.F. 2009) (quoting United States v. Bubonics, 45 M.J. 93, 95 (C.A.A.F. 1996)).  This inquiry examines "the accused's age, education, experience and intelligence."  Id. at 439-40.  Certain factors support the position that Appellant's statement was coerced, such as Appellant being physically secured and questioned by a superior commissioned officer.  See United States v. Jones, 73 M.J. 357, 360 (C.A.A.F. 2014) (noting existence of subtle pressures in military society when questioned by military superior); United States v. Morris, 49 M.J. 227, 230 (C.A.A.F. 1998) (examining whether physical abuse was factor in confession).  We also recognize that MAJ Warren pointed a weapon at Appellant, but the military judge found that Appellant "never saw the weapon pointed at him."  Appellant does not state why this finding is clearly erroneous, so we do not consider MAJ Warren's brandishing the weapon in our analysis.  Further, any other coercive factors were minimal, and we therefore find under the totality of the circumstances that Appellant's confession was voluntary given his age, his college education, his rank as an NCO, and his intelligence.  See Morris, 49 M.J. at 230 (noting accused's age and education as factors in determining coercive nature of interrogation).  Cf. United States v. Carroll, 207 F.3d 465, 472 (8th Cir. 2000) (finding use of physical force to subdue defendant resisting arrest did not render confession involuntary).

319, 332 (C.A.A.F. 2013) (quoting United States v. Moran, 65 M.J. 178, 187 (C.A.A.F. 2007)).  Appellant's confession presents no such reasonable possibility because Appellant did not contest his identity as the attacker at the court-martial. Also, there was overwhelming evidence that Appellant was responsible for the attack, including Appellant's fingerprints on the generator switch, the rounds from Appellant's weapon matched the rounds used in the attack, and Appellant's possession of grenades when apprehended.  See United States v. Powell, 49 M.J. 460, 464 (C.A.A.F. 1998) (explaining that Supreme Court in Arizona v. Fulminante, 499 U.S. 279 (1991), found admission of an involuntary confession harmless where there was overwhelming evidence of guilt).  This overwhelming evidence directly linked Appellant to the attack, and we find that any error in admitting Appellant's admission was harmless beyond a reasonable doubt.

### N.  Military Capital Case Procedures

Appellant challenges the constitutionality of three aspects of the military capital procedures:  (1) the congressional delegation of capital sentencing procedures to the President; (2) R.C.M. 1004's authorization for the convening authority to add aggravating elements at referral; and (3) the lack of a system to ensure consistent application of the death penalty in the military.  None of these challenges warrants relief.

First, the Supreme Court has already upheld the congressional delegation of the R.C.M. 1004 capital sentencing procedures to the President in United States v. Loving, 517 U.S. 748 (1996). Appellant claims that the Supreme Court's decision in Ring v. Arizona, 536 U.S. at 608-09, "overruled Loving sub silentio." However, the Supreme Court has instructed: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989). Consistent with this mandate, we will continue to adhere to the holding in Loving unless the Supreme Court decides at some point in the future that there is a basis to overrule that precedent. As a result, we reject Appellant's constitutional challenge to R.C.M. 1004 on the basis that it constitutes an improper delegation of power.

Second, Appellant argues that R.C.M. 1004 violates his due process rights by allowing the convening authority to add and amend aggravating factors at the time of referral. The relevant R.C.M. 1004 provision states:

> Before arraignment, trial counsel shall give the defense written notice of which aggravating factors under subsection (c) of this rule the prosecution intends to prove. Failure to provide timely notice

> under this subsection of any aggravating factors under
> subsection (c) of this rule shall not bar later notice
> and proof of such additional aggravating factors
> unless the accused demonstrates specific prejudice
> from such failure and that a continuance or a recess
> is not an adequate remedy.

R.C.M. 1004(b)(1) (2005 ed.). In this case, the charge sheet
omitted the R.C.M. 1004(c) aggravating factors, but it contained
special instructions that the court-martial "be tried as a
capital case." In accordance with R.C.M. 1004(b)(1), the
Government notified Appellant prior to arraignment of the two
aggravating factors it intended to prove.[25]

An aggravating factor that renders an accused eligible for
death is "the functional equivalent of an element of a greater
offense." Ring, 536 U.S. at 609 (quoting Apprendi, 530 U.S. at
494 n.19). The Supreme Court has determined that the Fifth
Amendment's due process clause and the Sixth Amendment's notice
and jury trial guarantees require any fact "that increases the
maximum penalty for a crime [to be] charged in an indictment,
submitted to a jury, and proven beyond a reasonable doubt."
Jones v. United States, 526 U.S. 227, 243 n.6 (1999). For
purposes of this appeal, we assume that the Government must
allege in the charge sheet the aggravating factor as a
functional equivalent of an element, and we therefore further

---

[25] Following Appellant's conviction, the Government, without
objection from Appellant, withdrew one of the aggravating
factors, leaving only one -- that there were multiple
convictions of premeditated murder in the case.

assume that the Government erred in failing to allege the aggravating factor on the charge sheet in the instant case.

Federal circuit courts have labeled this type of charging error as an "Apprendi error." See, e.g., United States v. Robinson, 367 F.3d 278, 285 (5th Cir. 2004) (defining "Apprendi error" as "the failure of an indictment specifically to charge aggravating factors regarded as elements because they increase the maximum available punishment"). Those circuit courts that have examined the issue have determined such a charging error is subject to harmless error review. See, e.g., id. at 286 (concluding that Apprendi error is not a structural error and subject to harmless error review); see also 5 Wayne R. LaFave et al., Criminal Procedure § 19.3, at 265 (3d ed. 2007) (Circuit courts have "almost uniformly held that the failure of the indictment to include the Apprendi-element, like the failure to submit that element to the jury, [is] subject to harmless error review."). Our case law also indicates that this type of Apprendi error would be subject to harmless error review. See United States v. Humphries, 71 M.J. 209, 215 (C.A.A.F. 2012) (noting that each case in which an element was not alleged "must be reviewed for harmless error to determine whether the constitutional error was harmless beyond a reasonable doubt"). Because Appellant preserved the charging issue at trial, the Government bears the burden of establishing the error was

harmless beyond a reasonable doubt.  See id. at 213 n.5; United States v. Savala, 70 M.J. 70, 77 (C.A.A.F. 2011).  A specification's failure to allege an element is not harmless if this "error frustrated an accused's right to notice and opportunity to zealously defend himself."  United States v. Gaskins, 72 M.J. 225, 233 (C.A.A.F. 2013).

The Government has established that any error in failing to allege the aggravating factor in the charge sheet was harmless.  First, the fundamental essence of the aggravating factor ultimately pursued by the Government -- multiple murder (R.C.M. 1004(c)(7)(J)) -- already appeared on the charge sheet as Appellant was charged in separate specifications with murdering CPT Seifert and MAJ Stone, and the investigating officer recommended that both specifications go forward.  Cf. Robinson, 367 F.3d at 288-89 (concluding that Apprendi error was harmless in part where there was sufficient evidence that grand jury would have indicted had it known the proper elements).  Second, the Government has demonstrated that Appellant's trial defense counsel could not articulate how he would have altered his strategy at the Article 32, UCMJ, 10 U.S.C. § 832 (2012), hearing had the charge sheet specifically alleged the aggravating factor.  Finally, Appellant received actual notice of the aggravating factors prior to his arraignment pursuant to R.C.M. 1004(c)(1) allowing him ample opportunity to prepare for

the aggravating factor.  See Robinson, 367 F.3d at 287 (finding
Apprendi error harmless in part where defendant had sufficient
notice and opportunity to defend against aggravating factor).
We therefore conclude that any error in failing to allege the
aggravating factor in the charge sheet was harmless.  Because we
resolve Appellant's due process argument on harmless error
grounds, we do not need to reach the issue of whether R.C.M.
1004 is unconstitutional in the instant case.  However, we note
that Appellant has raised a viable question as to whether
adherence to the provisions of R.C.M. 1004(b)(1) may violate
Fifth Amendment due process rights.  See Ring, 536 U.S. at 609;
Apprendi, 530 U.S. at 490; Jones, 526 U.S. at 243 n.6; United
States v. Fosler, 70 M.J. 225, 229-30, 232 (C.A.A.F. 2011); cf.
United States v. Lawrence, 735 F.3d 385, 420 (6th Cir. 2013)
("After Ring, several courts have held that an indictment
charging a death-eligible offense under the [Federal Death
Penalty Act] must charge the statutory aggravating factors.").

Third, citing the provisions in the United States
Attorneys' Manual that set forth policies and procedures in
federal civilian capital cases, Appellant claims the military's
failure to create similar procedures violates his Article 36,
UCMJ, rights and his Fifth Amendment equal protection rights.
Appellant's reliance on Article 36, UCMJ, is unpersuasive
because this article does not require the President to prescribe

similar policies for military death penalty cases.  See Article

36(a), UCMJ, 10 U.S.C. 836(a) (2012) (noting that pretrial

procedures "may be prescribed by the President, which shall, so

far as he considers practicable, apply the principles of law and

the rules of evidence generally recognized in the trial of

criminal cases in the United States district courts").

Appellant's equal protection argument is equally

unpersuasive.  Appellant asserts that servicemembers who are

death-eligible are treated differently than their similarly

situated civilian counterparts because convening authorities do

not have to comply with death penalty protocols.  "An 'equal

protection violation' is discrimination that is so unjustifiable

as to violate due process."  United States v. Rodriguez-Amy,

19 M.J. 177, 178 (C.M.A. 1985).  However, "equal protection is

not denied when there is a reasonable basis for a difference in

treatment."  United States v. McGraner, 13 M.J. 408, 418 (C.M.A.

1982).  We do not find any unjustifiable discrimination in the

instant case because Appellant, as an accused servicemember, was

not similarly situated to a civilian defendant.  See Parker v.

Levy, 417 U.S. 733, 743 (1974) ("[T]he military is, by

necessity, a specialized society separate from civilian

society.").  We also note that "[t]he policy of the Justice

Department is but an internal policy, without the force of law

and subject to change or suspension at any time."  Therefore, it

does not serve as the basis for an equal protection violation.

See United States v. Jones, 527 F.2d 817, 822 (D.C. Cir. 1975);

cf. United States v. Lopez-Matias, 522 F.3d 150, 156-57 (1st

Cir. 2003) (concluding United States Attorneys' Manual on death

penalty protocols did not confer substantive rights).[26]

Accordingly, we conclude there was no equal protection

violation.

O. Constitutionality of Death Sentence

Appellant contends that his death sentence violates (1) his

Fifth Amendment rights because he has been denied due process

and (2) his Eighth Amendment rights because his mental illness

renders the punishment disproportionate to his culpability.  We

conclude that the claim of a Fifth Amendment due process

violation is too vague to merit relief.[27]

Similarly, we are unpersuaded by Appellant's Eighth

Amendment claim.  First, courts have uniformly determined that

there is no constitutional impediment to imposing a capital

---

[26] In his reply brief, Appellant notes two other differences
between the military and civilian systems:  (1) the military
system did not allow him to be tried by a military judge alone;
and (2) the military system only provided one peremptory
challenge instead of the twenty permitted in the civilian
system.  While we recognize differences exist, we find no
unjustifiable differences that rise to the level of an equal
protection violation.

[27] We also doubt that we have the authority to hold "capital
punishment per se violative of due process."  See United States
v. Sampson, 486 F.3d 13, 28 (1st Cir. 2007) (citing Chapman v.
United States, 500 U.S. 453, 465 (1991)); United States v.
Quinones, 313 F.3d 49, 70 (2d Cir. 2002).

sentence where a criminal defendant suffers from a mental illness.[28]  See, e.g., Mays v. Stephens, 757 F.3d 211, 219 (5th Cir. 2014) (noting that no Supreme Court case has "created a rule of constitutional law making the execution of mentally ill persons unconstitutional"); Franklin v. Bradshaw, 695 F.3d 439, 455 (6th Cir. 2012) (noting "no authorities have extended [Supreme Court precedent] to prohibit the execution of those with mental illnesses"); Carroll v. Secretary, DOC, 574 F.3d 1354, 1369 (11th Cir. 2009); Baird v. Davis, 388 F.3d 1110, 1114 (7th Cir. 2004) (noting Supreme Court has not ruled on executions of those "who kill under an irresistible impulse").

Second, Appellant's specific mental illness did not make his death sentence highly disproportionate to his culpability. The Eighth Amendment prohibits punishments, including the death penalty, that are greatly disproportionate to the culpability of the accused, and thus "individualized consideration" is constitutionally required in imposing the death sentence. Enmund v. Florida, 458 U.S. 782, 798 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605 (1978)).  The record demonstrates that

---

[28] The Supreme Court has identified three discrete classes of offenders who are exempt from execution under the Eighth Amendment:  (1) those who are insane (and we note that being insane is not the same as having a mental illness), Ford v. Wainwright, 477 U.S. 399, 410 (1986); (2) those who suffer from intellectual disability, Hall v. Florida, 134 S. Ct. 1986, 1992 (2014), Atkins v. Virginia, 536 U.S. 304, 321 (2002); and (3) those who were under the age of eighteen when they committed their crimes, Roper v. Simmons, 543 U.S. 551, 575 (2005).

individualized consideration did occur in the instant case.  We

first note that most of the mental health experts who examined

Appellant concluded that although he suffered from some form of

mental illness, he was mentally responsible at the time he

committed the offenses.  Further, the panel members not only

determined that Appellant had the requisite mental ability to

form the premeditated intent to kill when he committed the

offenses, they also determined that he deserved the punishment

of death for those offenses.  Accordingly, this record does not

support the conclusion that Appellant's mental impairments

rendered his death sentence highly disproportionate to his

culpability.

Third, to the extent Appellant claims that his mental

illness presently rises to the level of insanity, once again the

record does not support such a conclusion.  We recognize that an

accused's "earlier competency to be held responsible for

committing a crime and to be tried for it" does not foreclose a

later determination that he or she is presently insane and

cannot be executed.  Panetti v. Quarterman, 551 U.S. 930, 934

(2007).  However, prior to and during the court-martial

proceedings, mental health experts determined that Appellant was

mentally responsible at the time of the offense and mentally

competent to stand trial.  There is no basis in the record for

108

us to conclude that Appellant is presently insane.[29]  Therefore,

we reject Appellant's Eighth Amendment challenge premised on a

claim of mental illness.  See Ford v. Wainwright, 477 U.S. 399,

410 (1986).

### P.  Crime Scene Photographs

Appellant contends that the admission of the Government's

crime scene photographs violated his Fifth and Eighth Amendment

right to due process because they were unduly prejudicial.  We

reject this challenge.  We conclude that "it cannot be seriously

argued that [the autopsy and surgical] photographs were admitted

only to inflame or shock this court-martial."  Gray, 51 M.J. at

35.

### Q.  Voir Dire

Appellant asserts that the Government used voir dire to

impermissibly advance the Government's theory.  The Discussion

to Rule 912 states that voir dire should not be used "to argue

the case."  R.C.M. 912(d) Discussion (2005 ed.).  However,

Appellant does not cite any instances in the record where this

occurred, and our review of the record does not reveal (1) any

questions in which the Government impermissibly advanced its

---

[29] We recognize that appellate defense counsel signed a January 28, 2010, affidavit identifying certain behaviors by Appellant that they believed might call into question Appellant's competency to assist with his appeal.  We are unaware, however, of any diagnosis from a mental health professional or any judicial finding that Appellant was or is insane.

theory or (2) any objections by Appellant on this basis.  This issue therefore does not provide any basis for reversal.

### R.  Government Peremptory Challenge

Appellant challenges the constitutionality of the Government's use of peremptory challenges to remove a member whose moral bias against the death penalty does not justify a challenge for cause.  As Appellant recognizes, we have previously rejected this argument.  See Loving, 41 M.J. at 294-95; see also Gray, 51 M.J. at 33.  He provides no compelling reason for us to reconsider our prior precedent, and we decline to do so.

### S. Panel Reconsideration

Appellant claims that the panel's reconsideration of its sentence violated the Fifth Amendment double jeopardy clause. The Supreme Court has held that, under the double jeopardy clause, a defendant cannot be sentenced to death at a retrial if he was sentenced to life imprisonment following a trial-like capital sentencing proceeding at his first trial.  Caspari v. Bohlen, 510 U.S. 383, 386 (1994) (citing Bullington v. Missouri, 451 U.S. 430, 446 (1981)).  However, the circumstances of the instant case are quite different from those in the cases cited above because here the same panel reconsidered its own sentence during its one and only deliberation session.  Therefore, this

Supreme Court precedent is readily distinguishable.[30]  Moreover,

we are unaware of any other cases that have applied double

jeopardy principles to reconsideration of a death sentence at

the same trial and during the course of the same deliberations,

and Appellant has cited no such authority.  For these reasons,

we conclude that there is no double jeopardy violation stemming

from the panel's reconsideration of its sentence in the course

of its deliberations, and its ultimate imposition of a death

sentence in this case.

### T.  CCA Proportionality Review

Appellant seeks a remand because the CCA failed to engage

in a proportionality review.  Although not constitutionally

required, we have interpreted Article 66(c), UCMJ, 10 U.S.C. §

866(c) (2012), as requiring the courts of criminal appeals to

perform proportionality reviews of death sentences as part of

the sentence appropriateness determination.  United States v.

Curtis, 33 M.J. 101, 109 (C.M.A. 1991).  Our task is to assure

that the lower court's review was "properly performed."  Id.

However, we do not require a lower court to "always articulate

its reasoning for its decisions."  United States v. Wean, 37

---

[30] Even if Bullington could be analogized to the circumstances of this case, the record before us does not reveal the circumstances or results of the panel's first vote.  Therefore, there is no evidence upon which to base a conclusion that the panel's ultimate sentence of death violated any double jeopardy principles.

111

M.J. 286, 287 (C.M.A. 1993) (citing United States v. Clifton, 35 M.J. 79 (C.M.A. 1992)); see also United States v. Winckelmann, 73 M.J. 11, 16 (C.A.A.F. 2013) (stating that CCA was not "obligated" to detail its analysis); United States v. Matias, 25 M.J. 356, 361 (C.M.A. 1987) (noting that no provision in the UCMJ or the R.C.M. requires the lower court to address all assignments of error in a written opinion).

Although the CCA did not explicitly include any discussion of a proportionality review in its opinion, we conclude that Appellant received a proper legal review under Article 66(c), UCMJ. We first note that Appellant raised an Article 66(c), UCMJ, proportionality challenge below, so the CCA was fully aware of the need to resolve this issue. We next note that, absent evidence to the contrary, we presume that the judges on the courts of criminal appeals know and properly apply the law. United States v. Schweitzer, 68 M.J. 133, 139 (C.A.A.F. 2009). Given this presumption and these facts, we find that the CCA implicitly performed its Article 66(c), UCMJ, proportionality review when it determined, both initially and on reconsideration, that Appellant's approved sentence was "correct in law and fact." Cf. United States v. Reed, 54 M.J. 37, 42-43 (C.A.A.F. 2000) (finding "nothing in the opinion that would lead one to conclude that the lower court did not give . . . appellant's assignment[] of error careful consideration").

United States v. Akbar, No. 13-7001/AR

Although we emphasize that an explicit discussion by the CCA of
its proportionality review would have been far preferable,[31] we
do not find a sufficient basis to remand this case for the CCA
to explicitly articulate its reasoning in the course of
performing its proportionality review.[32]

## U.  Joint Affidavits

The courts of criminal appeals are authorized to compel
trial defense counsel to submit affidavits.  United States v.
Lewis, 42 M.J. 1, 5 (C.A.A.F. 1995).  Here, the CCA authorized
trial defense counsel, MAJ Brookhart and CPT Coombs, to submit
joint affidavits.  Appellant challenges this decision because
the joint affidavits prevented him from obtaining the
independent recollections of each counsel.

---

[31] Cf. United States v. Durant, 55 M.J. 258, 261 (C.A.A.F. 2001)
(noting that lower court analysis is "extremely beneficial" in
cases involving unique sentencing issues because "[s]ound
articulation of their rationale . . . avoids speculation and
promotes judicial economy").

[32] Even if the CCA erred by failing to perform a proportionality
review, we conclude that any error was harmless.  See Article
59(a), UCMJ, 10 U.S.C. § 859(a) (2012).  We require the CCA to
employ a general offense-oriented proportionality review, United
States v. Gray, 51 M.J. 1, 63 (C.A.A.F. 1999), meaning that the
CCA must consider whether the sentence is appropriate for the
crimes of conviction and whether the sentence is generally
proportional to those imposed by other jurisdictions under
similar situations.  Curtis, 33 M.J. at 109.  To perform this
latter function, the service courts may consider military cases,
federal district court cases, and Supreme Court decisions on
state cases involving circumstances similar to an appellant's.
Gray, 51 M.J. at 63; Curtis, 33 M.J. at 109.  Here, the
Government has adequately shown that the capital sentence was
both appropriate and proportional for Appellant's actions.

The courts of criminal appeals have "discretion . . . to determine how additional evidence, when required, will be obtained." Lewis, 42 M.J. at 6. They may determine that evidence is required "by affidavit, testimony, stipulation, or a factfinding hearing." Boone, 49 M.J. at 193. "We are reluctant to mandate procedures for the" courts of criminal appeals, but we will do so when appropriate. Lewis, 42 M.J. at 6.

We conclude that the CCA did not abuse its discretion in permitting trial defense counsel to submit joint affidavits. Appellant has not cited any authorities directly prohibiting the use of joint affidavits, and we have found none.[33] Absent any authority prohibiting the use of joint affidavits, we conclude that the CCA did not abuse its discretion in allowing trial defense counsel to submit one.

Although we conclude that there was no error, we do have reservations about the submission of joint affidavits by trial defense counsel when an appellant alleges ineffective assistance

---

[33] There is authority that the use of joint affidavits is "undesirable." Masiello v. United States, 304 F.2d 399, 402 (D.C. Cir. 1962) (discussing joint affidavits in warrant applications). As noted infra, we agree with this assessment. However, a federal district court also has noted that it was unable to find "any authority for the proposition that the use of a joint affidavit is per se improper" and that "numerous courts" in the Second Circuit had referred to or relied on them. Steward v. Graham, No. 01-CV-0569, 2007 U.S. Dist. LEXIS 101402, at *26 n.14 (N.D.N.Y. July 24, 2007), adopted by 2008 U.S. Dist. LEXIS 40381, at *3 (N.D.N.Y. May 19, 2008), 2008 WL 2128172, at *10 n.14 (N.D.N.Y. May 19, 2008).

of counsel.  Almost by necessity, joint affidavits harmonize the memories and views of each counsel, and they often use the pronoun "we" when explaining the actions or reasoning that only one counsel may have engaged in.  Therefore, although "[w]e evaluate the combined efforts of the defense as a team rather than evaluating the individual shortcomings of any single counsel," United States v. Garcia, 59 M.J. 447, 450 (C.A.A.F. 2004), we conclude that the better practice in future cases is for the courts of criminal appeals to require counsel to submit individual affidavits.  Nonetheless, we conclude there was no error in the instant case.

## III.  Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.

Appendix

Issues Presented

A.I

SGT HASAN K. AKBAR WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AT EVERY CRITICAL STAGE OF HIS COURT-MARTIAL.

A.II

THIS COURT SHOULD ORDER A POST-TRIAL EVIDENTIARY HEARING TO RESOLVE DISPUTED FACTUAL ISSUES RELEVANT TO SGT AKBAR'S NUMEROUS COLLATERAL CLAIMS UNLESS THIS COURT FINDS IN HIS FAVOR ON ANOTHER DISPOSITIVE GROUND.

A.III

WHETHER THE PROSECUTION'S VICTIM-IMPACT PRESENTATION AND ARGUMENT, AND COUNSEL'S FAILURE TO OBJECT, VIOLATED SGT AKBAR'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

A.IV

THE MILITARY JUDGE, BY FAILING TO SUA SPONTE DISMISS FOURTEEN OF THE FIFTEEN PANEL MEMBERS FOR CAUSE BASED ON ACTUAL AND IMPLIED BIAS MANIFESTED BY RELATIONSHIPS OF THE MEMBERS, A PREDISPOSITION TO ADJUDGE DEATH, AN INELASTIC OPINION AGAINST CONSIDERING MITIGATING EVIDENCE ON SENTENCING, VISCERAL REACTIONS TO THE CHARGED ACTS, PRECONCEIVED NOTIONS OF GUILT, AND DETAILED KNOWLEDGE OF UNCHARGED MISCONDUCT THAT HAD BEEN EXCLUDED, DENIED SGT AKBAR A FAIR TRIAL.

A.V

THE MILITARY JUDGED ERRED TO SGT AKBAR'S SUBSTANTIAL PREJUDICE BY DENYING HIS MOTION FOR CHANGE OF VENUE.

A.VI
SGT AKBAR WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHT TO COUNSEL WHEN HIS TRIAL DEFENSE COUNSEL ACTIVELY REPRESENTED CONFLICTING INTERESTS WHICH ADVERSELY AFFECTED THEIR PERFORMANCE.

A.VII

"WHERE [UNLAWFUL COMMAND INFLUENCE] IS FOUND TO EXIST, JUDICIAL
AUTHORITIES MUST TAKE THOSE STEPS NECESSARY TO PRESERVE BOTH THE
ACTUAL AND APPARENT FAIRNESS OF THE CRIMINAL PROCEEDING."
UNITED STATES v. LEWIS, 63 M.J. 405, 407 (C.A.A.F. 2006).
PROSECUTORIAL MISCONDUCT IS "ACTION OR INACTION BY A PROSECUTOR
IN VIOLATION OF SOME LEGAL NORM OR STANDARD, e.g., A
CONSTITUTIONAL PROVISION, A STATUTE, A MANUAL RULE, OR AN
APPLICABLE PROFESSIONAL ETHICS CANON."  UNITED STATES v. MEEK,
44 M.J. 1, 5 (C.A.A.F. 1996).  IN THIS CASE, GOVERNMENT COUNSEL
MANIPULATED THE DUTY ASSIGNMENTS OF SGT AKBAR'S TRIAL DEFENSE
COUNSEL TO AVOID TRIAL DELAY AND THEREBY CREATED A CONFLICT OF
INTERESTS. See A.E. VI, SEC. E. DID GOVERNMENT COUNSEL'S ACTIONS
AMOUNT TO UNLAWFUL COMMAND INFLUENCE OR PROSECUTORIAL MISCONDUCT
IN VIOLATION OF SGT AKBAR'S RIGHT TO DUE PROCESS?

A.VIII

STANDARDS APPLICABLE TO FEDERAL AND STATE CAPITAL DEFENSE
COUNSEL HAVE APPLICABILITY TO COURTS-MARTIAL AS RELEVANT
STANDARDS OF CARE AND THE ARMY COURT'S ANALYSIS OF SGT AKBAR'S
CASE WAS FLAWED BECAUSE OF ITS MISAPPLICATION OF THE GUIDELINES
AND ITS DETERMINATION COUNSEL WERE "WELL-QUALIFIED."

A.IX

DENYING SGT AKBAR THE RIGHT TO PLEAD GUILTY UNCONSTITUTIONALLY
LIMITED HIS RIGHT TO PRESENT MITIGATION EVIDENCE.  IN THE
ALTERNATIVE, COUNSEL'S FAILURE TO DEMAND AN INSTRUCTION ON THIS
LIMITATION OF MITIGATION PRESENTATION AMOUNTED TO [INEFFECTIVE
ASSISTANCE OF COUNSEL] AS OMISSION OF THE INSTRUCTION DENIED SGT
AKBAR MITIGATION EVIDENCE IN VIOLATION OF THE EIGHTH AMENDMENT.

A.X

THE SECRETARY OF THE ARMY'S EXEMPTION FROM COURT-MARTIAL SERVICE
OFFICERS OF THE SPECIAL BRANCHES NAMED IN AR 27-10 VIOLATED
ARTICLE 25(d)(2), UCMJ, PREJUDICING SGT AKBAR'S RIGHT TO DUE
PROCESS AND A FAIR TRIAL.

A.XI

AS SGT AKBAR'S TRIAL DEFENSE COUNSEL DID NOT ADEQUATELY
INVESTIGATE HIS CASE, THE ARMY COURT ERRED DENYING HIS REQUEST
TO RETAIN PSYCHIATRIST AND PSYCHOLOGIST DR. RICHARD DUDLEY AND
DR. JANICE STEVENSON, OR OTHERWISE, ORDERING PROVISION OF
ADEQUATE SUBSTITUTES.  FURTHER INVESTIGATION BY APPELLATE

DEFENSE COUNSEL ALSO REVEALS THE NECESSITY OF OBTAINING THE EXPERT ASSISTANCE OF CLINICAL PSYCHOLOGIST DR. WILBERT MILES.

A.XII

THE MILITARY JUDGE COMMITTED PLAIN ERROR BY PROVIDING SENTENCING RECONSIDERATION INSTRUCTIONS THAT FAILED TO INSTRUCT THE PANEL DEATH WAS NO LONGER AN AVAILABLE PUNISHMENT IF THE PANEL'S INITIAL VOTE DID NOT INCLUDE DEATH AND DID NOT COMPLY WITH R.C.M. 1004.

A.XIII

THE MILITARY JUDGE ERRED IN NOT SUPPRESSING THE STATEMENT "YES" BY SGT AKBAR TO MAJ WARREN, WHEN THAT STATEMENT WAS GIVEN WHILE SGT AKBAR WAS AT GUNPOINT, IN CUSTODY, AND BEFORE HE RECEIVED RIGHTS WARNINGS UNDER MIRANDA v. ARIZONA OR ARTICLE 31(b), UCMJ.

A.XIV

UNDER THE SUPREME COURT'S REASONING IN RING v. ARIZONA, 536 U.S. 584 (2002), CONGRESS UNCONSTITUTIONALLY DELEGATED TO THE PRESIDENT THE POWER TO ENACT ELEMENTS OF CAPITAL MURDER, A PURELY LEGISLATIVE FUNCTION.

A.XV

DID THE PROCEDURES PROVIDED UNDER R.C.M. 1004 VIOLATE SGT AKBAR'S RIGHT TO DUE PROCESS BY ALLOWING THE CONVENING AUTHORITY TO UNILATERALLY APPEND UNSWORN AND UNINVESTIGATED AGGRAVATING ELEMENTS TO HIS MURDER SPECIFICATIONS AT REFERRAL?

A.XVI

"WHEN A FINDING OF FACT ALTERS THE LEGALLY PRESCRIBED PUNISHMENT SO AS TO AGGRAVATE IT, THE FACT NECESSARILY FORMS A CONSTITUENT PART OF A NEW OFFENSE AND MUST BE SUBMITTED TO THE JURY." ALLEYNE, 133 S. CT. AT 2162. UNDER R.C.M. 1004(b)(4)(C), DEATH CANNOT BE CONSIDERED ABSENT A PRELIMINARY, UNANIMOUS FINDING THAT AGGRAVATING CIRCUMSTANCES "SUBSTANTIALLY OUTWEIGH" MITIGATING AND EXTENUATING CIRCUMSTANCES. AT TRIAL, SGT AKBAR UNSUCCESSFULLY REQUESTED SENTENCING INSTRUCTIONS REQUIRING THAT AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING AND EXTENUATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT PURSUANT TO APPRENDI, 530 U.S. 466 AND RING, 536 U.S. 584. DID THE MILITARY JUDGE VIOLATE SGT AKBAR'S RIGHT TO DUE PROCESS BY FAILING TO INSTRUCT THAT AGGRAVATING CIRCUMSTANCES MUST OUTWEIGH MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT?

A.XVII

THE LACK OF A SYSTEM TO ENSURE CONSISTENT AND EVEN-HANDED APPLICATION OF THE DEATH PENALTY IN THE MILITARY VIOLATES BOTH SGT AKBAR'S EQUAL PROTECTION RIGHTS AND ARTICLE 36, UCMJ.  See 18 U.S.C. § 2245 AND U.S. DEP'T OF JUSTICE, U.S. ATTORNEY'S MANUAL § 9-10.010 (JUNE 1998) (USAM) AND 10 U.S.C. § 949a(b)(2)(C)(ii).  IN CONTRAST TO THE USAM, NO PROTOCOL EXISTS FOR CONVENING AUTHORITIES IN CAPITAL CASES, CREATING AN AD HOC SYSTEM OF CAPITAL SENTENCING.

A.XVIII

SGT AKBAR'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE APPELLANT'S SEVERE MENTAL ILLNESS MAKES SUCH A PUNISHMENT HIGHLY DISPROPORTIONATE TO HIS CULPABILITY AND VIOLATES THE FIFTH AMENDMENT BECAUSE IT WOULD BE A DENIAL OF DUE PROCESS TO EXECUTE HIM.

A.XIX

THE MILITARY JUDGE ERRED IN ADMITTING THE GOVERNMENT'S CRIME SCENE PHOTOGRAPHS AS THEY UNDULY PREJUDICED SGT AKBAR'S FIFTH AND EIGHTH AMENDMENT RIGHT TO DUE PROCESS.  See, e.g., APP. EXS. 157, 299.

A.XX

THE TRIAL COUNSEL COMMITTED REVERSIBLE ERROR BY USING THE VOIR DIRE OF THE MEMBERS TO IMPERMISSIBLY ADVANCE THE GOVERNMENT'S THEORY OF THE CASE. See APP. EX. VII (DEFENSE MOTION FOR APPROPRIATE RELIEF FOR INDIVIDUAL SEQUESTRATION OF MEMBERS DURING VOIR DIRE); See R.C.M. 912(d), DISCUSSION.

A.XXI

THE MILITARY JUSTICE SYSTEM'S PEREMPTORY CHALLENGE PROCEDURE, WHICH ALLOWS THE GOVERNMENT TO REMOVE ANY ONE MEMBER WITHOUT CAUSE, IS AN UNCONSTITUTIONAL VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION IN CAPITAL CASES, WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE.  But see UNITED STATES v. CURTIS, 44 M.J. 106, 131-33 (C.A.A.F. 1996); UNITED STATES v. LOVING, 41 M.J. 213, 294-95 (C.A.A.F. 1994).

A.XXII

THE PANEL'S RECONSIDERATION OF THE SENTENCE IN SGT AKBAR'S CASE VIOLATED THE FIFTH AMENDMENT'S DOUBLE JEOPARDY CLAUSE BECAUSE "NO PERSON . . . SHALL BE SUBJECT FOR THE SAME OFFENSE TO BE TWICE PUT IN JEOPARDY OF LIFE." See APP. EX. XXXVII (DEFENSE MOTION FOR APPROPRIATE RELIEF -- FINDING AND SENTENCING INSTRUCTIONS EXPLAINING VOTING PROCEDURE ON CAPITAL OFFENSES AND DEATH).

B.I

THE ARMY COURT'S FAILURE TO DO AN ARTICLE 66(c), UCMJ, PROPORTIONALITY REVIEW REQUIRES REMAND FOR THE COMPLETE REVIEW IT WAS REQUIRED BY LAW TO CONDUCT, AND THE FAILURE TO DETAIL ITS REVIEW IN ITS OPINION UNDERMINES THIS COURT'S ABILITY TO REVIEW THE PROPORTIONALITY ANALYSIS UNDER ARTICLE 67, UCMJ.

B.II

THE ARMY COURT'S REFUSAL TO ACCEPT SGT AKBAR'S EVIDENCE IN REBUTTAL TO GOV'T APP. EX. 13, A DECLARATION FROM TRIAL DEFENSE COUNSEL, AND REFUSAL TO GRANT THE FEW WEEKS NECESSARY TO OBTAIN DISCOVERY NOT PROVIDED AS ORDERED IN 2008, REQUIRES REMAND FOR A COMPLETE REVIEW UNDER ARTICLE 66, UCMJ, BECAUSE (1) THE ARMY COURT WAS REQUIRED BY LAW TO CONDUCT THE REVIEW, AND (2) THIS COURT DOES NOT HAVE FACT FINDING ABILITY UNDER ARTICLE 67, UCMJ.

B.III

THE 2,633 DAY GAP BETWEEN THE COMPLETION OF SGT AKBAR'S COURT-MARTIAL AND THE ARMY COURT'S DECISION WAS FACIALLY UNREASONABLE AND REQUIRES REMAND TO DETERMINE IF SGT AKBAR WAS PREJUDICIALLY DENIED THE DUE PROCESS OF LAW GUARANTEED UNDER THE FIFTH AMENDMENT.

B.IV

THE ARMY COURT ERRED ALLOWING TRIAL DEFENSE COUNSEL TO FILE A JOINT AFFIDAVIT OVER SGT AKBAR'S OBJECTION, DEPRIVING HIM OF THE INDEPENDENT RECOLLECTIONS OF BOTH COUNSEL AND DELEGATING THE ARMY COURT'S FACT FINDING RESPONSIBILITY TO HIS TRIAL DEFENSE TEAM WHO NOW STAND OPPOSED TO SGT AKBAR'S INTERESTS.

B.V

"ELIGIBILITY FACTORS ALMOST OF NECESSITY REQUIRE AN ANSWER TO A QUESTION WITH A FACTUAL NEXUS TO THE CRIME OR THE DEFENDANT SO

AS TO 'MAKE RATIONALLY REVIEWABLE THE PROCESS FOR IMPOSING A SENTENCE OF DEATH.'" ARAVE v. CREECH, 507 U.S. 463, 471 (1993) (CITATION OMITTED). IN THIS CASE, THE SOLE AGGRAVATING FACTOR RELIED UPON BY THE PANEL TO FIND SGT AKBAR DEATH ELIGIBLE WAS THAT, HAVING BEEN FOUND GUILTY OF PREMEDITATED MURDER, IN VIOLATION OF ARTICLE 118(1), UCMJ, THE ACCUSED WAS FOUND GUILTY, IN THE SAME CASE, OF ANOTHER VIOLATION OF ARTICLE 118, UCMJ, PURSUANT TO R.C.M. 1004(c)(7)(J). IS THE AGGRAVATING FACTOR PROVIDED IN R.C.M. 1004(c)(7)(J) UNCONSTITUTIONALLY VAGUE BECAUSE IT IS NOT DIRECTED AT A SINGLE EVENT AND DEPENDANT UPON THE GOVERNMENT'S DECISION TO PROSECUTE TWO OR MORE VIOLATIONS OF ARTICLE 118, UCMJ, AT A SINGLE TRIAL?

B.VI

THE CUMULATIVE ERRORS IN THIS CASE COMPEL REVERSAL OF THE FINDINGS AND SENTENCE.

B.VII

RULE FOR COURTS-MARTIAL (R.C.M.) 1004 DOES NOT ENSURE THE GOALS OF INDIVIDUAL FAIRNESS, REASONABLE CONSISTENCY, AND ABSENCE OF ERROR NECESSARY TO ALLOW THIS COURT TO AFFIRM APPELLANT'S DEATH SENTENCE BECAUSE R.C.M. 1004 DOES NOT ENSURE THE RACE OF THE VICTIM OR ALLEGED PERPETRATOR IS NOT A FACTOR IN THE DEATH SENTENCE. McCLESKEY v. KEMP, 481 U.S. 279 (1987).

B.VIII

THE VARIABLE SIZE OF THE COURT-MARTIAL PANEL CONSTITUTED AN UNCONSTITUTIONAL CONDITION ON SERGEANT AKBAR'S FUNDAMENTAL RIGHT TO CONDUCT VOIR DIRE AND PROMOTE AN IMPARTIAL PANEL. See APP. EX. XXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF -- GRANT OF ADDITIONAL PEREMPTORY CHALLENGES); IRVIN v. DOWD, 366 U.S. 717, 722 (1961).

B.IX

THE DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BECAUSE THE MILITARY SYSTEM DOES NOT GUARANTEE A FIXED NUMBER OF MEMBERS. See APP. EX. XXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF -- GRANT OF ADDITIONAL PEREMPTORY CHALLENGES); See also APP. EX. LXXXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF TO PRECLUDE THE COURT-MARTIAL FROM ADJUDGING A SENTENCE OF DEATH SINCE THE MANUAL FOR COURTS-MARTIAL FAILS TO MANDATE A FIXED SIZE PANEL IN CAPITAL CASES); IRVIN v. DOWD, 366 U.S. 717, 722 (1961).

United States v. Akbar, No. 13-7001/AR

B.X

DISCUSSION OF FINDINGS AND SENTENCING INSTRUCTIONS AT R.C.M. 802
CONFERENCES DENIED SGT AKBAR HIS RIGHT TO BE PRESENT AT EVERY
STAGE OF TRIAL.  See APP. EX. XLVII (DEFENSE MOTION FOR
APPROPRIATE RELIEF -- REQUEST THAT ALL CONFERENCES BE HELD IN AN
ARTICLE 39(a)).

B.XI

THIS COURT ARBITRARILY AND SEVERELY RESTRICTED THE LENGTH OF SGT
AKBAR'S BRIEF, IN VIOLATION OF THE EQUAL PROTECTION AND DUE
PROCESS CLAUSES OF THE FOURTEENTH AMENDMENT AND ARTICLE 67, WHEN
THIS COURT ORDERED SGT AKBAR TO FILE AN ABBREVIATED BRIEF,
INCONSISTENT WITH THE PAST PRACTICE OF THIS COURT IN CAPITAL
CASES AND ARTICLE 67, AND WITHOUT GOOD CAUSE SHOWN.

C.I

THE ROLE OF THE CONVENING AUTHORITY IN THE MILITARY JUSTICE
SYSTEM DENIED SGT AKBAR A FAIR AND IMPARTIAL TRIAL IN VIOLATION
OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ,
BY ALLOWING THE CONVENING AUTHORITY TO ACT AS A GRAND JURY IN
REFERRING CAPITAL CRIMINAL CASES TO TRIAL, PERSONALLY APPOINTING
MEMBERS OF HIS CHOICE, RATING THE MEMBERS, HOLDING THE ULTIMATE
LAW ENFORCEMENT FUNCTION WITHIN HIS COMMAND, RATING HIS LEGAL
ADVISOR, AND ACTING AS THE FIRST LEVEL OF APPEAL, THUS CREATING
AN APPEARANCE OF IMPROPRIETY THROUGH A PERCEPTION THAT HE ACTS
AS PROSECUTOR, JUDGE, AND JURY.  See APP. EX. XIII (DEFENSE
MOTION FOR APPROPRIATE RELIEF TO DISQUALIFY ALL MEMBERS CHOSEN
BY THE CONVENING AUTHORITY).

C.II

ARTICLE 18, UCMJ, AND R.C.M. 201(f)(1)(C), WHICH REQUIRE TRIAL
BY MEMBERS IN A CAPITAL CASE, VIOLATES THE GUARANTEE OF DUE
PROCESS AND A RELIABLE VERDICT UNDER THE FIFTH, SIXTH, AND
EIGHTH AMENDMENTS.

C.III

SERGEANT AKBAR WAS DENIED HIS RIGHT TO A TRIAL BY AN IMPARTIAL
JURY COMPOSED OF A FAIR CROSS-SECTION OF THE COMMUNITY IN
VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION.
DUREN v. MISSOURI, 439 U.S. 357 (1979).  But see UNITED STATES
v. CURTIS, 44 M.J. 106, 130-33 (C.A.A.F. 1996).

C.IV

THE SELECTION OF THE PANEL MEMBERS BY THE CONVENING AUTHORITY IN A CAPITAL CASE DIRECTLY VIOLATES SGT AKBAR'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ, BY IN EFFECT GIVING THE GOVERNMENT UNLIMITED PEREMPTORY CHALLENGES. See APP. EX. XIII (DEFENSE MOTION FOR APPROPRIATE RELIEF TO DISQUALIFY ALL MEMBERS CHOSEN BY THE CONVENING AUTHORITY).

C.V

THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS-MARTIAL BY GRANTING TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVENING AUTHORITY'S ARTICLE 25(d) AUTHORITY TO DETAIL MEMBERS OF THE COURT. See APP. EX. XXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF -- GRANT OF ADDITIONAL PEREMPTORY CHALLENGES).

C.VI

THE DESIGNATION OF THE SENIOR MEMBER AS PRESIDING OFFICER FOR DELIBERATIONS DENIED SGT AKBAR A FAIR TRIAL BEFORE IMPARTIAL MEMBERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. See APP. EX. XXV (DEFENSE MOTION FOR APPROPRIATE RELIEF -- REQUEST THAT THE SENIOR MEMBER NOT BE MADE THE PRESIDENT OF THE PANEL).

C.CVII

THE DENIAL OF THE RIGHT TO POLL MEMBERS REGARDING THEIR VERDICT AT EACH STAGE OF TRIAL DENIED SERGEANT AKBAR A FAIR TRIAL BEFORE IMPARTIAL MEMBERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. See APP. EX. XVII (DEFENSE MOTION FOR APPROPRIATE RELIEF -- POLLING OF PANEL MEMBERS).

C.VIII

THERE IS NO MEANINGFUL DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER ALLOWING DIFFERENTIAL TREATMENT AND SENTENCING DISPARITY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. See APP. EX. LIX (DEFENSE MOTION TO DISMISS THE CAPITAL REFERRAL DUE TO ARTICLE 118 OF THE UCMJ BEING UNCONSTITUTIONALLY VAGUE).

C.IX

SERGEANT AKBAR WAS DENIED HIS CONSTITUTIONAL RIGHT UNDER THE FIFTH AMENDMENT TO A GRAND JURY PRESENTMENT OR INDICTMENT.  See APP. EX. LXIX (DEFENSE MOTION TO DISMISS CAPITAL REFERRAL ON THE GROUND THAT THE MILITARY CAPITAL SCHEME VIOLATES THE FIFTH AMENDMENT).

C.X

COURT-MARTIAL PROCEDURES DENIED SGT AKBAR HIS ARTICLE III RIGHT TO A JURY TRIAL.  SOLORIO v. UNITED STATES, 103 U.S. 435, 453-54 (1987) (MARSHALL, J., DISSENTING).  But see UNITED STATES v. CURTIS, 44 M.J. 106, 132 (C.A.A.F. 1996).

C.XI

DUE PROCESS REQUIRES TRIAL AND INTERMEDIATE APPELLATE JUDGES IN MILITARY DEATH PENALTY CASES BE PROTECTED BY A FIXED TERM OF OFFICE, NOT SUBJECT TO INFLUENCE AND CONTROL BY THE JUDGE ADVOCATE GENERAL OF THE ARMY.  See APP. EX. V (DEFENSE MOTION FOR APPROPRIATE RELIEF, HEIGHTENED DUE PROCESS).  But see UNITED STATES v. LOVING, 41 M.J. 213, 295 (C.A.A.F. 1994).

C.XII

THE ARMY COURT LACKED JURISDICTION BECAUSE THE JUDGES ARE PRINCIPAL OFFICERS NOT PRESIDENTIALLY APPOINTED AS REQUIRED BY THE APPOINTMENTS CLAUSE OF THE CONSTITUTION.  See U.S. CONST., ART. II, § 2.  But see UNITED STATES v. GRINDSTAFF, 45 M.J. 634 (N-M. CT. CRIM. APP. 1997); cf. EDMOND v. UNITED STATES, 115 U.S. 651 (1997).

C.XIII

THIS COURT LACKS THE JURISDICTION AND AUTHORITY TO REVIEW THE CONSTITUTIONALITY OF THE RULES FOR COURTS-MARTIAL AND THE UCMJ BECAUSE THIS COURT IS AN ARTICLE I COURT, NOT AN ARTICLE III COURT WITH THE POWER TO CHECK THE LEGISLATIVE EXECUTIVE BRANCHES UNDER MARBURY v. MADISON, 5 U.S. (1 CRANCH) 137 (1803).  See also COOPER v. AARON, 358 U.S. 1 (1958) (THE POWER TO STRIKE DOWN UNCONSTITUTIONAL STATUTES OR EXECUTIVE ORDERS IS EXCLUSIVE TO ARTICLE III COURTS).  But see LOVING, 41 M.J. AT 296.

C.XIV

SERGEANT AKBAR IS DENIED EQUAL PROTECTION OF LAW IN VIOLATION OF THE FIFTH AMENDMENT AS ALL U.S. CIVILIANS ARE AFFORDED THE

OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF THE UNITED STATES MILITARY BY VIRTUE OF THEIR STATUS AS SERVICE MEMBERS ARE NOT.  But see UNITED STATES v. LOVING, 41 M.J. 213, 295 (C.A.A.F. 1994).

C.XV

SERGEANT AKBAR IS DENIED EQUAL PROTECTION OF LAW UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION BECAUSE [IN ACCORDANCE WITH] ARMY REGULATION 15-130, PARA. 3-1(d)(6), HIS APPROVED DEATH SENTENCE RENDERS HIM INELIGIBLE FOR CLEMENCY BY THE ARMY CLEMENCY AND PAROLE BOARD, WHILE ALL OTHER CASES REVIEWED BY THIS COURT ARE ELIGIBLE FOR SUCH CONSIDERATION.  But see UNITED STATES v. THOMAS, 43 M.J. 550, 607 (N-M. CT. CRIM. APP. 1995).

C.XVI

SERGEANT AKBAR'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CAPITAL REFERRAL SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER.  See APP. EX. LXV (DEFENSE MOTION TO SET ASIDE CAPITAL REFERRAL FOR LACK OF STATUTORY GUIDELINES).

C.XVII

THE DEATH PENALTY PROVISION OF ARTICLE 118, UCMJ, IS UNCONSTITUTIONAL AS IT RELATES TO TRADITIONAL COMMON LAW CRIMES THAT OCCUR IN THE U.S.  But see UNITED STATES v. LOVING, 41 M.J. 213, 293 (C.A.A.F. 1994).  THE COURT RESOLVED THE ISSUE AGAINST PRIVATE LOVING, ADOPTING THE REASONING OF THE DECISION OF THE ARMY COURT OF MILITARY REVIEW.  See UNITED STATES v. LOVING, 34 M.J. 956, 967 (A.C.M.R. 1992).  HOWEVER, PRIVATE LOVING'S ARGUMENT BEFORE THE ARMY COURT RELIED ON THE TENTH AMENDMENT AND NECESSARY AND PROPER CLAUSE OF THE U.S. CONSTITUTION.  Id. SERGEANT AKBAR'S ARGUMENT RELIES ON THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION.

C.XVIII

THE DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ, AS THE CONVENING AUTHORITY DID NOT DEMONSTRATE HOW THE DEATH PENALTY WOULD ENHANCE GOOD ORDER AND DISCIPLINE.  See APP. EX. LXVII (DEFENSE MOTION FOR APPROPRIATE RELIEF TO PRECLUDE IMPOSITION OF DEATH AS INTERESTS OF JUSTICE WILL NOT BE SERVED).

C.XIX

THE MILITARY CAPITAL SENTENCING PROCEDURE IS UNCONSTITUTIONAL BECAUSE MILITARY JUDGES DO NOT HAVE THE POWER TO ADJUST OR SUSPEND A DEATH SENTENCE IMPROPERLY IMPOSED.  See APP. EX. V (DEFENSE MOTION FOR APPROPRIATE RELIEF, HEIGHTENED DUE PROCESS).

C.XX

DUE TO THE MILITARY JUSTICE SYSTEM'S INHERENT FLAWS CAPITAL PUNISHMENT AMOUNTS TO CRUEL AND UNUSUAL PUNISHMENT UNDER ALL CIRCUMSTANCES.  See APP. EX. LXXI (DEFENSE MOTION FOR APPROPRIATE RELIEF TO PRECLUDE THE COURT-MARTIAL FROM ADJUDGING A SENTENCE IN VIOLATION OF ARTICLE 55 OF THE UCMJ).

C.XXI

THE DEATH PENALTY CANNOT BE CONSTITUTIONALLY IMPLEMENTED UNDER CURRENT EIGHTH AMENDMENT JURISPRUDENCE.  See CALLINS v. COLLINS, 510 U.S. 1141, 1143-59 (1994) (BLACKMUN, J., DISSENTING) (CERT. DENIED).

C.XXII

R.C.M. 1209 AND THE MILITARY DEATH PENALTY SYSTEM DENY DUE PROCESS AND CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AND ARE TANTAMOUNT TO FORESEEABLE, STATE-SPONSORED EXECUTION OF INNOCENT HUMAN BEINGS BECAUSE THERE IS NO EXCEPTION FOR ACTUAL INNOCENCE TO THE FINALITY OF COURTS-MARTIAL REVIEW.  Cf. TRIESTMAN v. UNITED STATES, 124 F.3d 361, 378-79 (2d CIR. 1997).

C.XXIII

R.C.M. 1001(b)(4) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD AS APPLIED TO THE APPELLATE AND CAPITAL SENTENCING PROCEEDINGS BECAUSE IT PERMITS THE INTRODUCTION OF EVIDENCE BEYOND THAT OF DIRECT FAMILY MEMBERS AND THOSE PRESENT AT THE SCENE IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS.  See APP. EX. LV (DEFENSE MOTION FOR APPROPRIATE RELIEF -- TO LIMIT ADMISSIBILITY OF VICTIM'S CHARACTER AND IMPACT ON FAMILY FROM VICTIM'S DEATH); See also APP. EX. 296 (MOTION FOR APPROPRIATE RELIEF -- LIMIT VICTIM IMPACT AND GOVERNMENT ARGUMENT).

C.XXIV

R.C.M. 1001(b)(4) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD AS APPLIED TO THE APPELLATE AND CAPITAL SENTENCING PROCEEDINGS BECAUSE IT PERMITS THE INTRODUCTION OF CIRCUMSTANCES WHICH COULD

NOT REASONABLY HAVE BEEN KNOWN BY SERGEANT AKBAR AT THE TIME OF THE OFFENSE IN VIOLATION OF HIS FIFTH AND EIGHTH AMENDMENT RIGHTS.  See APP. EX. LV (DEFENSE MOTION FOR APPROPRIATE RELIEF -- TO LIMIT ADMISSIBILITY OF VICTIM'S CHARACTER AND IMPACT ON FAMILY FROM VICTIM'S DEATH).

C.XXV

THE MILITARY JUDGE ERRED IN ADMITTING VICTIM-IMPACT EVIDENCE REGARDING THE PERSONAL CHARACTERISTICS OF THE VICTIMS WHICH COULD NOT REASONABLY HAVE BEEN KNOWN BY SERGEANT AKBAR AT THE TIME OF THE OFFENSE IN VIOLATION OF HIS FIFTH AND EIGHTH AMENDMENT RIGHTS.  See APP. EX. LV (DEFENSE MOTION FOR APPROPRIATE RELIEF -- TO LIMIT ADMISSIBILITY OF VICTIM'S CHARACTER AND IMPACT ON FAMILY FROM VICTIM'S DEATH).

C.XXVI

THE DEATH SENTENCE IN THIS CASE VIOLATES THE EX POST FACTO CLAUSE, FIFTH AND EIGHTH AMENDMENTS, SEPARATION OF POWERS DOCTRINE, PREEMPTION DOCTRINE, AND ARTICLE 55, UCMJ, BECAUSE WHEN IT WAS ADJUDGED NEITHER CONGRESS NOR THE ARMY SPECIFIED A MEANS OR PLACE OF EXECUTION.  See APP. EX. LXXIII (DEFENSE MOTION TO DISMISS -- MILITARY SYSTEM FOR ADMINISTERING THE DEATH PENALTY VIOLATES THE NON-DELEGATION DOCTRINE).

Issues Presented Pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A. 1982)

I.

WHETHER THERE WAS A FRAUD ON THE COURT WHERE TWO WITNESSES TESTIFIED DIFFERENTLY AT TRIAL THAN AT THEIR ARTICLE 32 HEARING AND WHERE FORENSIC ANALYSIS OF THE BULLETS SHOWED THEY WERE ARMOR PIERCING WHERE APPELLANT ONLY WAS ISSUED STANDARD ISSUE BULLETS.

II.

WHETHER APPELLANT WAS ABLE TO ASSIST COUNSEL AT TRIAL.

III.

WHETHER THE BULLET ANALYSIS WAS A SHAM.

IV.

WHETHER THE PANEL AND THE MILITARY JUDGE WERE BIASED AGAINST APPELLANT.

V.

WHETHER SOMEONE USED MIND CONTROL ON APPELLANT TO FORCE HIM TO ATTACK.

VI.

WHETHER TRIAL DEFENSE COUNSEL COERCED APPELLANT NOT TO TESTIFY.

VII.

WHETHER LEAD CIVILIAN COUNSEL SHOULD HAVE ACCEDED TO APPELLANT'S REQUEST TO REMOVE MILITARY DEFENSE COUNSEL.

VIII.

WHETHER APPELLANT WAS DENIED COUNSEL OF HIS CHOICE WHEN TRIAL DEFENSE COUNSEL REFUSED TO INVITE LTC HANSEN BACK AND CIVILIAN COUNSEL'S FAMILY WAS THREATENED FOR WORKING ON THE CASE.

United States v. Akbar, No. 13-7001/AR

BAKER, Judge,* with whom ERDMANN, Chief Judge, joins (dissenting):

Principle is hardest to hold in the face of countervailing virtue. For a judge that moment may arrive when knowing what is just, one must also consider what is fair. This is a case about whether or not the military justice system was fair, not whether it was just.

## INTRODUCTION

Appellant raises fifty-nine issues on appeal. This Court heard oral argument on five issues. However, in my view, there is but one pivotal question: Did defense counsel provide ineffective assistance of counsel in the manner in which they presented Appellant's sentence mitigation case?

To understate, defense counsel had a hard case. Their task was made harder by the absence of guidelines in the military for handling death penalty cases and a requirement to provide counsel "learned in the law applicable to capital cases" in death penalty cases. That meant that defense counsel, appointed from the ranks of judge advocates, were on their own, without clear guidance or expert assistance on the criteria against which to measure the effective assistance of counsel in this death penalty case.

* Former Chief Judge James E. Baker took final action in this case prior to the expiration of his term on July 31, 2015.

The military has guidelines on the length of hair and mustaches.[1] It has guidelines on how much fat is permitted on a cut of meat served in the mess hall,[2] and it has guidelines on the placement of the necktie in relation to one's belt,[3] but it does not have guidelines on how to provide effective assistance of counsel in a death penalty case. This seems to expose counsel unnecessarily to allegations of ineffective assistance of counsel. The absence of counsel "learned in the law applicable to capital cases" who might have helped fill this void compounds the problem.

Guidelines or not, hard case or not, in my view, Appellant's trial defense counsel were ineffective in two respects. First, and foremost, counsel were ineffective for providing to members Appellant's 313-page diary without appropriate contextual explanation. The Government earlier introduced three pages of this diary. However, it was defense counsel who introduced the other 310 pages. These pages included a running diatribe against Caucasians and the United

---

[1] See, e.g., Dep't of the Army, Reg. 670-1, Uniform and Insignia, Wear and Appearance of Army Uniforms para. 3-2(a) (Apr. 10, 2015) [hereinafter AR 670-1].

[2] See, e.g., Dep't of the Army Pam. 30-22, Food Program, Operating Procedures for the Army Food Program Table I-1 (Feb. 6, 2007).

[3] See, e.g., AR 670-1, para. 20-18(c)(3)(a).

2

States dating back twelve years, and included repeated references to Appellant's desire to kill American soldiers "for Allah" and for "jihad."

The defense intended the diary to reflect Appellant's descent into mental illness. However, the diary was offered without adequate explanation, expert or otherwise. Until closing arguments, members were left on their own to read and interpret the diary's contents along with the mitigation specialist's notes and an FBI report. In the words of defense counsels' expert medical witness: it "was a mistake" to admit the diary into evidence. He "never advised or would have advised trial defense counsel to admit the diary as they did" because, "[t]o a lay person the diary is damning evidence, standing alone, . . . and the nature of [Appellant]'s diary contained explosive material." Appellant's mitigation specialist stated she "would have never advised introduction of . . . [Appellant's] diary without providing context through testimony." No wonder it was Government trial counsel who referenced the diary throughout his closing argument.

Second, counsel were ineffective for failing to produce a single witness, including any family member, to provide humanizing testimony in favor of a life sentence. The message was clear and unmistakable: not even a family member was prepared to say Appellant's life was worth sparing.

Finding ineffective assistance, this leaves the question of prejudice under Strickland prong II.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  As the majority suggests, Appellant has a steep cliff to scale.  The evidence of guilt was overwhelming, including through defense counsels' introduction of Appellant's diary.  Moreover, Appellant's crimes were heinous.  Appellant murdered two soldiers and wounded fourteen others.  He did so with wanton disregard.  He did so on the eve of battle and, in his mind, to aid the enemy.  And, he did so with premeditation, as evidenced by the diary.  Nonetheless, there are two arguments supporting a finding of prejudice.

First, the members requested an instruction on reconsideration of sentence.  That makes this case different from almost every other death penalty case and virtually every other ineffective assistance of counsel case.  It indicates that at least one member was open to considering an outcome other than death.  In other words, the request for this instruction suggests that at least one juror may have been persuaded to spare Appellant's life with an effective presentation of mitigation evidence.

Second, the standard for prejudice cannot be: "if there ever was a case where a military court-martial panel would impose the death penalty, this was it."  United States v. Akbar, __ M.J. __, __ (6) (C.A.A.F. 2015).  That is the standard

4

adopted by the majority.  With a standard like that, if a
defendant committed a particularly despicable crime, it would
not matter if he received effective assistance of counsel, or
for that matter a fair trial, because we could be confident in
the outcome.  However, the hallmark of American justice is its
commitment to procedural justice as well as to substantive
justice.  How we reach a result can matter as much as what
result we reach.  That is the essential judicial virtue of a
democracy.  This case tests that commitment.

Therefore, for the reasons explained below, I respectfully
dissent and would remand this case for a new sentence rehearing.

This opinion proceeds in two sections.  Section I addresses
the applicable standard for ineffective assistance of counsel in
death penalty cases.  The section highlights the absence of
standards and guidelines for defense counsel in death penalty
cases in the military and considers the consequences of such an
absence.  Section II considers the application of Strickland in
this case.  Part A addresses the submission of Appellant's
entire diary into evidence without medical context or
explanation and explains why, in this case, such a decision
amounted to ineffective assistance of counsel.  Part B discusses
the failure of counsel to offer mitigating evidence in the form
of humanizing testimony to spare Appellant's life.  Finally,
Part C addresses prejudice and determines that where, as here,

the members asked for a sentence reconsideration instruction, there is concrete rather than speculative evidence that an effective presentation on sentencing might have swayed at least one member to vote for life.

DISCUSSION

I. Standards for Capital Defense Counsel in the Military

A. Absence of Military Guidelines, Standards, and Norms

Evaluation of defense counsels' performance starts with the identification of the prevailing standard or professional norm against which to measure counsels' performance. However, such standard is elusive. There are no guidelines in the military on death penalty defense. The armed services have not adopted the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.[4] American Bar Association

---

[4] No branch of the armed forces has adopted the ABA Guidelines as the yardstick for measuring defense counsels' performance. The Supreme Court has specifically disavowed adoption of the ABA Guidelines as definitive statements on "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 689 (1984). And this Court has previously rejected arguments by counsel to adopt the ABA guidelines as the comprehensive standard of prevailing professional norms. See United States v. Loving (Loving I), 41 M.J. 213, 300 (1994), opinion modified on reconsideration, (C.A.A.F. Feb. 2, 1995), aff'd, 517 U.S. 748 (1996) (considering whether due process requires that this Court establish minimum standards for defense counsel in capital cases and concluding that specification of such standards are not constitutionally required); United States v. Murphy, 50 M.J. 4, 9 (C.A.A.F. 1998) (noting that "both the ABA Guidelines and federal law are instructive," without finding that ABA Guidelines are binding on capital military defense counsel). Nevertheless, the ABA Guidelines are helpful for determining

6

Guidelines on Appointment of Counsel in Death Penalty Cases,

reprinted in 31 Hofstra L. Rev. 913, 1061 (2003) [hereinafter

ABA Guidelines].  And yet, we know that "death is a punishment

different from all other sanctions."[5]  It is different in

_____

prevailing professional norms, and have been used by both the
Supreme Court and this Court for this purpose.  See, e.g.,
Rompilla v. Beard, 545 U.S. 374, 387 (2005) (looking to ABA
Guidelines to establish appropriate standard of common practice
and finding that the State "has come up with no reason to think
the [applicable guideline] impertinent here"); Wiggins v. Smith,
539 U.S. 510 (2003) (looking to Maryland professional standards
and ABA Guidelines to determine the standard of reasonable
professional conduct); Williams v. Taylor, 529 U.S. 362, 396
(2000) (citing 1 ABA Standards for Criminal Justice 4–4.1,
commentary, p. 4-55 (2d ed. 1980)); Murphy, 50 M.J. at 9-10
(recognizing that "the ABA Guidelines and federal law are
instructive").  Consequently, I also look to these standards for
guidance in reviewing counsels' performance.

[5] Booth v. Maryland, 482 U.S. 496, 509 n.12 (1987) overruled on
other grounds by Payne v. Tennessee, 501 U.S. 808 (1991) (citing
Woodson v. North Carolina, 428 U.S. 280, 303–304, 305 (1976)
(plurality opinion of Stewart, Powell, and Stevens, JJ.)
(internal quotation marks omitted)); Loving v. United States
(Loving II), 62 M.J. 235, 236 (C.A.A.F. 2005) ("'Death is
different' is a fundamental principle of Eighth Amendment
law."); Harmelin v. Michigan, 501 U.S. 957, 995 (1991) ("The
penalty of death differs from all other forms of criminal
punishment, not in degree but in kind." (quoting Furman v.
Georgia, 408 U.S. 238, 306 (1972))); United States v. Curtis
(Curtis I), 32 M.J. 252, 255 (C.M.A. 1991) (recognizing that the
Supreme Court treats capital and noncapital cases differently);
see also Jeffrey Abramson, Death-is-Different Jurisprudence and
the Role of the Capital Jury, 2 Ohio State J. Crim. L. 117, 117
n.1 (2004) (collecting Supreme Court concurrences authored by
various justices articulating the principle that death is
different).

severity; different in finality; and different in what is expected of competent counsel.  Guidance is needed.

This Court has "decline[d] to mandate minimum standards based on years of practice or number of cases tried" for military capital defense counsel.[6]  The Supreme Court has not mandated minimum qualifications or training either.  It is not constitutionally required.

In the absence of military norms, guidelines, and standards, Strickland becomes the standard.  In Strickland v. Washington, a capital case, the Supreme Court set forth the familiar two-part test applicable to claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the

---

[6] See Loving I, 41 M.J. at 300; Murphy, 50 M.J. at 10 (explaining that this Court will not "view[] the limited experience of counsel as inherent deficiency," but will look solely "to the adequacy of counsel's performance"); United States v. Gray, 51 M.J. 1, 54 (C.A.A.F. 1999) (declining to adopt minimum qualifications standards for capital defense counsel); see also United States v. Curtis (Curtis II), 44 M.J. 106, 126 (C.A.A.F. 1996), on reconsideration, United States v. Curtis (Curtis III), 46 M.J. 129 (C.A.A.F. 1997) (this Court has rejected a requirement for appointment of ABA qualified counsel twice in summary dispositions (citing United States v. Gray, 34 M.J. 164 (C.M.A. 1991); Curtis v. Stumbaugh, 31 M.J. 397 (C.M.A. 1990)); Loving I, 41 M.J. at 300)).

> defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

466 U.S. at 687; see also United States v. Green, 68 M.J. 360, 361 (C.A.A.F. 2010). With respect to the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," based on "prevailing professional norms." Strickland, 466 U.S. at 688. This now-axiomatic standard, by design, provides little guidance as to what these "prevailing professional norms" are, or where one can find them. Indeed, the Supreme Court stated in Strickland that "[m]ore specific guidelines are not appropriate." Id.; see also Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000) (citing Strickland, 466 U.S. at 689) (Strickland has "reject[ed] mechanistic rules governing what counsel must do."). "Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides." Id.; see also Bobby v. Van Hook, 558 U.S. 4, 8-9 (2009) (noting that the ABA Guidelines are not "inexorable commands with which all capital defense counsel 'must fully comply,'" rather, they are "'only guides' to what reasonableness means, not its definition") (internal citations omitted).

What, then, are the key elements of the Strickland standard?  Objectively reasonable tactical choices based on objectively reasonable investigation informing those choices, both of which are measured by "prevailing professional norms." Here is the problem.  As Strickland itself recognizes, this standard is evolving and changing.  Nor is it one that is immediately evident to a practitioner outside the death penalty field.  And, even where discernible, prevailing professional civilian norms may not fit with military practice.

Perhaps cognizant of these limitations, the Supreme Court since Strickland has endorsed the adoption of more detailed guidance for capital defense counsel as a non-constitutional matter.  See Flores-Ortega, 528 U.S. at 479; see also Van Hook, 558 U.S. at 8-9.  As the Supreme Court has recognized, even though "the Federal Constitution imposes one general requirement:  that counsel make objectively reasonable choices," state governments and private organizations "are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented."  Flores-Ortega, 528 U.S. at 479 (state governments can impose specific rules); Van Hook, 558 U.S. at 9 ("What we [the Supreme Court] have said of state requirements is a fortiori true of standards set by private organizations.").  For example, a "less categorical use of the [ABA] Guidelines" to evaluate counsel's performance may be

proper to the extent the guidelines "reflect prevailing norms of practice and standard practice and must not be so detailed that they would interfere with the constitutionally protected independence of counsel." Van Hook, 558 U.S. at 8 n.1 (citations omitted) (internal quotation marks omitted).

There is therefore no reason not to promulgate standards for capital defense counsel in the military. Guidelines are useful and necessary if the military is going to have a death penalty. Specialized facets of the military justice system make such guidance invaluable.

B. The Utility of Guidelines for Military Capital Defense Counsel

It is self-evident that "[c]ounsel who are 'learned in the law applicable to capital cases' are less likely to provide an inadequate or ineffective defense than those 'not learned' in the law." United States v. Murphy, 50 M.J. 4, 9 (C.A.A.F. 1998). "[I]nexperience -- even if not a flaw per se -- might well lead to inadequate representation." Id.[7]

---

[7] See also United States v. Curtis, 48 M.J. 330 (C.A.A.F. 1997) (denial of petition for reconsideration) ("[I]n order to ensure that those few military members sentenced to death have received a fair and impartial trial within the context of the death-penalty doctrine of the Supreme Court, we should expect that: . . . Each military servicemember has available a skilled, trained, and experienced attorney.").

First, the military justice system does not have a death penalty qualified bar.[8]  In civilian courts, federal capital defense counsel are required by statute to be "learned in the law applicable to capital cases."  18 U.S.C. § 3005 (1994). Under 18 U.S.C. § 3005, as amended in 1994 through the Federal Death Penalty Act, a capital defendant is entitled to two counsel, "of whom at least 1 shall be learned in the law applicable to capital cases."  Prior to the 1994 amendment, the statute only required that counsel be "learned in the law"; the 1994 amendment added the phrase "applicable to capital cases." Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591–3598.[9]  At least one federal circuit court has interpreted this to mean that counsel must have significant experience litigating

---

[8] See Dwight H. Sullivan, Killing Time: Two Decades of Military Capital Litigation, 189 Mil. L. Rev. 1, 47-48 (2006) ("The paucity of military death penalty referrals, combined with the diversity of experience that is required of a successful military attorney,  leaves the military's legal corps unable to develop the skills and experience necessary to represent both sides properly." (citing Kevin J. Barry, A Face Lift (And Much More) for an Aging Beauty:  The Cox Commission Recommendations to Rejuvenate the Uniform Code of Military Justice, L. Rev. Mich. St. U.-Detroit. C.L. 57, 110 (2002))).

[9] The Tenth Circuit has interpreted this amendment to be a substantive change, "creating a new requirement which previously had not existed," namely, that counsel be proficient in trying capital cases, not merely proficient as lawyers writ large. United States v. McCullah, 76 F.3d 1087, 1098 (10th Cir. 1996); see also In re Sterling-Suarez, 323 F.3d 1, 5-6 (1st Cir. 2003) (Torruella, J., dissenting).

criminal cases to qualify as "learned counsel" under this statute.[10]  Significantly, even persons accused of committing terrorist acts against the United States are entitled, "to the greatest extent practicable," to at least one "counsel who is learned in applicable law relating to capital cases" under the Military Commissions Act.  10 U.S.C. § 949a(b)(2)(C)(ii)(2012).[11]  Yet no similar requirement exists for service members accused of a capital crime.  As a result, there is no guarantee that any accused service member will receive counsel who have specialized training or experience defending death penalty cases.

Second, there are an insufficient number of capital cases to effectively train a cadre of military counsel to be well versed in capital litigation.  For example, there were forty-seven capital prosecutions between 1984 and 2006, with only fifteen of them resulting in a death sentence.  See Sullivan, supra note 8, at 17.  Moreover, there is little opportunity for counsel to specialize in capital litigation, as counsel are

---

[10] See McCullah, 76 F.3d at 1098  (finding that experienced public defenders practicing for ten years were learned under the statute); In re Sterling-Suarez, 323 F.3d at 4-6 (Torruella, J., dissenting) (noting that counsel must, inter alia, have extensive prior experience litigating a capital case, and be familiar with complex death penalty procedure).

[11] Under the Military Commissions Act, at least one learned counsel shall be provided to the accused, even if this requires hiring civilian capital defense counsel.  10 U.S.C. § 949a(b)(2)(C)(ii)(2012).

expected to be military law generalists who should be prepared to practice in a number of legal fields, of which only one is criminal law. As the ABA Guidelines acknowledge, "death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases," ABA Guidelines, Introduction, 31 Hofstra L. Rev. at 923, yet there is little opportunity to develop relevant experience. In addition, military defense counsel are typically transferred to different duty stations over the course of their careers after serving a three-year tour, reducing the amount of time they can spend on protracted capital litigation. See Sullivan, supra note 8, at 48 ("Given that judge advocates typically stay in a position for no more than three years, it is unlikely that any participant in a capital court-martial will have experience performing his or her duties in a death penalty case."). In the context of capital cases, this contributes to uncertainty that counsel "learned in the law applicable to capital cases" will indeed be provided to accused persons at every stage of their case.

In this case, for example, Appellant's defense counsel had a permanent change of station while they were still representing Appellant. Lieutenant (LTC) Brookhart was reassigned to the 10th Mountain Division. Major (MAJ) Coombs was assigned a new position as senior defense counsel at Fort Eustis and Fort Lee,

Virginia.  Defense counsel attributed their transfers to Government counsel's "tampering," stating in their post-trial affidavit that they "were both shocked that a senior judge advocate would take such action" and believed "it created a very damaging appearance issue with regards to the fairness of the military justice system."  LTC Brookhart, the more experienced of the two attorneys, stated that he was only able to continue working on Appellant's case because the staff judge advocate, LTC Jim Garrett, "recognized the seriousness of the situation" and "made arrangements for LTC Brookhart to stay at Fort Drum to work as a special projects officer in Administrative Law," permitting LTC Brookhart to work on Appellant's case.  As defense counsel have noted, such a structure is problematic, not only because of the public perceptions of fairness.

Third, military lawyers are not specially trained in death penalty voir dire.  "The conventional wisdom is that most trials are won or lost in jury selection."  John H. Blume et al., Probing "Life Qualification" Through Expanded Voir Dire, 29 Hofstra L. Rev. 1209 (2001).[12]  Voir dire is, without

---

[12] Citing 45 Am. Jur. Trials § 144 (1992) ("Experienced trial lawyers agree that a case can often be won or lost in voir dire."); V. Hale Starr & Mark McCormick, Jury Selection:  An Attorney's Guide to Jury Law and Methods § 3.8 (1985) ("Lawyers apparently do win, as they occasionally boast, some of their cases during, or with the help of voir dire." (quoting Hans Zeisel, The American Jury, Annual Chief Justice Earl Warren Conference on Advocacy in the United States 81-84 (1977))); Jon

exaggeration, a matter of life and death.  As the Supreme Court

noted in Morgan v. Illinois, 504 U.S. 719, 729-30 (1992):

> part of the guarantee of a defendant's right to an
> impartial jury is an adequate voir dire to identify
> unqualified jurors.  Voir dire plays a critical
> function in assuring the criminal defendant that his
> [constitutional] right to an impartial jury will be
> honored.  Without an adequate voir dire the trial
> judge's responsibility to remove prospective jurors
> who will not be able impartially to follow the court's
> instructions and evaluate the evidence cannot be
> fulfilled.

Id. at 729-30 (brackets in original) (citations omitted) (citing

Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981)

(plurality opinion)).  Yet no resources are provided to equip

---

M. Van Dyke, Jury Selection Procedures: Our Uncertain Commitment
to Representative Panels 139 (1977) ("Many attorneys believe
that trials are frequently won or lost during [jury
selection]."); Jeffery R. Boyll, Psychological, Cognitive,
Personality and Interpersonal Factors in Jury Verdicts, 15 Law &
Psychol. Rev. 163, 176 (1991) (stating that a "case may be [won]
or lost at the [jury selection stage]"); Margaret Covington,
Jury Selection: Innovative Approaches to Both Civil and Criminal
Litigation, 16 St. Mary's L.J. 575, 575-76 (1984) (arguing that
"[e]xperienced trial lawyers agree that the jury selection
process is the single most important aspect of the trial
proceedings.  In fact, once the last person on the jury is
seated, the trial is essentially won or lost."); Chris F. Denove
& Edward J. Imwinkelried, Jury Selection: An Empirical
Investigation of Demographic Bias, 19 Am. J. Trial Advoc. 285,
285 (1995) ("[J]ury selection can be the most important phase of
a trial. Pick the right jury and the battle is half won. But
select the wrong jury, and the case is lost before [the]
evidence is even heard.")).  See also Williams v. Bagley, 380
F.3d 932, 978 (6th Cir. 2004) (Merritt, J., dissenting) ("In
such a randomized system, the capital case often is won or lost
at voir dire.  The voir dire and the method of jury selection
become more important than the trial itself.  Executions depend
on "the line between innocence and guilt [which] is drawn with
reference to reasonable doubt" by individual jurors (citing
Schlup v. Delo, 513 U.S. 298, 329 (1995)).

military defense counsel with the necessary skills to conduct effective voir dire in a capital case.

Lack of specialized training in death penalty voir dire is compounded by the structure of the military justice member selection process.  In the instant case, the members that would comprise the panel were to be selected from a pool of twenty servicemembers.  This pool would be replenished only if causal challenges reduced the panel below twelve members, the statutory minimum for capital cases.  Article 41, UCMJ, 10 U.S.C. § 841 (2012).  Presumptively, all twenty members in the initial pool could serve on the panel if there were no peremptory or causal challenges.[13]

Cognizant of the limitations of panel selection, trial defense counsel in this case deliberately did not challenge any panel members for cause under the theory that the more people that were placed on the panel, the higher the likelihood that there would be an "ace of hearts" who would vote against the death penalty, leading counsel to structure "a voir dire with an aim to keep anyone who did not have a clear basis for a challenge for cause."  Defense counsels' "ace of hearts"

---

[13] Defense counsel were only entitled to exercise one peremptory challenge per Rule for Courts-Martial (R.C.M.) 912(g)(1).  By contrast in federal civilian capital cases, defense counsel are entitled to exercise twenty peremptory challenges.  Fed. R. Crim. P. 24(b)(1).

strategy has no basis in prevailing professional norms.  The

strategy was adopted by trial defense counsel based on a comment

made in a concurring opinion in a United States Air Force Court

of Criminal Appeals case.  See United States v. Simoy, 46 M.J.

592, 625-26 (A.F.Ct.Crim.App. 1996) (Morgan, J., concurring),

aff'd in part, rev'd in part, 50 M.J. 1 (C.A.A.F. 1998).[14]

Essentially, all considerations regarding the beliefs,

biases, and personalities of the panel members, and the

potential group dynamics that would form with particular

combinations of members, were subordinate to the overarching

goal of filling the panel.[15]  This strategy is contrary to

---

[14] In Simoy, Judge Morgan stated in concurrence:
    Little mathematical sophistication is required to
    appreciate the profound impact in this case of
    reducing the court-martial panel size.  To use a
    simple metaphor – if appellant's only chance to escape
    the death penalty comes from his being dealt the ace
    of hearts from a deck of 52 playing cards, would he
    prefer to be dealt 13 cards, or 8? . . . Each
    challenge of an individual 'spots' the prosecution a
    vote, and becomes in essence, a vote for death.
Simoy, 46 M.J. at 625-26.

[15] See Dwight H. Sullivan, Playing the Numbers: Court-Martial
Panel Size and the Military Death Penalty, 158 Mil. L. Rev. 1,
36 (1998) ("A defense counsel who is attempting to obtain a
large panel will not engage in voir dire, with the exception of
questions designed to rehabilitate any member who appears
vulnerable to a challenge for cause by either the government or
the defense.  After all, it does the defense little good to
discover that a member is biased against the accused.  An
accused whose primary goal is to avoid the death penalty may
choose to leave biased members on the panel rather than reduce
the panel size by removing them even if only a minuscule chance

prevailing professional norms in civilian courts, but it may make sense in the military context where counsel receive only one peremptory challenge. R.C.M. 912(g)(1).

In civilian capital cases, by contrast, defense counsel are expected to do a searching inquiry of potential jurors to "life-qualify" a jury, meaning they should "conduct a voir dire that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law, . . . [or] unwilling to consider mitigating evidence" in order to strike them from the panel. See ABA Guideline 10.10.2, commentary, 31 Hofstra L. Rev. at 1052-53.[16] Counsel additionally "should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty." Id.

It is imperative that counsel be trained to identify prospective jurors during voir dire who would automatically impose the death penalty following a murder conviction without

---

exists that they could overcome their bias and vote for the defense.").

[16] "[T]he starkest failures of capital voir dire are the failure to uncover jurors who will automatically impose the death penalty following a conviction or finding of the circumstances which make the defendant eligible for the death penalty, and the failure to uncover jurors who are unable to consider particular mitigating circumstances." ABA Guideline 10.10.2, commentary, 31 Hofstra L. Rev. at 1050.

meaningfully weighing the aggravating and mitigating evidence as they are required to do.  See ABA Guideline 10.10.2.B., 31 Hofstra L. Rev. at 1049.[17]  The Supreme Court has recognized the importance of this function of capital voir dire.  See Morgan, 504 U.S. at 735-36 ("A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under [the] misconception" that a defendant convicted of a capital crime ought to be sentenced to death).[18]

Quite frankly, the incentives in the civilian and military systems are entirely at odds with respect to capital voir dire.

_____

[17] The ABA Guidelines instruct that counsel should be familiar with techniques:  (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; and (2) for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence.  ABA Guideline 10.10.2.B., 31 Hofstra L. Rev. at 1049.

[18] The Morgan Court stated, in full:

A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception [that a person convicted of a death-eligible crime ought to be put to death]. The risk that such jurors may have been empaneled in this case and infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized. Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.

Morgan, 504 U.S. at 735-36 (brackets in original) (internal quotation marks omitted) (citations omitted).

The emphasis in civilian capital cases is to have counsel engage in a searching inquiry to "life-qualify" a jury. In the armed forces and the instant case, the incentive is to conduct a superficial voir dire to avoid elucidating statements that could prompt a causal challenge, in order to have the largest panel possible.[19] This does not afford accused servicemembers the most effective capital defense.

In summary, the armed forces have no guidelines regarding the qualifications, training, or performance required of capital defense counsel. Such omission leaves the standard amorphous and, significantly, deprives capital defense counsel of a standard against which to measure their performance. This opens the door to ineffective assistance of counsel claims, real or perceived. In failing to specify what quality of performance is

---

[19] For example, in this case, defense counsels' strategy prompted them to include in the panel individuals who may have exhibited a bias in Appellant's case. Defense counsel had the statutory right to have one panel member excused because he had served in the same unit as Appellant. Although the military judge brought this to defense counsels' attention and informed them of their statutory right of removal, defense counsel demurred and kept this member on the panel. Another panel member expressed views that Muslims are "misguided, easily influenced, [and] too rigid." On voir dire, when questioned about such views, he stated his belief that Islam is a "passionate religion" and sometimes Muslims can't "think clearly and . . . take certain views that are selfish . . . . They interpret it the way they want to interpret certain things for their own self interests." After perfunctory questioning, wherein the member stated that his views of Islam would not impact his impartiality, defense counsel promptly moved to a different topic, and did not raise a causal challenge or use their lone peremptory challenge to strike this member from the panel.

expected, counsel are gratuitously exposed to claims of ineffective assistance of counsel.  Confidence in the outcome of the trial on guilt or on sentencing may also diminish, as might confidence that the outcome will be upheld on appeal.  This is neither good for the accused, counsel, the victims of an offense, the military, or the public credibility of the military justice system.

As is often said, death is different.  It is different in kind.  It is different in finality.  Death is also different because the standard for ineffective assistance of counsel is hardest to find and pinpoint.  When we apply the Strickland standard to determine what "prevailing professional norms" are in the military, do we look to the professional norms of counsel writ large?  Or capital defense counsel specifically?  Do we draw our standard for professional norms from military defense counsel?  Or civilian?  Given the lack of specific "prevailing professional norms," we are left to evaluate counsels' performance on the basis of this Court's at best intermittent case law on the subject, and Supreme Court case law, which is directed towards state law and habeas review.  This strikes me as unfair to the accused, unfair to defense counsel, and potentially unfair to the victims and their families who are left in doubt about the ultimate outcome of a case until all appeals are final.

II.  Trial Defense Counsel Were Ineffective in the Penalty
     Phase of Appellant's Court-Martial

"[I]ndulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," in my view, trial defense counsels' performance during the penalty phase of Appellant's court-martial was not "reasonable[] under prevailing professional norms."  Strickland, 466 U.S. at 688-89.  As discussed further below, Appellant has identified two "acts or omissions of counsel" that were not "the result of reasonable professional judgment."  Id. at 690. First, defense counsel submitted into evidence the entirety of Appellant's diary, including particularly damaging passages relaying Appellant's hatred of Caucasians and the United States, without redactions or sufficient contextualization.  Second, defense counsel were deficient in the witness presentation at the penalty phase of Appellant's court-martial by omitting any testimony that would humanize Appellant and demonstrate that his life has worth.

Counsel are ordinarily afforded great deference when making reasonable tactical decisions.  Nevertheless, I conclude, as this Court concluded in Murphy, that although "[w]e have no quarrel . . . regarding the obligation of an appellate court not to second-guess tactical judgments[, h]ere, . . . counsels' lack of training and experience contributed to questionable tactical

23

judgments, leading us to the ultimate conclusion that there are no tactical decisions to second-guess." Murphy, 50 M.J. at 13.

### A. Appellant's Diary

#### a. Admission of Appellant's Entire Diary

During the mitigation phase of Appellant's court-martial, defense counsel submitted into evidence the entirety of Appellant's personal diary, dating from March 1990 to March 2003. The diary consists of 313 handwritten pages. The diary was given to the members to take home to read without explanation and with three lines of general instruction from the military judge. Along with the diary, members also received notes by defense counsels' mitigation specialist, Ms. Deborah Grey, summarizing the diary for defense counsels' case preparation, and an FBI analysis of the diary.

In their post-appeal affidavit, counsel give two reasons supporting their decision to submit the diary in its entirety: first, their belief that "[t]he government had, in its merits case, already admitted the most damaging aspects of [Sergeant] SGT Akbar's diary," so no more harm could be done; and, second, that defense expert Dr. Woods believed that "SGT Akbar's diary documented a progressive deterioration into a psychotic state," and the diary "read in total proved SGT Akbar had mental illness."

24

Under Strickland, appellate courts are obliged to give heavy deference to counsel's professional judgment because "Strickland insulates [tactical decisions] from Monday-morning quarterbacking." Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014) cert. denied sub nom. Hittson v. Chatman, 135 S.Ct. 2126 (2015). Nevertheless, "[w]hile the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it." Couch v. Booker, 632 F.3d 241, 246 (6th Cir. 2011). Here, counsel did not reasonably investigate the basis of their decisions, and in the context of this case, introducing a 313-page diary without further investigation cannot be viewed as a reasonable tactical decision.

A review of the diary illustrates why expert consultation was necessary to fully and properly gauge the impact the diary would have on the panel. It also illustrates why counsels' reasoning that the most damaging aspects of the diary had already been admitted is unreasonable. The Government admitted two diary entries, totaling less than three pages, as Prosecution Exhibit 176a. The most damaging portion of the first entry, from February 2, 2003, states:

> I may not have killed any Muslims but being in the
> Army is the same thing. I may have to make a choice
> very soon about who to kill. If we go to war with

> Iraq, . . . I will have to decide if I should kill my
> Muslim brothers fighting for Saddam Hussein or my
> battle buddies.

The second entry, from February 4, 2003, contains the

following remarks:

> as soon as I am in Iraq I am going to try to kill as
> many of them as possible.  If I am wrong then may
> Allah, The Great, stop me.  I will not be able to live
> with myself if I go there and help these sick people
> kill Muslims.

Although these excerpts are damaging to Appellant's case, they

are limited temporally, and in subject matter.  The entirety of

the diary contains many more damaging passages.

For example, the diary is rife with references to

Appellant's hatred of Caucasians, extending back over a decade

prior to the attack.  In an entry from July 19, 1991, Appellant

references "what the Nation of Islam taught me:  to hate

Caucasians . . . sleep is lost thinking about the destruction of

Caucasians and how to carry it out."  It is troubling that the

diary also includes passages that could be interpreted to

portend the crimes he committed, including an April 9, 1992,

entry where Appellant writes:  "I made a promise that if I was

not able to achieve success because of some caucasion [sic] I

would kill as many of them as possible. . . . if I am denied

anything given to me by almighty God, Allah, I will kill as many

cacasions [sic] as possible."  In another entry, from March 3,

1996, Appellant writes:

> Destroying America was my plan as a child, jovenile [sic] and freshman in college. Some where [sic] along the way it got side tracked [sic] by all of the academic problems that came my way. My life will not be complete if America is not destroyed. It is my biggest goal.

Appellant writes in his final diary entry, dated March 1, 2003, approximately three weeks before the attack, "May Allah, the Often Forgiving, forgive me for what I am about to do."

The diary also contains passages where Appellant disparages the military, and self-identifies as "anti-government," including a passage from January 17, 2000, where he writes: "[b]eing in the military . . . is horrible to me. It is as if all of my beliefs mean nothing to me. . . . My feeling is that it is a betrayal of everything that a Muslim is supposed to stand for." Appellant also references, on multiple occasions, his intent to make "jihad." He writes in an October 2, 1999, entry: "As far as being in the Army perhaps it will be useful if there is jihad in my future."

Appellant's diary also related an incident where Appellant had a dispute with a sergeant:

> I went to Grandpa's Pawn Shop and bought three weapons and enough ammo to reload each of them five times. I came to work that Tuesday, we had Monday off, with all three weapons fully loaded. I had decided to just attack [the sergeant] as soon as I saw him. But he was at sick call. Right after PT formation the 1st Sgt. called me into his office. First he told me that the people at Grandpa's called CID and said they were worried that I might be a terrorist.

27

None of these entries were introduced by the Government. Moreover, these passages all preceded the February 2003 entries the Government submitted into evidence.

The admission of these entries is significant for at least four reasons.  First, far from showing progressive mental deterioration, the passages show a consistent thread of anti-Caucasian, anti-American, violent tendencies that extend from Appellant's young adulthood to the time of the attack.  The passages in the diary indicate that Appellant harbored antipathy towards the United States and the armed forces for years, and may have been planning an attack well in advance of March 23, 2003.  Specifically, with no medical context in which to place the final diary entry, it is hard to read this passage as anything other than evidence of premeditation from a depraved man who will kill and kill again if not stopped.[20]  Second, they

---

[20] I disagree with the majority opinion's contention that premeditation was not at issue in the sentencing phase of Appellant's court-martial as it was already proved beyond a reasonable doubt in the merits phase, Akbar, __ M.J. at __ (53). In arriving at a sentence, the members were instructed that they may "consider any matter in extenuation and mitigation" and "may also consider mercy, sympathy, and sentiment in deciding . . . what sentence to impose."  Surely, a panel member would be less inclined to feel mercy or sympathy towards Appellant if he or she believed he had premeditated the attack over the span of months or even years, rather than in the days or hours leading up to the attack he ultimately carried out.  In addition, evidence of lengthy premeditation would undercut defense counsels' theory that the attack was the result of the onset of

tend to support the view that Appellant's attack was not an anomaly, but the manifestation of years of hatred directed at Caucasians, the military, and, in one instance, a fellow sergeant.  Third, quite simply, these passages quell any possible sympathy the members might have garnered for Appellant based on his life story.  Fourth, submitting the entire diary into evidence gave the Government additional fodder to bolster its case, which trial counsel fully exploited in closing arguments.

All of these points are illustrated with reference to the Government's closing arguments.  The Government used specific passages from the diary, on multiple occasions, to argue that Appellant deserved the death penalty.  The Government argued that Appellant should be sentenced to death "to protect society from his violence and his hatred," a short time later showing the panel slides with five passages from Appellant's diary. Trial counsel later argued:

> The defense introduced [Appellant's] complete diary,
> several hundred pages filled with repeated threats of
> violence and murder.  When did the thoughts of
> violence and murder emerge?  Is it only in the last
> four entries?  Is it after the Army is being prepared
> to be sent into harm's way?  Was it even after 9/11?
> No, it's not.  These are Sergeant Akbar's own words,

---

mental illness.  Consequently, the degree of premeditation Appellant exhibited is of consequence in the sentencing phase of trial, even though this element of the crime was already proved in the merits phase.

> dated years before he even joined the Army, back
> before there was any mention of soldier talk. . . .
> Look back in his diary, look back at critical dates.

Trial counsel repeated quotations from Appellant's diary, remarking, "Look at his diary.  It is full of rage, it is full of hate, and it was all there before he was ever notified he was deploying."  What defense counsel introduced as mitigation evidence was successfully converted to powerful aggravating evidence by the Government.  For these reasons, defense counsels' judgment that the entirety of Appellant's diary was less damaging to Appellant's mitigation case than the two entries Government trial counsel admitted is unreasonable.  It does not account for the impact of a consistent and enduring theme of hatred towards Caucasians, and, later, towards the United States armed forces.  Nor was it tactically reasonable to admit the diary without explanation.  This allowed members to set the context themselves, or have the Government do so in closing arguments.  A reasonable investigation into the wisdom of submitting the entire diary might well have averted this problem.

> b.  Absence of Prior Investigation and Consultation Regarding the Diary

As noted above, in their post-trial affidavits, defense counsel defend their decision to submit the diary to the members

without medical explanation on two related grounds. First, they argue that Dr. Woods's assessment of the diary was that it "documented a progressive deterioration into psychotic state," which supported their decision to offer the complete diary into evidence. Second, counsel argue that the summary created by their mitigation specialist, Ms. Deborah Grey, and the FBI's analysis of the diary otherwise placed the diary in the intended medical context.

There are a number of problems with this explanation that undercut the decision to admit the diary. The underlying issue is that defense counsels' decision was not supported by a reasonable investigation because they failed to seek advice before submitting the diary into evidence. First, while defense counsel invoke Dr. Woods's expertise in support of offering the diary into evidence, in actuality they did not consult with Dr. Woods before doing so. Dr. Woods states in his post-trial declaration that "[w]hile the diary is powerful evidence of schizophrenia, it is only so when viewed . . . by a trained practitioner." According to Dr. Woods, it "was a mistake" to admit the diary into evidence and he "never advised or would have advised trial defense counsel to admit the diary as they did" because, "[t]o a lay person the diary is damning evidence, standing alone, . . . and the nature of [Appellant]'s diary contained explosive material." Ms. Grey similarly opined that

submitting into evidence "the diary itself without any context would be a horrible mistake from the standpoint of mitigation strategy. . . . the diary, without context, is potentially far more damaging than mitigating." She stated that she "would have never advised introduction of . . . [Appellant's] diary without providing context through testimony."[21]

Second, defense counsel did not consult any experts to determine whether Ms. Grey's notes or the FBI analysis sufficiently contextualized Appellant's diary. Upon my review, these documents do not adequately explain these damning passages. Ms. Grey stated in a post-trial affidavit that the notes she created summarizing the diary's contents were intended for counsels' pretrial preparations. She cautioned that these summaries "are helpful in preparing for trial, but they are not a device intended to introduce evidence," repeating that these notes "were not prepared for trial." She also believed that although interview summaries might be used "[i]f for some reason a vital witness is inappropriate or unavailable to testify," she

---

[21] Trial defense counsel stated in their post-trial affidavit that they recalled speaking with Ms. Grey regarding admission of documentary evidence she authored "in lieu of her live testimony" and that she did not have "any strong opinions regarding 'the wisdom of this tactic.'" Defense counsel do not mention informing or consulting Ms. Grey on their decision to admit Appellant's entire diary into evidence without supporting testimony. As evidenced by the post-trial affidavits, both Dr. Woods and Ms. Grey would have opposed submission of Appellant's entire diary.

"cannot think of an instance where [she] would recommend the introduction of an interview summary in isolation to a jury." She stated that "presenting [her] summary of the diary . . . would be a horrible mistake."[22]  Ms. Therese Scarlet Nerad, another mitigation specialist employed by defense counsel, echoed this sentiment, opining post-trial that Ms. Grey's notes were "incomplete work product[s]" and "should never have been admitted in that form" as it "would do serious disservice to a jury."

Ms. Grey's work product is not a polished, concise explanation of the implications of Appellant's diary.  Rather, it consists of a factual summary of Appellant's diary -- not an analysis.  In some portions, it is apparent that these notes are in draft form.  To illustrate, at one point, Ms. Grey writes in response to a passage, "Again, lack of problem solving . . . ? grandiosity?"  In some instances, Ms. Grey's notes, rather than relating how Appellant's more hateful passages support a

---

[22] As noted, although defense counsel state in their post-trial affidavit that Ms. Grey did not have "any strong opinions" regarding admitting documentary evidence, it is not clear that they consulted her specifically about presenting her interview notes with the purpose of contextualizing Appellant's entire diary.  As it appears from Ms. Grey's uncontradicted statement that she was unaware defense counsel intended to submit the diary, she could not have realized that defense counsel intended to use her notes for this purpose.  Her post-trial affidavit clarifies that she would not have endorsed use of her notes under these circumstances.

narrative of mental illness, merely draws attention to these passages. For example, the diary contains references to Appellant's indoctrination in the tenets of the Nation of Islam, which defense counsel allegedly did not wish to introduce to the members. Ms. Grey's notation next to one such passage reads: "Hatred of Caucasians -- stemming from exposure to Nation of Islam," with nothing more. Her notes point out in other places, "Childhood goal of destroying America," and "Kill as many Caucasians as possible if they block his success in helping his people: prays Allah will stop him if he is wrong." In short, her notes do not communicate that the diary is indicative of long-standing mental illness.

The FBI analysis, similarly, fails to relate back to defense counsels' mitigation case theme: that Appellant was mentally ill. The report does not, for example, explain that Appellant's feelings are symptomatic of mental illness. Nor does it otherwise contextualize the damaging, anti-American, prejudicial passages in the diary. For example, the summary condenses the passages where Appellant's entries exhibit "anger and . . . increasingly verbalize[] a desire to kill some of his comrades," without further analysis. Although the report's concluding paragraphs do state that Appellant's "diary reflects years of a lonely struggle," they also relate that: "[a]lthough no mention is made in his diary of a specific plan to kill his

military 'buddies,' given what has been written, his actions come as no surprise." Significantly, the conclusion ends with this statement: "None of this excuses what Akbar has done. Based on his writings and pleas to Allah, Akbar clearly knew right from wrong. He states, 'I have nothing left to lose. I don't even have any pride left.'" Although the FBI assessment presents a more cohesive analysis of the diary than Ms. Grey's notes, it still does not place damaging diary entries in the larger context of defense counsels' theme of mental illness. Consequently, these notes did not support defense counsels' reasoning for submitting the diary in the first place: to illustrate Appellant's latent and emerging mental illness.

More importantly, submitting these documents along with Appellant's entire diary does not alleviate defense counsels' obligation to first consult with experts before admitting the diary. Defense counsel ought to have sought advice on this issue, not merely inferred that their experts would support their decision.

Defense counsel are not required to consult an expert every time they seek to submit documentary evidence. Such a standard would be absurd. They may generally rely on their own judgment regarding the submission of exhibits. However, Strickland presents a fact- and case-specific test. See Williams v. Taylor, 529 U.S. 362, 391 (2000) (noting that Strickland "of

necessity requires a case-by-case examination of the evidence,"
as each mitigation case is unique (quoting Wright v. West, 505
U.S. 277, 30 (1992)); Rompilla v. Beard, 545 U.S. 374, 394
(2005) (O'Connor, J., concurring) (recognizing the Supreme
Court's "longstanding case-by-case approach to determining
whether an attorney's performance was unconstitutionally
deficient under Strickland v. Washington."). And this is no
ordinary piece of evidence. The diary was used in support of
Appellant's lack of mental responsibility defense -- a matter
that is heavily influenced by the input and advice of experts.
Just as competent defense counsel are expected to consult an
expert before mounting a mental illness defense,[23] so, too,
should they seek expert advice before submitting critical
evidence in support of such a defense.[24] Counsel here were not

---

[23] See, e.g., Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005)
(determining counsel was ineffective for relying on defendant's
own testimony to support "heat of passion or diminished
capacity" defense rather than "investigat[ing], discover[ing],
and present[ing] mental health evidence").

[24] See Duncan v. Ornoski, 528 F.3d 1222, 1235-36 (9th Cir. 2008)
(noting that "[i]t is especially important for counsel to seek
the advice of an expert when he has no knowledge or expertise
about the field" and holding counsel's performance deficient for
failing to consult an expert before trial because counsel "did
not have the personal expertise . . . to make strategic
decisions about how to handle . . . evidence on his own and he
certainly was not qualified to undermine the State's case by
simply cross-examining its experts without obtaining expert
assistance himself."); Bell v. Miller, 500 F.3d 149, 156 (2d

in a position to assume that their experts would support submission of the entire diary based on general "discussions with Dr. Woods," rather than meaningful and direct consultation. In a similar case, the United States District Court for the Eastern District of New York concluded that defense counsel was deficient for submitting into evidence "a complete, unredacted" copy of a medical report detailing a child's account of her sexual abuse by the defendant. Usher v. Ercole, 710 F.Supp. 2d 287, 305-06 (E.D.N.Y. 2010). The court found that even if some of the evidence in the report was admissible, defense counsel was not "justified in placing a complete and unredacted copy of the . . . Report before the jury," calling its contents "highly damaging," and noting that "[t]he extraneous details in [the report] are disturbing and inflammatory." Id. at 306-07. The court found that "[t]hese and other contextual details . . . [describe a] frankly harrowing narrative of chronic abuse, with a suggestion of continuing danger." Id. at 307. On this basis, the district court concluded that defense counsel's decision to

---

Cir. 2007) (concluding that counsel's failure to consult expert before cross-examining sole eyewitness who had suffered from "trauma, blood loss and sedation" was deficient performance under Strickland); Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005) (holding that counsel was deficient for "fail[ing] to consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues.").

present the report fell below the standard of reasonable competence expected of counsel.  Id. at 307-09.

Similar to Usher, here, defense counsels' decision to present the diary to the members, unvarnished and unredacted, was not the result of a reasonable tactical decision.  Not only because defense counsel failed to properly investigate the basis of their decision, but also because the decision itself was unreasonable.

The diary is problematic for two reasons.  First, Appellant's diary was a key component in the defense's theory of Appellant's mental illness.  Second, the diary contained inflammatory entries recounting Appellant's hatred for Caucasians, meaning it was potentially prejudicial to Appellant's case.  Cognizant of these factors, defense counsels' lack of investigation into whether, or how, to present the diary was error.

Accordingly, trial defense counsel were deficient in deciding to submit into evidence Appellant's entire diary without adequate investigation.

### B.   Omitting "Humanizing" Testimony From Appellant's Family and Friends

a.   The Importance of "Humanizing" Testimony

Although not required per se, testimony by lay mitigation witnesses humanizing an accused person is significant.  In the context of a death penalty case involving a heinous offense, it may be invaluable, as well as a defendant's best hope for life.  The Supreme Court, for example, has repeatedly emphasized "the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant's social and familial connections."  See Strickland, 466 U.S. at 718 (Marshall, J., dissenting); see also Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable"); Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) (presentation of a defendant's life history in a capital case is "part of the process of inflicting the penalty of death" (internal quotation marks omitted)).  The Court has noted that a defendant's "troubled history . . . [is] relevant to assessing a defendant's moral culpability."  Porter v. McCollum, 558 U.S. 30, 41 (2009).

The ABA Guidelines also recognize value in such testimony.  Guideline 10.11 states that "it is critically important to construct a persuasive narrative in support of the case for

life, rather than to simply present a catalog of seemingly unrelated mitigating factors." ABA Guideline 10.11, commentary, 31 Hofstra L. Rev. at 1061. To that end, the ABA Guidelines encourage counsel to consider presenting, in the penalty phase of the court-martial, "[w]itnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that . . . would present positive aspects of the client's life, or would otherwise support a sentence less than death," as well as "witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones." Id. at 1055-56. This is so because "[f]amily members and friends can provide vivid first-hand accounts of the poverty and abuse that characterizes the lives of many capital defendants. These witnesses can also humanize the client by allowing the jury to see him in the context of his family, showing that they care about him, and providing examples of his capacity to behave in a caring, positive way, such as attempting to protect other family members from domestic violence or trying to be a good parent and provider." Id. at 1062.

Moreover, under the ABA Guidelines, "[a] capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death." ABA Guidelines, Introduction, 31 Hofstra L. Rev. at

40

927. "This Eighth Amendment right . . . does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those compassionate or mitigating factors stemming from the diverse frailties of humankind." Id. (internal quotation marks omitted) (citation omitted).

> b. The Absence of "Humanizing" Testimony in Appellant's Mitigation Case

Counsel in this case were not oblivious to the value of such humanizing testimony. Multiple mitigation specialists employed by defense counsel emphasized the importance of mounting a detailed social history through lay witnesses in Appellant's mitigation case.[25] Yet counsel did not call any

---

[25] See Grey Declaration (mitigation specialist) ("[T]he best way to present mitigation evidence, the evidence of the client's life history, is through lay witnesses, those individuals who may be family, friends, teachers, and treating professionals."); Nerad Declaration (mitigation specialist) (advising, in the context of a mitigation presentation, that "it is unacceptable to substitute lay witnesses" with expert witnesses, because expert witnesses "should be used only in conjunction with lay witnesses who lay the foundation with their information."); Rogers Declaration (mitigation specialist) ("Understanding and appreciating the relevance of Sergeant Akbar's unusual life and extremely strange upbringing would be nearly impossible without detailed accounts and explanation" from witnesses); Dunn Declaration (experienced capital litigator) ("I instructed counsel that SGT Akbar's story must include both the 'nature' and 'nurture' aspects of his life which . . . provide a means of understanding his actions on the day of the crimes" and that they should present a "multigenerational life history" of Appellant).

41

witnesses that humanized Appellant.  During the mitigation phase
of the court-martial, defense counsel called two servicemembers
as well as one civilian mitigation witness:  Daniel Duncan,
Appellant's high school teacher.[26]  However, counsel did not call
any member of Appellant's family to request that his life be
spared, standing instead on a single familial declaration from
Appellant's brother.

In their joint post-trial affidavits, counsel reasoned that
they did not wish to call Appellant's family members as
witnesses for fear that their testimony could open the door to
the "incident of 30 March 2005" where Appellant "allegedly
stabbed a military policeman in the neck with a pair of 12-inch-
scissors" while in pretrial custody.[27]  Defense counsel explained

---

[26] As explained below, Mr. Duncan's testimony did little to
humanize Appellant, in part because Mr. Duncan had only a vague
recollection of Appellant as a student.  And no other live
witness testified to facts that would humanize Appellant. During
the merits phase of the trial, defense counsel called two
experts, Dr. Woods and Dr. Tuton, as well as Appellant's college
roommate, Paul Tupaz.  As explained further below, see infra,
Part C, this testimony was clinical and dispassionate and did
not humanize Appellant. Certainly, in omitting humanizing
testimony from willing family members, counsel did not "at every
stage of the case . . . take advantage of all appropriate
opportunities to argue why death is not suitable punishment for
their particular client."  ABA Guideline 10.11, 31 Hofstra L.
Rev. at 1058.

[27] Strikingly, given defense counsel's Herculean efforts to keep
out any mention of the "scissor attack" of March 30, 2005,
defense counsel did not challenge any of the panel members who
had stated on voir dire that they were, in some manner, aware
that the attack had occurred.  Out of fifteen panel members, ten

that "[a]lthough the defense motion to preclude the government from referencing the incident during the case was successful, it was a ruling that was made without prejudice for the government to revisit the decision at a later date." Defense counsel stated that after the alleged attack they "re-interviewed each of [their] civilian mitigation witnesses" and chose not to call any of them because of the "inability of the witness[es] to limit their testimony in order to avoid opening the door to the 30 March 2005 incident on rebuttal."[28] (JA 2350).

---

stated during voir dire that they had heard of such an attack either from the local news, or from workplace chatter. Of these ten, three were never asked if they could put this incident out of their minds and decide the case solely based on the evidence. Four panel members stated that they were aware from news reports that a "scuffle" had occurred involving Appellant and a military police officer. Another panel member stated he heard that Appellant had "overpowered" a guard. Yet, despite defense counsel's insistence that this incident never be mentioned during the court-martial, defense counsel did not challenge a single member who had heard of the event, not even the panel member who both expressed a slanted view of Muslims and Islam and had heard of the alleged scissor attack.

[28] I note that it is the majority opinion, not defense counsel, which reasons that family members' testimony on the impact of Appellant's death would have alienated the members. Akbar, __ M.J. at __ (67). Defense counsel did not make this claim in their post-trial affidavits. Indeed, they would not, as up until the night before closing arguments, defense counsel sought to admit the testimony of Appellant's parents as mitigating evidence. Defense counsel did not believe that testimony from family members would be fruitless or counterproductive of its own accord, only because it may open the door to the March 30, 2005 attack.

Certainly, as a general matter, defense counsel have discretion on whether or not to call witnesses to testify. That is not the issue. The real issue is that counsels' reasoning was decided on the basis of insufficient inquiry. "[A] reviewing court must consider the reasonableness of the investigation said to support that strategy." Wiggins v. Smith, 539 U.S. 510, 527 (2003) (citing Strickland, 466 U.S. at 691). Having reviewed counsels' strategy, it is apparent that, similar to the decision to submit Appellant's diary, counsels' decision was not sufficiently supported by an adequate investigation, and therefore is not entitled to deference.

We can infer that counsel valued humanizing testimony because defense counsel intended to call Appellant's family members to testify on his behalf during the mitigation phase of Appellant's court-martial.[29] Defense counsels' witness list for

---

[29] Further proof that counsel valued humanizing testimony can be gleaned from defense counsels' correspondences after the merits phase of the court-martial, where counsel seemed to acknowledge the shortcomings of their mental illness defense. In an e-mail to Dr. Walker, an expert whom defense counsel had retained in preparation for trial, LTC Brookhart requested Dr. Walker's help, explaining that "[o]ur expert in the merits case, Dr. Woods, did ok, but obviously, the panel rejected his theory." We can deduce from this e-mail that, mid-trial, counsel doubted the value of emphasizing the mental illness theme that Dr. Woods had developed through his differential diagnosis in the merits phase of the trial. This should have prompted a renewed focus on presenting humanizing testimony. Government appellate counsel argued in its brief before this Court that calling

44

the sentencing phase of the court-martial included Appellant's

high school classmate, Regina Weatherford; Appellant's brother,

Musa John Akbar; and Appellant's parents, Quran Bilal and John

Akbar.  Indeed, up until the night before closing arguments were

scheduled, MAJ Coombs implied that he would be calling one or

more of these mitigation witnesses.  When the military judge

asked MAJ Coombs:  "just to get a handle on what we might expect

tomorrow; two -- maybe three witnesses, so the defense

sentencing case should close by 1000?," MAJ Coombs responded, "I

would think so, sir.  Yes."  Yet, the next day, defense counsel

called no additional witnesses, and that morning the parties

delivered their closing arguments.[30]  Defense counsels' actions

demonstrate that despite the complication the alleged scissor

attack posed, they nevertheless planned on calling civilian

---

family members as mitigation witnesses was unnecessary because
none would have contributed to defense counsels' mental illness
theme in both the merits and penalty phase of the trial.  This
argument is not supported by defense counsels' post-trial
affidavits, nor is it consistent with their actions at trial,
wherein they appeared ready to call family members as mitigation
witnesses up to the night before closing arguments.
Consequently, this belief that defense counsel eschewed
humanizing testimony  is merely post-hoc argument that should
not factor into an objective analysis of the reasonableness of
defense counsels' strategy at the time of trial.

[30] When questioned, MAJ Coombs informed the military judge that
he had "sound tactical reasons not to" call further witnesses.
Of course, this Court should not defer to counsel's own
assessment that their tactical reasoning was sound; this Court
must undergo this analysis objectively.

mitigation witnesses for almost four weeks following the
incident.

After the alleged attack, counsel had almost a month to,
either, prepare their mitigation witnesses to avoid testimony
that would "open the door" to the attack, or interview
replacement witnesses.  It appears that counsel did neither.
Rather, counsel stayed the course, representing that they would
call Appellant's family as mitigation witnesses until the
eleventh hour, even though defense counsel now claim, post-
trial, that they did not wish to call these witnesses at all
after the alleged scissor attack had occurred.[31]

More importantly, despite anticipating the limitations of
their current mitigation witnesses, defense counsel did not seek
out replacement witnesses.  Upon determining that several

---

[31] Defense counsel did present statements in the mitigation phase
of the court-martial from two potential mitigation witnesses:
Appellant's brother, Musa John Akbar, and Appellant's high
school classmate Regina Weatherford.  These documents were of
limited value in humanizing Appellant.  For example, Ms.
Weatherford's statement, offered into evidence by defense
counsel by way of a question-and-answer form, relates that
Appellant and Ms. Weatherford were "not really" friends but
"acquaintances with a love hate relationship," and implied that
Appellant was sexist, writing, "Hasan had very specific
viewpoints of what a woman should or should not do.  I believe
it was part of his religious beliefs."  Mr. Musa John Akbar's
statement, while more personalized, was also presented in the
form of a standardized question-and-answer sheet, and lacked the
personal value that live witness testimony would have provided.

mitigation witnesses scheduled to testify would prove problematic, the reasonable next step would have been for defense counsel to interview additional potential witnesses beyond Appellant's mother, father, brother, and childhood friend.  There were other family members known to defense counsel who would have been willing to testify on Appellant's behalf:  Appellant's sisters Sultana Bilal, and Mashiyat Akbar; Appellant's aunt, Dyan Rankins; Appellant's cousins, Starr Wilson, Merthine Vines, Catherine Brown, and Jill Brown; Appellant's high school friend, Ruthie Avina; and Appellant's college landlord, Marianne Springer. Yet counsel did not seek out these witnesses to see if they could testify without opening the door to the alleged attack.[32]

---

[32] Three federal circuits have recognized that counsel are not under an obligation to interview every witness who is willing to testify.  See Magee v. United States, 277 F. App'x 598, 602 (7th Cir. 2008) (unpublished) ("When counsel already knows what a potential witness is going to say and makes a strategic decision not to pursue the testimony, counsel's performance is not defective."); Parker v. Woodford, 168 F. App'x 152, 155 (9th Cir. 2006) (unpublished) ("[C]ounsel of course . . . need not interview every possible witness to have performed proficiently. Interviewing witnesses whose testimony is generally known to counsel, for example, may be unnecessary." (citing Strickland, 466 U.S. at 691) (internal quotation marks omitted) (citations omitted)); Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998) ("The Sixth Amendment, however, does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony.") (collecting cases).  Nevertheless, under these circumstances, where counsel were specifically concerned about their ability to control a witness on the stand, defense

Counsel were reasonably expected to further investigate following the alleged attack, yet did not. See Williams, 529 U.S. at 396 (finding that counsel's omissions "clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." (citing 1 ABA Standards for Criminal Justice 4–4.1, commentary, p. 4-55 (2d ed. 1980))). According to the ABA Guidelines, even when tailoring a mitigation case to avoid bringing in otherwise inadmissible aggravating evidence, "[c]ounsel should pursue all appropriate means . . . to ensure that the defense case concerning penalty is constricted as little as possible by this consideration." ABA Guideline 10.11, 31 Hofstra L. Rev. at 1056-57. This was not a case where counsel believed that interviewing additional witnesses would be fruitless, Wiggins, 539 U.S. at 525, "that character and psychological evidence would be of little help," Strickland, 466 U.S. at 699, or that all the witnesses they had investigated were more harmful than helpful to Appellant's case, Burger v. Kemp, 483 U.S. 776, 794-95 (1987).[33] Counsel simply did not

---

counsels' failure to interview additional witnesses beyond their original witness list was unreasonable.

[33] It does not appear from the post-trial affidavits that counsel concluded that no further investigation into additional humanizing witnesses was necessary following the alleged attack. See Strickland, 466 U.S. at 690.

interview any other family members or close friends to determine whether they could replace the mitigation witnesses.

Based on counsels' lack of investigation, their omission of humanizing testimony was not a "virtually unchallengeable" decision made "after thorough investigation of law and facts relevant to plausible options." See Strickland, 466 U.S. at 690; Knowles v. Mirzayance, 556 U.S. 111, 126 (2009). Rather, as the Wiggins Court noted, "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." Wiggins, 539 U.S. at 526. Such a decision was unreasonable, even if "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made." Rompilla, 545 U.S. at 381 (citing Strickland, 466 U.S. at 689).

Defense counsels' incomplete investigation into whether humanizing witnesses could testify without opening the door to aggravating evidence distinguishes the instant case from past Supreme Court cases with seemingly similar factual predicates.

In Bell v. Cone, 535 U.S. 685, 700 (2002), the Supreme Court did not hold defense counsel deficient where counsel neglected to "call[] other witnesses from [the defendant's] childhood or days in the Army" out of "fear[] that the

49

prosecution might elicit information about respondent's criminal history." Id. Nevertheless, that case is distinguishable because the defendant in Bell did not allege that counsel had conducted an incomplete investigation into the viability of calling other mitigation witnesses, as Appellant does here.[34] Id. Similarly, in Burger, 483 U.S. at 792-94, the Supreme Court concluded that defense counsel's decision not to call the defendant's mother to testify was reasonable because counsel reasonably believed her testimony might raise "matters of historical fact that would have harmed his client's chances for a life sentence." Id. at 792. Like Bell, Burger is inapposite becausethe defendant did not claim that defense counsel had failed to interview additional witnesses.. Id.[35]

---

[34] In fact, defense counsel had called the accused's mother to testify in the merits portion of the case, but did not recall her during the sentencing case only because she "had not made a good witness at the guilt stage and should not be subjected to further cross-examination." Bell, 535 U.S. at 687. Defense counsel in Bell was not alleged to have made this tactical decision without a sufficient investigation.

[35] In Burger the accused claimed, without success, that defense counsel had failed to conduct a sufficient investigation into Appellant's background by neglecting to interview all available witnesses. Nevertheless, the basis for this claim is distinguishable from Appellant's because in Burger the Court found that defense counsel "did interview all potential witnesses who had been called to his attention," Burger, 483 U.S. at 794-95, whereas in the instant case, counsel did not re-interview the mitigation witnesses known to them and could provide no reasonable justification for this omission.

Wong v. Belmontes, 558 U.S. 15 (2009), is distinguishable on separate grounds. In that case, similar to the case at hand, defense counsel "built his mitigation strategy around the overriding need to exclude" evidence that the accused had committed a prior bad act, "tailor[ing] his mitigation case carefully to . . . exclud[e]" the prejudicial evidence. Id. at 18-19. Yet, ultimately, the Supreme Court did not sanction this strategy, instead resolving the case on Strickland's prejudice prong alone. Id. at 19. Significantly, the Supreme Court did not repudiate the circuit court's conclusion that counsel's "performance was constitutionally deficient," even though defense counsel had mounted a lengthy mitigation case over the span of two days, "put[ting] on nine witnesses he thought could advance a case for mitigation," and presenting detailed personal stories about the defendant's character and life history. Id. Wong, therefore, is not an endorsement of counsel's averred strategy in this case of excluding mitigation witnesses to avoid mention of the March 30, 2005, attack.

Ultimately, counsel missed the forest for the trees. Out of concern that they not open the door to inquiry regarding Appellant's assault of a guard with a pair of scissors, they chose not to offer what may have been Appellant's best opportunity to avoid a sentence of death. How could a single member of the panel be expected to argue for mercy if

Appellant's own family was seemingly not prepared to do so? Moreover, to the extent the goal was to avoid opening the door to the scissor incident, and thus Appellant's violent nature and propensity to commit acts of future violence, Appellant's diary already arguably opened, closed, and sealed that door.

In summary, counsel were aware of the scissor attack for weeks, and intended to present mitigating witnesses to testify. Under such circumstances, proficient counsel would have undergone additional investigation instead of staying the course in light of changed circumstances.  Consequently, counsels' strategy is not entitled to deference because it was based on an incomplete investigation that was unreasonable under the circumstances.  Given that defense counsel did not interview other witnesses, counsels' choice to present no witnesses to humanize Appellant was not sound strategy.  In the end, it is hard not to ask the question:  If Appellant's own family is not prepared to argue for his life, why should an individual member?

> C. <u>Prejudice -- Is There a Reasonable Probability That At Least One Juror Would Have Struck a Different Balance?</u>

The second prong of <u>Strickland</u> addresses prejudice.  466 U.S. at 692-96.  Under this prong, Appellant is not required to show "'that counsel's deficient conduct more likely than not

altered the outcome' of his penalty proceeding, but rather . . . establish 'a probability sufficient to undermine confidence in [that] outcome.'" Porter, 558 U.S. at 44 (citing Strickland, 466 U.S. at 693-94); see also Rompilla, 545 U.S. at 393. When looking at deficient performance during capital sentencing, courts specifically examine whether "there is a reasonable probability that at least one juror would have struck a different balance" in sentencing. Wiggins, 539 U.S. at 537. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695. "[W]e reweigh the evidence in aggravation against the totality of available mitigating evidence." Loving v. United States (Loving III), 68 M.J. 1, 7 (C.A.A.F. 2009) (quoting Wiggins, 539 U.S. at 534).

   To be sure, counsel did present some mitigating evidence. But solely mounting a mitigation case is not enough. As the Supreme Court noted in Sears v. Upton, 561 U.S. 945 (2010), "[W]e also have found deficiency and prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." Id. at 954-55 (citing Williams, 529 U.S. at 398 (remorse and cooperation with police), Rompilla, 545 U.S. at 378 (residual doubt), Porter, 558 U.S. at 32 (intoxication)).

53

Contrary to the majority's declaration that "if there ever was a case where a military court-martial panel would impose the death penalty, this was it," Akbar, __ M.J. at __ (6), a death sentence was not a foregone conclusion in this case. Indeed, both the Supreme Court and this Court have found prejudice in death penalty cases even when the crimes have been abhorrent. See Rompilla, 545 U.S. at 377-80 (concluding there was prejudice notwithstanding evidence that defendant had repeatedly stabbed the victim and set him on fire); Wiggins, 539 U.S. at 514-19 (concluding there was prejudice despite the fact that the accused drowned a septuagenarian); Murphy, 50 M.J. at 12 (concluding there was prejudice even though the case involved "a gory and inexplicable family homicide" where the accused's "first wife had been killed by repeated blows to the head by . . . a hammer, and then drowned in her bathtub" and her two young children "had been violently killed"). The question presented is not whether Appellant is guilty, but whether he had fair opportunity, with the effective representation of counsel, to argue for life.

Here, when viewing the totality of the mitigating evidence and weighing the mitigating and aggravating factors, there is a reasonable probability that "at least one [member] would have struck a different balance." Loving III, 68 M.J. at 7 (citing Wiggins, 539 U.S. at 537). First, the errors in question were

harmful to Appellant's case.  Second, the mitigating evidence the defense introduced did not otherwise compensate for the introduction of the diary and absence of familial support. Third, and most importantly, the members requested an instruction on reconsideration, indicating that the sentence outcome was not inevitable or certain.

Admission of the diary in its entirety was harmful to Appellant's case.  As previously noted, there were damaging passages spanning from Appellant's early twenties to the weeks before the attack, a decade later, which defense counsel introduced into evidence.  First, the diary undercut defense counsels' theory that the attack was due to Appellant's mental illness.  These passages portrayed Appellant as hateful and resentful of Caucasians and the U.S. government.  They demonstrated that this hatred was enduring.  This does not suggest a recent worsening of an existing mental illness that drove Appellant to attack his fellow soldiers.  Second, the diary undercut the argument that the attack was not premeditated.  As the FBI report states, when reading the diary, Appellant's "actions [came] as no surprise."  Third, the diary sapped any sympathy the members may have had for Appellant.

Similarly, the absence of live lay witnesses to humanize Appellant was prejudicial.  As noted, Supreme Court case law and the ABA Guidelines recognize the value of presenting humanizing

witness testimony.  See Penry, 492 U.S. at 319; Eddings, 455
U.S. at 112; Porter, 558 U.S. at 41; ABA Guideline 10.11, 31
Hofstra L. Rev. at 1061.  Such testimony was completely absent
in this case.  The panel was left with the impression that no
one could be bothered to come into court and testify on
Appellant's behalf, and that no one would be affected by his
death, even his family.

Second, the witnesses that defense counsel did call to
testify were unhelpful, and even harmful, to Appellant's
mitigation case.  The only witnesses who testified in support of
Appellant's mitigation case were either dispassionate expert
witnesses, servicemembers who demonstrated aversion for
Appellant, or civilian lay witnesses who were ambivalent about
Appellant.[36]

During the merits phase of the court-martial, defense
counsel called three witnesses in support of Appellant's merits
and mitigation case.  Dr. Woods and Dr. Tuton testified in
support of the mental illness defense.  These witnesses did not
know Appellant personally.  Their testimony was intended to
support a mental health diagnosis and was, as a result, clinical
and impersonal.  Dr. Woods testified from a clinician's

---

[36] The six witnesses comprise the total number of witnesses
called in support of Appellant's mitigation case in both the
merits and mitigation phases of the trial.

perspective, providing a dispassionate differential diagnosis based on his post-arrest evaluation of Appellant, and therefore did little to humanize Appellant, other than point out that he likely suffers from a mental illness. Dr. Tuton had limited experience with Appellant, having conducted a mental evaluation of him when he was a teenager after speaking with Appellant for only four hours. Such testimony is no substitute for the live testimony of lay witnesses who had, at one point, a strong affinity for Appellant.

Defense counsel also called a civilian lay witness, Mr. Paul Tupaz, Appellant's former roommate, to testify. Mr. Tupaz's testimony, similar to that of the two experts, focused on symptoms of mental illness, such as Appellant's habit of pacing, his short temper, and his habit of keeping lists. This testimony did not speak to any personal positive attributes of Appellant's character, only to manifestations of a potential mental ailment.

During the mitigation phase of the trial, defense counsel called two servicemembers who had served with Appellant to testify regarding behaviors Appellant exhibited that were consistent with the theme of mental illness introduced in the merits stage of the court-martial.[37] Yet the behaviors described

---

[37] The testimony of all three witnesses during Appellant's mitigation case lasted less than one hour total.

by these witnesses did not further establish that Appellant was psychologically ill -- only that he was irresponsible and a "subpar" noncommissioned officer (NCO).  For example, Captain Storch testified that Appellant had "deficiencies as a team leader," often "exhibiting poor decision-making skills."  He testified that Appellant never improved as a platoon leader.  He related an incident where Sergeant Akbar was put in charge of cleaning up a company bunker and, after doing so, dumped all the trash, including "unused M.R.E. heaters, some air conditioning units . . . hazardous material[s]" into a creek, where it was eventually discovered.  In addition, Sergeant Kumm testified that Appellant was a "below average" NCO and that "[i]t had been an ongoing issue that [Appellant] was not coming up to par."  The testimony presented did not support a cohesive and compelling case for Appellant's mental illness.  This testimony illustrated that Appellant was disagreeable, and had squandered his potential.

The third witness defense counsel called during the mitigation phase was similarly unhelpful.  Daniel Duncan, Appellant's high school teacher, testified that Appellant "was an excellent student" who "ha[d] an aptitude and showed an interest" in learning.  Yet he also testified that he did not have many interactions with Appellant personally.  Mr. Duncan's unfamiliarity with Appellant and endorsement of his "aptitude"

58

are no replacement for humanizing testimony from Appellant's family and close friends on Appellant's character or worth as a person.

Appellant's mitigation case is insubstantial in contrast with the mitigation presentation in Loving III, where this Court found no prejudice. 68 M.J. at 2. In Loving III, this Court considered the fact that:

> [d]uring the sentencing phase, defense counsel presented the testimony of a number of witnesses to address Loving's family and social background. These included: Joe Loving Sr., Loving's father; Lucille Williams, Loving's mother; Ronald Loving, Loving's brother; Wendolyn Black, Loving's sister; Lord Johnson, Loving's childhood boxing coach; and Detective Verna of the Rochester police department. Stipulated testimony was submitted from Harry Loving, Loving's brother, and Kenneth Wilson, Loving's childhood teacher.

Id. at 9-10. Appellant's case is lacking even when compared to United States v. Curtis (Curtis III), 46 M.J. 129, 130 (C.A.A.F. 1997), where this Court did hold that the defendant was prejudiced by counsel's deficient performance. This Court concluded that "there is a reasonable probability that there would have been a different result if all available mitigating evidence had been exploited by the defense," 46 M.J. at 130, despite the fact that defense counsel made an "effort to present a picture of appellant not only through his mother's own words but also through the words of over 27 individuals who knew appellant from his community in Wichita," comprising forty pages

59

of the court-martial transcript. United States v. Curtis
(Curtis II), 44 M.J. at 123, on reconsideration, 46 M.J. 129
(C.A.A.F. 1997). In contrast to both Loving and Curtis, in the
instant case not only were there far fewer character witnesses,
but some of these witnesses painted an unflattering portrait of
Appellant. It is therefore unconvincing that defense counsel
presented some mitigating evidence. In weighing the aggravating
and mitigating evidence, it is clear that Appellant was
prejudiced by defense counsels' decisions.

Consequently, even considering the aggravating evidence, I
disagree with the majority opinion's contention that testimony
on the impact of Appellant's death on family members would have
made no difference. Akbar, __ M.J. at __ (65-67). In my view,
some of the mitigating evidence that defense counsel presented
was arguably unhelpful, and even harmful to Appellant's
mitigation case.

The third and critical piece to the prejudice analysis is
that at least one member waivered in their decision, as
evidenced by the members' request for an opportunity to
reconsider the sentence they had initially reached. This
indicates that the members' views were not fixed and could have
been swayed by an effective mitigation presentation.

The members deliberated for six hours before indicating to
the military judge that reconsideration had been proposed.

60

During deliberations, any member may propose a sentence, and the members vote on a sentence by secret written ballot, starting with the least to the most severe, "until a sentence is adopted by the concurrence of the number of members required."  See R.C.M. 1006(c), (d)(2), R.C.M. 1009.[38]  If a consensus is reached on a proposed sentence, the members may not vote again unless they do so under the reconsideration procedures established under R.C.M. 1009.  See R.C.M. 1006(c), (d)(2), R.C.M. 1009.  Any member may propose reconsideration, but the members may only reconsider a sentence if a threshold number of members agree to do so.  R.C.M. 1009.  The military judge instructed the members on reconsideration after they had indicated that reconsideration had been proposed.

It is not apparent in the record what sentence the members had initially reached, namely, whether it was a death sentence, or life without parole.  Indeed, the military judge instructed the members not to disclose whether the announced sentence was identical to the original vote, or had changed upon

---

[38] The members are required to first vote on whether the prosecution has proved an aggravating factor beyond a reasonable doubt.  R.C.M. 1004(b)(4)(A).  The members must then "concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances" before they may vote on a sentence.  R.C.M. 100(b)(4)(C).

reconsideration. This detail is immaterial.[39] The request for an instruction on reconsideration itself demonstrates waiver, doubt, and room for persuasion. As this Court noted in United States v. Wilson:

> [w]ithout enumerating [reasons for recasting a ballot], we may state generally that they relate to the desirability of having the theories for both the prosecution and defense weighed and debated thoroughly before final judgment, for it cannot be disputed that justice is more likely to be administered if full and free discussions are not automatically cut off just because a vote has been recorded.

18 M.J. 204, 207 (C.M.A. 1984). There is a reasonable probability that in weighing and debating thoroughly the evidence presented, at least one member was swayed to vote for death by the hate-filled passages in Appellant's diary. Conversely, there is a reasonable probability that at least one member would have voted for life after hearing humanizing testimony from Appellant's family. The prejudice prong requires only a "reasonable probability that at least one juror would have struck a different

---

[39] Based on the trial record, it is possible that, either, the members reached a sentence of life without parole and reconsidered with a view to increasing the sentence, or voted for death and adhered to this position on a second vote. Had the members voted on the death sentence, at least one person would need to vote for reconsideration in order to compel a second vote. This is nevertheless significant because even if one person had misgivings about a death sentence, that individual could have been persuaded by an effective mitigation case and could have precluded a sentence of death by voting for life imprisonment.

balance." Wiggins, 539 U.S. at 537. This reconsideration request supports a reasonable probability that at least one of the members would have voted for life. This, in my view, undermines confidence in the result which, in turn, establishes prejudice. See id. at 526-27.

Accordingly, because I would conclude that counsel was deficient and that Appellant was prejudiced by such deficient representation in the mitigation presentation, I would reverse Appellant's sentence on the basis that he received ineffective assistance of counsel.

## CONCLUSION

There is no doubt that Appellant is guilty of the offenses for which he was charged and convicted. The verdict is just. As previously stated, the question presented is whether Appellant had a fair opportunity with effective representation to argue for life. In my view, he did not.

Capital defense counsel in the military are at a disadvantage. They are expected to perform effectively in surely the most challenging and long-lasting litigation they will face in their legal careers, without the benefit of the exposure, training, guidelines, or experience in capital litigation that is available to federal civilian lawyers. We do military lawyers, and accused servicemembers, a disservice by putting them in this position.

63

Without the benefit of guidelines or expertise, counsel made two tactical decisions that fell below the professional norms expected of competent counsel.  First, and critically, counsel introduced Appellant's vitriolic and expansive diary without appropriate contextualization, and did so without adequate prior investigation to support this decision.  Such investigation would have emphatically demonstrated a need to place the diary in medical context, particularly where it was used in support of the defense's theme of mental illness.  Without such context, the diary demonstrated that Appellant remained a threat to society and the soldiers around him.

Second, counsel failed to introduce a single witness in court to humanize Appellant and to argue for life.  This was done not because counsel thought such testimony was meritless, but to avoid opening the door to rebuttal testimony regarding Appellant's alleged attack on a guard.  Yet counsel reached this decision without first interviewing known family members to see if they could testify on Appellant's behalf without opening the door to this aggravating evidence.  Defense counsels' decision, therefore, was not supported by reasonable investigation under the circumstances.  Moreover, this water was already under the bridge.  Appellant was identified as a violent offender based on overwhelming evidence of guilt.  And, as the diary seemed to indicate, Appellant would offend again.  Under such conditions

it was not a reasonable tactical decision not to call at least one family member or friend to sincerely argue for life.

Finally, weighing the aggravating and mitigating factors, and considering that the members requested an instruction on reconsidering sentences, there is a reasonable probability that at least one juror may have been influenced by an effective presentation of mitigation evidence.

Accordingly, I respectfully dissent and conclude that Appellant did not receive effective assistance of counsel. I would reverse Appellant's sentence, and remand the case for a new hearing on Appellant's sentence.